1  Leonard M. Shulman – State Bar No. 126349
   Ryan D. O'Dea – Bar No. 273478
2  **SHULMAN HODGES & BASTIAN LLP**
   100 Spectrum Center Drive, Suite 600
3  Irvine, California 92618
   Telephone:      (949) 340-3400
4  Facsimile:      (949) 340-3000
   Email:      lshulman@shbllp.com; rodea@shbllp.com
5
   Attorneys for OC Media Tower, L.P.
6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

10

11 | In re | Case No.  8:15-bk-15311-MW
12 | **FREEDOM COMMUNICATIONS, INC. a Delaware corporation, et al.,** | Chapter 11
13 |  | Adv. Case No.
   |           Debtors and debtors-in-Possession. |
14 |  | **COMPLAINT TO DETERMINE THE**
15 | _____ | **VALIDITY, EXTENT, AND PRIORITY OF PLAINTIFF'S LIEN**
16 | **OC MEDIA TOWER, L.P. a California limited partnership,** |
17 |           Plaintiff, |
18 |
19 | **vs.** |
20 | **FREEDOM COMMUNICATIONS, INC. a Delaware corporation; and FREEDOM** |
21 | **SPV II, Inc., a Delaware limited liability company,** |
22 |
   |           Defendants. |
23
24

25        OC Media Tower, L.P. a California limited partnership ("Plaintiff") brings this complaint

26 against Freedom Communications, Inc., a Delaware corporation and Freedom SPV II, Inc., a

27 Delaware corporation (collectively, "Defendants") and alleges as follows:

28 ///

**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

                    1

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

## STATEMENT OF JURISDICTION AND VENUE

1.    This is an action to determine the validity, extent, and priority of Plaintiff's lien on certain real property recently sold in Defendants' jointly-administered bankruptcy.

2.    The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.    This adversary proceeding arises in and relates to the Defendants' bankruptcy case which was filed in the Central District of California, Santa Ana Division on November 1, 2015 (the "Petition Date").

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 which is pending in this District and does not involve a consumer debt less than $5,000.

5.    This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## THE PARTIES

6.    Plaintiff is a California limited partnership with a principal business address of 1103 N. Broadway, Santa Ana California, 92701.

7.    Defendant Freedom Communications, Inc. is a Delaware corporation, doing business in California, with its corporate headquarters located at 625 North Grand Avenue, Santa Ana California, 92701 (the "625 Building").

8.    Defendant Freedom SPV II, Inc. is a Delaware corporation doing business in California, with its corporate headquarters located at the 625 Building.

## DEFENDANTS' CORPORATE STRUCTURE AND OPERATIONS

9.    Defendants are headquartered in Santa Ana, California at the 625 Building. The parent company is 2100 Freedom, Inc. ("2100 Freedom"), a Delaware corporation.

10.    2100 Freedom is the 100% owner of Freedom Communications Holdings, Inc. (aka The Press Enterprise) ("FCHI"). FCHI, a Delaware corporation, is the 100% owner of both Freedom Communications, Inc. (aka The Orange County Register) ("FCI"), a Delaware corporation, and Freedom SPV VI, LLC ("SPV VI" or "Freedom SPV VI"), a Delaware limited liability company.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

11.    FCI is, in turn, the 100% owner of Freedom Services, Inc., a Delaware corporation, 100% of Freedom Newspapers, Inc., a Delaware corporation, and a 79% owner of Freedom SPV I, LLC ("SPV I"), a Delaware limited liability company. The remaining interests of SPV I are held by Freedom Colorado Information, Inc., a Delaware corporation (10%), Victorville Publishing Company, a California limited partnership (8%), and Victor Valley Publishing Company, a California corporation (3%).

12.    SPV I is the ultimate 100% owner of Freedom SPV II, LLC ("SPV II" or "Freedom SPV II"), a Delaware limited liability company, Freedom SPV IV, LLC ("SPV IV"), a Delaware limited liability company, and Freedom SPV V, LLC ("SPV V"), a Delaware limited liability company. SPV II owns real property utilized by the Debtors in Santa Ana, California, including for the operation and publication of The Orange County Register. SPV V owns 100% of the Daily Press, LLC, a California limited liability company.

13.    Defendants' enterprise was founded in 1935 by R.C. Hoiles, with the purchase of a newspaper now known as The Orange County Register, and grew over time to be a national media conglomerate in the print and television industries.

14.    By 2012, The Orange County Register was the eighth (8th) largest newspaper in the United States as measured by circulation.

15.    As of Petition Date, Defendants owned real property, by and through SPV II, in Santa Ana, California (the "Santa Ana Property").

## THE SANTA ANA PROPERTY

16.    As of the Petition Date, SPV II's major asset was the Santa Ana Property, which is real property consisting of land, printing facilities and parking areas surrounding the 625 Property.

17.    The Santa Ana Property consists of 14.32 acres and is located on 2 noncontiguous parcels. The Santa Ana Property is partially improved with a 2-story single tenant industrial printing facility (the "Print Facility") that contains 108,440 square feet of rentable area.

18.    The Print Facility is occupied by FCI (i.e. The OC Register), which uses this facility as a printing press for several local newspapers.

**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

19.     The balance of the Santa Ana Property is vacant land and surface parking areas.  Prior to its transfer to SPV II in November 2013, the Santa Ana Property was owned by FCI.  FCI owned the Santa Ana Property for over 20 years.

20.     The OC Register, by and through FCI, does not have a lease with SPV II to occupy the Print Facility.

21.     The OC Register, by and through FCI, does not have a contract with SPV II to use the printing press and related equipment housed within the Print Facility.

22.     Plaintiff is informed and believes, and based thereon alleges that The OC Register, by and through FCI, does not pay rent to SPV II in connection with its occupation of the Print Facility.

23.     The OC Register, by and through FCI, does not pay rent to SPV II in connection with its use of the printing press and related equipment housed within the Print Facility.

### **PLAINTIFF'S PURCHASE OF THE 625 PROPERTY**

24.     Adjacent to the Santa Ana Property is the 625 Property, which is a 5-story office building that serves as Defendants' executive offices.

25.     On November 19, 2013, FCI conveyed the 625 Property to SPV II vis-à-vis grant deed, recorded in the Official Records of Orange County as Instrument No. 2013000644090.

26.     In September of 2014, SPV II and Plaintiff entered into a sale agreement (the "APA") providing for Plaintiff's purchase of the 625 Property for a net sales price of $27,000,000.00. A fully executed copy of the APA is affixed hereto as **Exhibit "A"**.

27.     The APA provided that upon finalizing and closing of the sale of the 625 Property to Plaintiff, Plaintiff would enter into a lease-back agreement with FCI to use and occupy the 625 Property (the "Lease-back Agreement").

28.     The APA was contingent upon Plaintiff agreeing to the Lease-back Agreement.

29.     On September 19, 2014, FCI and Plaintiff entered into a the Lease-back Agreement, which provided FCI with a 20-year lease of the 625 Property, with two 10-year options to renew (the "625 Lease"). A fully executed copy of the Lease-back Agreement is affixed hereto as **Exhibit "B"**.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

30.    In connection with the Lease-back Agreement, FCI issued to Plaintiff a promissory note in the amount of $2,145,239.20 ("Note Amount"), reflecting a holdback for FCI's performance under the lease of the Office Building (the "OC Media Note"). A fully executed copy of the OC Media Note is affixed hereto as **Exhibit "C"**.

31.    The OC Media Note provides that if the Santa Ana Property is sold, the Note Amount is due, owing, and shall be paid to Plaintiff.  Further, the OC Media Note provides that Plaintiff shall be entitled to its reasonable attorney fees incurred in connection with the collection or enforcement of the OC Media Note, specifically including costs of suit in connection with such enforcement or collection.

32.    To secure repayment of the OC Media Note, and as consideration for entering into the APA which required the Lease-back Agreement, SPV II granted to Plaintiff a lien against the Santa Ana Property, which Deed of Trust with Assignment of Rents was recorded by Plaintiff in the Orange County Recorder's Office on September 19, 2014 at 2:29 pm, as Instrument No. 2014000381741 (the "OC Media Lien"). A fully executed copy of the recorded OC Media Lien is affixed hereto as **Exhibit "D"**.

33.    Concurrently with the recordation of the OC Media Lien, a grant deed ("625 Grant Deed") was recorded in Orange County Recorder's Office on September 19, 2014 at 2:29 pm, as Instrument No. 2014000381737, which conveyed title to the 625 Property to Plaintiff. A fully executed copy of the 625 Grant Deed as **Exhibit "E"**.

## THE SALE MOTION

34.    On March 19, 2016, at docket number 508 in bankruptcy case number 8:15-bk-15311, Defendants – along with all other related debtors and debtor-in-possession – filed a brief in support of entry of order, in relevant part, authorizing the sale of the Defendants' assets free and clear of liens, claims, encumbrances, and other interests (the "Sale Motion"). A copy of the Sale Motion obtained from the Court's docket at number 508 is affixed hereto as **Exhibit "F"**.

35.    The Sale Motion detailed the mechanics and procedure for the proposed sale of substantially all of Defendants' assets for cash consideration in the amount of $51,800,000.00 to MediaNews Group, Inc. d/b/a Digital First Media.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

5

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

36.    As stated in the Sale Motion, Defendants sought to sell substantially all of Defendants' assets free and clear of numerous liens, including in relevant part, the OC Media Lien of $2,145,000.00 encumbering the Santa Ana Property.

37.    Defendants assert in the Sale Motion that the proposed sale could proceed and close free and clear of the OC Media Lien, as said lien was purportedly "disputed/avoidable."

38.    On March 30, 2016, the Court entered an order authorizing the sale of Defendants', and related debtor entities', assets free and clear of liens, claims, encumbrances, and other interests, reflected on the Court's docket as entry number 562 (the "Sale Order"). A copy of the Sale Order obtained from the Court's docket at number 562 is affixed hereto as **Exhibit "G"**.

39.    On April 5, 2016, Defendants filed a notice of motion and motion to reject the 625 Lease ("Motion to Reject").  A copy of the Motion to Reject obtained from the Court's docket at number 562 is affixed hereto as **Exhibit "H"**.

**FIRST CLAIM FOR RELIEF**

**Determination of the Validity, Extent, and Priority of the OC Media**

**Lien**

40.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 39 and incorporates them in this Paragraph by reference.

41.    This is an action for equitable and declaratory relief brought pursuant to Fed. R. Bankr. P. 7001(2) and/or 7001(9) to determine the validity, extent, and priority of the OC Media Lien on the Santa Ana Property.

42.    The APA, the Lease-Back Agreement, the OC Media Note, and the OC Media Lien were all part of the same transaction for SPV II's sale of the 625 Property to Plaintiff.

43.    The sale of the 625 Property was specifically conditioned upon Plaintiff agreeing to the Lease-back Agreement.

44.    In exchange for Plaintiff's commitment to enter into the Lease-back Agreement, which obligated Plaintiff to lease the entirety of the 625 Property to FCI for no less than twenty (20) years, Plaintiff deemed the OC Media Note and OC Media Lien necessary to protect its rights as a landlord.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

45.     Specifically, at the time the APA was being negotiated and executed – which necessarily contemplated and required the Lease-Back Agreement, Plaintiff was informed and believed that FCI's creditworthiness was very low.  As a result, Plaintiff believed that entering into a landlord-tenant relationship with FCI was a risky business venture without additional security.

46.     Without the OC Media Note and the OC Media Lien, Plaintiff would not have entered into the APA or ultimately closed on the sale of the 625 Building.

47.     As a result of Plaintiff's purchase of the 625 Building, SPV II received the benefit of no less than $24,000,000.00 (the "Sale Proceeds").

48.     Plaintiff is informed and believes, and based thereon alleges that SPV II provided the Sale Proceeds to FCI.

49.     Plaintiff is informed and believes, and based thereon alleges that FCI paid approximately $18,000,000.00 of the Sale Proceeds to Silver Point Finance, LLC ("Silver Point") – which paid down a secured debt owed by both FCI and SPV II.

50.     Plaintiff is informed and believes, and based thereon alleges that on Petition Date, SPV II carried on its books an inter-company debt of at least $22,000,000.00 in connection with FCI's receipt and use of the Sale Proceeds (the "Inter-Company Debt").

51.     As a result of the Lease-back Agreement, FCI was able to maintain its continued occupancy and use of the 625 Building.

52.     Given the proximity of the Print Facility relative to the 625 Property, FCI's continued occupancy of the 625 Property would ensure that the OC Register's business operations would carry on as it had for at least 50 years prior to Plaintiff's purchase of the 625 Building.

53.     As a result of the Inter-Company Debt, Plaintiff is informed and believes, and based thereon alleges that FCI's continued and uninterrupted occupancy of the 625 Property was beneficial to SPV II and its prospective ability to be reimbursed for FCI's use of the Sale Proceeds.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

54.     The OC Media Lien was for exchange of valuable consideration between Plaintiff and SPV II as a result of said lien being partial consideration for the APA and Plaintiff's purchase of the 625 Building.

55.     Therefore, the OC Media Lien is not avoidable by the Defendants, or any of its related debtor entities, and Plaintiff is entitled to immediate payment of the Note Amount ($2,145,000.00) resulting from the sale of the Santa Ana Property approved by the Sale Order.

56.     In addition, Plaintiff is entitled to its reasonable attorney fees, as allowed under the OC Media Note and in an amount to be established at trial, resulting from Defendants' refusal to tender payment of the Note Amount after the Santa Ana Property was sold.

## SECOND CLAIM FOR RELIEF

### Determination of the Validity, Extent, and Priority of the OC Media Lien

57.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 56 and incorporates them in this Paragraph by reference.

58.     At the time the APA, OC Media Note, and OC Media Lien were entered into or perfected, Defendants shared all, if not substantially all, of the same officers and directors.

59.     At the time the APA, OC Media Note, and OC Media Lien were entered into or perfected, continuing through the Petition Date, Defendants shared the same corporate headquarters at the 625 Property.

60.     SPV II does not have a lease or sublease with FCI to use or occupy the 625 Building.

61.     At the time the APA, OC Media Note, and OC Media Lien were entered into or perfected, continuing through the Petition Date, FCI occupied and used the Print Facility on the Santa Ana Property, which was then owned by SPV II.

62.     At all times relevant to this complaint, FCI did not have a lease with SPV II to occupy or use the Print Facility.

63.     At all times relevant to this complaint, Plaintiff is informed and believes, and based thereon alleges that FCI did not pay rent to SPV II in connection with its occupancy and use of the Print Facility.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

8

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

64.     Plaintiff is informed and believes, and based thereon alleges that for at least one year preceding the Petition Date, SPV II generate no income or revenue from its business operations and that any costs of ownership of the Santa Ana Property were paid, in whole or in part, by FCI.

65.     Based on the aforementioned, Plaintiff alleges that SPV II is the alter ego of FCI, and any benefit that the OC Media Note and OC Media Lien had to FCI, was also a benefit conferred upon SPV II.

66.     Therefore, the OC Media Lien is not avoidable by the Defendants, or any of its related debtor entities, and Plaintiff is entitled to immediate payment of the Note Amount ($2,145,000.00) resulting from the sale of the Santa Ana Property approved by the Sale Order.

67.     In addition, Plaintiff is entitled to its reasonable attorney fees, as allowed under the OC Media Note and in an amount to be established at trial, resulting from Defendants' refusal to tender payment of the Note Amount after the Santa Ana Property was sold.

### THIRD CLAIM FOR RELIEF

### Determination of the Validity, Extent, and Priority of the OC Media

### Lien

68.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 67 and incorporates them in this Paragraph by reference.

69.     The OC Media Note provides that the Note Amount shall be all due and payable upon the sale of the Santa Ana Property.

70.     On March 30, 2016, the Court entered the Sale Order authorizing the sale of Defendants', and related debtor entities', assets free and clear of liens, claims, encumbrances, and other interests.

71.     On April 5, 2016, Defendants' filed the Motion to Reject, which sought to reject the 625 lease.

72.     On April 26, 2016, the Court entered an order approving the Motion to Reject (the "Rejection Order").  A copy of the Rejection Order obtained from the Court's docket at number 598 is affixed hereto as **Exhibit "H"**.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

73.     Under the Bankruptcy Code, a rejection of the 625 Lease is treated as a retroactive default as of the Petition Date.

74.     As of the filing of the Motion to Reject, the 625 Lease had eighteen (18) years reaming on same.

75.     In connection with the 625 Lease, the annual lease rate for 2016 was $3,421,785.00, with a cumulative rent escalation per year of 3%.  Based thereon, the average effective rent per year for 18-years is $4,334,614.00.

76.     For purposes of determining Plaintiff's claim arising out of Defendants' rejection of the 625 Lease, Section 502(b)(6) allows for Plaintiff to have a claim for damages amounting to the greater of: (1) one year of rent; or (2) 15%, not to exceed three-years rent, of the remaining term of the 625 Lease.

77.     The effective rent of $4,334,614.00, times the remaining term of 18 years, times 15% is equal to $11,703,457.00 (the "15% Rule Calculation").

78.     The 15% Rule Calculation is lower than the effective rent of $4,334,614.00 times three-years, which equals $11,703,457.00.

79.     As a result of the Rejection Order and the ultimate rejection of the 625 Lease, Plaintiff is entitled to rejection damages of $11,703,457.00 (the "Rejection Damages").

80.     Due to the rejection serving as a default under the 625 Lease, and due to the sale of the Santa Ana Property triggering the requirement for immediate payment of the Note Amount, the Rejection Damages are secured in the amount of $2,145,000.00.

**WHEREFORE**, the Plaintiff requests this Court:

(a) Enter a declaratory judgment that determines the validity, extent, and priority of the OC Media Lien, specifically that the OC Media Lien is valid and $2,145,000.00 must be paid through the sale proceeds resulting from the sale approved by the Sale Order;

(b) Enter a declaratory judgment that Plaintiff's Rejection Damages are secured in an amount up to $2,145,000.00.

(c) An award of Plaintiff's reasonable attorney fees; and

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

10

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

1     (d) Granting such other, further, and different relief as the Court deems just and proper.

2

3                     **SHULMAN HODGES & BASTIAN LLP**

4

5   Dated:  April 27, 2016        /s/ Ryan D. O'Dea

6                          Leonard M. Shulman
                             Michael J. Petersen

7                          Ryan D. O'Dea
                          Attorneys for Plaintiff, OC Media Tower, L.P.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHULMAN HODGES &
BASTIAN LLP**
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\E-F\FreedomCommunications\Adv\Pld\Freedom Complaint.doc
5022-000

# Exhibit "A"

# AGREEMENT OF PURCHASE AND SALE

This AGREEMENT OF PURCHASE AND SALE (this "**Agreement**") is made and entered into as of the _19_ day of September, 2014 (the "**Effective Date**") by and between Freedom SPV II, LLC, a Delaware limited liability company ("**Seller**"), and OC Media Tower L.P., a California Limited Partnership, or its permitted assigns ("**Purchaser**").

## RECITALS:

A.     The Seller owns certain real property located at 625 North Grand Avenue, Santa Ana, CA 92701 depicted as Parcel 3 on the Lot Line Adjustment attached hereto as *Exhibit 1* (the "**Site**").

B.     The Site is improved with a five (5)-story office building and a basement, consisting of approximately 184,086 rentable square feet, a contiguous six (6)-story parking structure consisting of a minimum of 456 regular vehicular parking spaces, a central building plant, and land (collectively, the "**Facility**").  Adjacent to the Site is certain additional land owned by Seller and depicted as Parcel 1 on the Lot Line Adjustment attached hereto as *Exhibit 1* (the "**Other Property**").

C.     Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, on the terms and conditions hereinafter set forth, the Property (as hereinafter defined).

D.     Contemporaneously with the Seller's sale of the Property to Purchaser, on the Closing Date (as hereinafter defined) Seller's affiliate, Freedom Communications, Inc., (the "**Tenant**"), will enter into a lease for a portion of the Property with the Purchaser and will be required to assign the lease to New Age Media pursuant to the terms of the lease, on the terms and conditions hereinafter set forth.

## AGREEMENT:

In consideration of Ten and No/100 Dollars ($10.00), the mutual covenants and promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties to this Agreement, the parties agree to the following terms and conditions:

1.     **PURCHASE AND SALE**.  Subject to the terms of this Agreement, Seller agrees to sell and convey to Purchaser, for the compensation set forth herein and on the terms and conditions hereinafter set forth, the Facility in addition to and without limitation, all of Seller's right, title and interest in the following property (the "**Property**"):

1.1.1   **Land**.  The fee simple interest of Seller in and to that certain land more particularly described as Parcel 3 on *Exhibit 1*, attached hereto and incorporated herein by reference, together with other easements, appurtenances, and hereditaments thereto (collectively, the "**Land**");

1.1.2   **Improvements**.  All buildings, structures, Fixtures (as defined below), mechanical equipment, and other improvements, located on the Land,

EXECUTION VERSION2

including the Facility (collectively, the "**Improvements**"). The Land and the Improvements are collectively referred to herein as the "**Real Property**";

     1.1.3   **Intangible Property.** Seller's right, title and interest in and all licenses and permits relating to the ownership, operation and development of the Property; and (b) all guaranties and warranties received by Seller from any contractor, manufacturer or other person in connection with the acquisition, construction or operation of any of the Property (collectively, the "**Intangible Property**").

     1.2   **Contracts.** Seller's right, title and interest under, in and to those certain service contracts, construction contracts, and other contracts and agreements relating to the ownership and operation of the Property as listed on *Exhibit 3*, and all such contracts and agreements entered into by Seller related to the Property in accordance with the terms of this Agreement that expressly survive Closing (each a "**Contract**", and collectively, the "**Contracts**") will be approved by Purchaser and will be assigned to Tenant at the Closing; and

     1.3   **Definition of Fixtures.** Purchaser and Seller agree that, for purposes of this Agreement, the term "**Fixture**" shall mean any property permanently attached to a building, structure, the Facility or Land as defined in Civil Code §660 (the "**Fixtures**"). Seller represents and warrants that there are no trade fixtures located within the Improvements and all Fixtures are being transferred to Purchaser pursuant to the terms of this Agreement.

     1.4   **Personal Property.**

     (a)   Purchaser and Seller hereby acknowledge and agree that all of the personal property of the Seller on the Real Property which in no way is used in connection with the Real Property or the operation or maintenance of the Real Property shall not be part of the property conveyed to Purchaser hereunder and shall remain the property of Seller (the "**Excluded Personal Property**").

     (b)   Likewise, Purchaser and Seller acknowledge and agree that all personal property of Seller in or on the Real Property which is in any way used in connection with the Real Property or the operation or maintenance of the Real Property shall be sold and conveyed to Purchaser pursuant to this sale which personal property, by way of example, shall include but not be limited to equipment, tools, imbedded software, manuals, HVAC, fire systems, security or like systems, supplies, parts, and other property of a personal nature and used in connection with the Real Property or the operation or maintenance of the Real Property (the "**Personal Property**"). The Personal Property shall be sold to Purchaser pursuant to the Assignment and Bill of Sale attached hereto as *Exhibit 2* (the "**Bill of Sale**").

     1.5   **Adjustment in Legal Descriptions.**

The parties acknowledge and agree that the legal descriptions contained in this Agreement, and the Exhibits thereto shall be adjusted based on the final recorded Lot Line

Adjustment. The parties instruct Escrow Holder to update all legal descriptions in this Agreement and all Exhibits thereto to conform the legal descriptions to the actual recorded Lot Line Adjustment.

2.    **PURCHASE PRICE**

2.1    **Purchase Price.** The purchase price for the Property is Twenty Seven Million and No/100 Dollars ($27,000,000.00) (the "**Purchase Price**"). The Purchase Price is payable as follows:

2.1.1    Within three (3) Business Days following the Effective Date, Purchaser shall deposit with First American Title Company, (the "**Escrow Agent**") the sum of One Hundred Thousand Dollars ($100,000.00) (the "**Deposit**"), said Deposit to be paid by Purchaser by wire transfer or other immediately available U.S. Federal Funds. The Deposit shall be deposited upon receipt by Escrow Agent in an interest bearing escrow account, to be opened by Escrow Agent (the "**Escrow Account**"). The Deposit and all interest earned thereon will be applied to the Purchase Price or disbursed, with interest, to the party entitled to the Deposit as may be otherwise provided in this Agreement.

2.1.2    The balance of the Purchase Price shall be due and payable to Seller at Closing (as hereinafter defined).

2.2    **Disbursements and Holdbacks from Escrow.** Purchaser and Seller agree that the following disbursements and holdbacks shall be made and reflected on the Escrow closing statement (which statement shall reflect the gross purchase price of $27,000,000 and transfer tax payment computed on that amount):

2.2.1    Seller shall pay through Escrow Three Million Dollars ($3,000,000.00) out of the proceeds of the sale as a Property Acquisition Disbursement to Cactus Financial, Inc.; and

2.2.2    Purchaser shall holdback in Escrow, and Escrow Holder shall distribute to Purchaser at the Close of Escrow, Four Million Two Hundred Ninety Thousand Four Hundred Seventy-Eight Dollars and Forty Cents ($4,290,478.40) (for the benefit of Tenant) which shall be held, applied and/or released pursuant to the terms of the Lease and Purchaser shall have no liability or obligation to Seller or any other person or entity for payment or repayment of such amount except as specifically provided in the Lease ; and

2.2.3    Seller shall pay through Escrow Two Hundred Sixty-Eight Thousand One Hundred Fifty-Four Dollars and Ninety Cents ($268,154.90) (for the benefit of Tenant) as Tenant's first month's NNN Office and Parking Rent under the Lease which shall be held, applied and/or released pursuant to the terms of the Lease and Purchaser shall have no liability or obligation to Seller or any other person or entity for payment of such amount except as specifically provided in the Lease.

EXECUTION VERSION2

2.3    **Lease.** On the Closing Date and subject to the terms and conditions of this Agreement, Purchaser, as landlord ("**Lessor**"), and Tenant, shall enter into a triple net lease with a term of twenty (20) years and one (1) ten (10) year option and one (1) four (4) year and eleven (11) month option to extend (the "**Lease**") of the Real Property in the form of *Exhibit 4* annexed hereto.

3.    **SURVEY.** Seller has provided to Purchaser for its review and approval a copy of the most recent plat of survey of the Real Property that Seller has in its possession, custody or control (the "**Initial Survey**")  Seller has delivered from the preparer of the Initial Survey, at Seller's expense, the Initial Survey to be updated, reissued and certified to Seller, Purchaser, Title Company (as defined in **Section 5**) and any other party Purchaser may request (any Initial Survey so updated being referred to herein as the "**Survey**") prior to the end of the Feasibility Period.

4.    **TITLE.** Prior to the date hereof, Seller has provided to Purchaser a copy of a title commitment dated May 20, 2014 order number NCS-670611-LA2 (the "**Title Commitment**") from First American Title Company (the "**Title Company**"). Purchaser shall have the right, on or before the expiration of: (i) the Feasibility Period, or (ii) two (2) business days after delivery of the Survey, to notify Seller in writing of any objections Purchaser may have to title to the Property as shown in the Title Commitment or the Survey of the Property (each, an "**Objection**"). If Purchaser fails to give any such Objection on or prior to the expiration of the Feasibility Period, all matters affecting title to and the Survey of the Property as shown on the Title Commitment and the Survey shall be deemed to be permitted title exceptions (hereinafter collectively referred to as the "**Permitted Exceptions**"). If Purchaser does give notice of Objections on or prior to the expiration of the Feasibility Period, then Seller shall have two (2) Business Days after receipt of such Objections (the "**Seller Election Deadline**") to elect to cure some, all or none of the Objections; provided, however, if any such Objection is to a monetary lien or encumbrance that can be cured by the payment of money, Seller shall be required to cure same and the proceeds of the purchase of the Property by Purchaser at Closing may be used to do so (collectively, the "**Removable Liens**"). Seller's failure on or before the Seller Election Deadline to notify Purchaser of which Objections it elects to cure shall be deemed to be an election by Seller to cure none of the Objections, subject to Seller's mandatory obligation to cure the Removable Liens. If Seller elects to cure less than all of the Objections (subject to Seller's mandatory obligation to cure the Removable Liens), it shall so notify Purchaser on or before the Seller Election Deadline, and Purchaser shall have two (2) Business Days after the Seller Election Deadline to elect either (a) to terminate this Agreement, whereupon the Deposit and any interest thereon shall be returned to Purchaser and all rights and obligations hereunder shall immediately terminate (other than those obligations expressly set forth in this Agreement that specifically survive such termination), or (b) to close the purchase and sale contemplated hereby, in which case the Objections for which Seller elects not to cure shall be added to and be made a part of the Permitted Exceptions. The immediately preceding sentence shall not relieve Seller of its obligation to cure the Removable Liens. If Purchaser does not so respond within two (2) Business Days after the Seller Election Deadline, then Purchaser shall be deemed to have elected to terminate this Agreement, and the Deposit and any interest thereon shall be returned to Purchaser and all rights and obligations hereunder shall immediately terminate (other than obligations expressly set forth in this Agreement which specifically survive such termination). As to title defects arising after the date hereof and survey defects arising after the date of the

Survey that are not Permitted Exceptions, Purchaser shall be entitled to object thereto within five (5) Business Days after becoming aware of such defect, but no later than the Closing Date, and Seller shall have a reasonable time, not to exceed five (5) Business Days, to elect the options set forth above upon the same conditions set forth above (unless such defect was caused by the act or failure to act of Seller, in which event Seller is obligated to cure same and the same shall be deemed to be a Removable Lien), and the Closing Date shall be extended to the extent necessary, not to exceed fifteen (15) days, to provide said additional time period. For purposes of this Agreement, "**Business Day**" shall mean any day other than a Saturday, Sunday, or other days when national banks in New York, New York are required to be closed for business.

5.     **REPRESENTATIONS AND WARRANTIES.**

5.1     **Seller's Representations and Warranties.**     Seller warrants and represents to Purchaser the following, as of the date hereof and to be effective as of the Closing Date unless otherwise noted and except as set forth in the Due Diligence Materials (as defined below):

5.1.1     That Seller, as of the Closing Date, has and will transfer to Purchaser, good, marketable and indefeasible fee simple interest in the Real Property, Fixtures, and the Personal Property transferred to Purchaser herein, free and clear of all liens, encumbrances, conditions, security agreement, security interests, exceptions or reservations, excepting and subject to those liens, encumbrances, conditions, security agreement, security interests, exceptions or reservations set forth in the Title Commitment, as of the date hereof, and the Permitted Exceptions, as of the Closing Date, or specifically approved (or deemed approved) by Purchaser pursuant to this Agreement.

5.1.2     That Seller has not received any notices of, and Seller has no actual knowledge of, any condemnation, environmental, zoning or other land use regulation or proceeding whatsoever adversely affecting, or that could adversely affect, the ownership, use or operation of the Property, including, without limitation, any notices alleging that the Property is in violation of Environmental Laws (as hereinafter defined) or any notice of any condemnation of the Property;

5.1.3     That Seller is validly existing and in good standing under the laws of Delaware, and all documents, including this Agreement, executed or to be executed by Seller which are to be delivered to Purchaser prior to or at Closing have been or will be duly authorized, executed, and delivered by Seller, and are or will be legal, valid, and binding obligations of Seller sufficient to convey or to cause the conveyance of the Property to be conveyed by Seller, and the lease of the Property from Purchaser, and do not or will not violate any laws that Seller is subject to; and that Seller has full right, power and authority, without the necessity, consent or approval of any other person or entity, to enter into this Agreement and to transfer or to cause the transfer of the Property owned by Seller to Purchaser, and to lease the Property from Purchaser, pursuant to the terms of this Agreement and that the Seller is duly qualified or licensed to do business and is in good standing in the State of California and has all requisite power and

EXECUTION VERSION2

authority to own, lease and operate its assets and to carry on its business as now being conducted;

5.1.4   That *Exhibit 3* attached hereto and incorporated herein by reference sets forth a true, correct and complete list of all Contracts. Three (3) days prior to the end of the Feasibility Period, Seller shall have delivered to Purchaser true, correct and complete copies of the Contracts (including any and all amendments and modifications). As of Closing, the Seller shall be the benefitted party under each Contract and shall not have assigned any interest therein to any entity or person and Seller. Except as set forth in *Exhibit 3*, to Seller's knowledge, no party to a Contract is in default under any Contract, and the Seller has not given to or received from any party to a Contract any notice of such default. Except as required or permitted pursuant to the Lease, there will be no outstanding contracts made or authorized by Seller for the Property for work or services with respect to the Property, including professionals such as architects, surveyors, engineers and planners, which have not been fully paid for; and Seller shall cause to be discharged all mechanics' or materialmen's liens arising from any labor or materials furnished to the Property prior to the Closing Date;

5.1.5   That Seller has not been served with any litigation (including eminent domain proceedings) and there are, to Seller's knowledge, no actions, suits, proceedings or investigations, at law or in equity, or before any governmental agency or other person, pending or threatened, relating to the Property or the ownership or operation of the Property;

5.1.6   The Property and the present use of the Property by Seller, and the contemplated use of the Property by the Tenant pursuant to the Lease, does not violate or conflict with any applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, zoning, building, fire, environmental, land use, noise abatement, occupational health and safety or other laws, any building permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not;

5.1.7   That there are no existing or, to Seller's actual knowledge, pending or threatened condemnation, taking, re-zoning, or other legal proceeding adversely affecting, or that could adversely affect, the Property, or special assessments, fees, or other obligations affecting the Property or any appurtenant property, including without limitation, impact fees, solid waste fees, reservation fees, aid-in-construction fees, utility connection fees, sewer or water assessments, fees for roadway and traffic improvements, or other developmental obligations which may be assessed by any governmental or quasi-governmental authority, water or sewer authority, solid waste authority, drainage district, street lighting district, or any other special taxing district, nor does Seller have any knowledge of any pending or proposed assessment for public improvements which might result in such being contemplated;

5.1.8   That Seller has obtained and kept in force or caused to be obtained and kept in force any necessary licenses to carry on its business now conducted in the State of California and that any necessary business certificates or fictitious name certificates, or both, required to be filed by Seller under the laws of any state have been duly filed and are in full force and effect in accordance with the respective terms thereof;

5.1.9   That except as otherwise set forth in this Agreement or the Lease, Seller has not entered into any other contracts for the sale or lease of, nor given any option to purchase or lease, all or any portion of the Property. Further, except for the Lease and as set forth in **Section 8**, Seller has not entered into any contracts, leases or use agreements with respect to any portion of the Property which will survive the Closing, and, except as otherwise permitted pursuant to **Section 8**, Seller shall not cause or permit any of the foregoing after the Effective Date and prior to Closing without the express written consent of Purchaser in every instance;

5.1.10  There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending against Seller;

5.1.11  Seller is not in violation, in connection with its ownership, use, maintenance or operation of the Property and the conduct of the business related thereto, of any applicable federal, state, county or municipal or local statutes, laws, regulations, rules, ordinances, codes, standards, orders or licenses or permits of any governmental authorities relating to environmental matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Occupational Safety and Health Act, the Toxic Substance Control Act, the Federal Water Pollution Control Act (also known as the Clean Water Act), the Hazardous Materials Transportation Act and the Federal Insecticide, Fungicide and Rodenticide Act (being hereinafter collectively referred to as the "**Environmental Laws**") and all other applicable environmental standards or requirements. *Exhibit 5* is a true, correct and complete list of all environmental studies or reports in Seller's possession or control relating to the Property (the "**Environmental Reports**"). Seller has furnished, or will furnish true, correct and complete copies of such Environmental Reports to Purchaser. Except as set forth in the Environmental Reports, the Property has not been used, and is not presently being used, and shall not be used prior to Closing, for the handling, storage, transportation, or disposal of hazardous or toxic materials or waste, as the same are defined by applicable local, state or federal environmental laws and regulations (except in the ordinary course of business and in compliance with laws applicable to such handling, storage, transportation, or disposal of hazardous or toxic materials or waste);

5.1.12  As of the Effective Date, there are no leases or other rights of occupancy affecting the Property except for the existing lease to Ellis

EXECUTION VERSION2

Communications KDOC, LLC previously disclosed by Seller to Purchaser (the "**Existing Lease**"). At Closing, except for the Existing Lease, the Lease will be the only lease or right of occupancy affecting the Property and to Seller's knowledge, as of Closing, there are no defaults and no facts which, with the passage of time or the giving of notice, would result in a default thereunder by Tenant as lessee. The Lease will be in full force and effect at Closing.

5.1.13 The materials furnished to Purchaser by or on behalf of Seller are true, correct and complete copies of the items they purport to be, and that there has not been withheld by Seller from Purchaser any additional materials which are necessary in order to make the materials so furnished to Purchaser by Seller not misleading;

5.1.14 The Seller has in full force and effect fire, casualty, and liability insurance policies, as listed on *Exhibit 6* (the "**Insurance Policies**") attached hereto and made a part hereof.

5.1.15 The Seller (i) has timely filed all tax returns that are required to have been filed by it with all appropriate governmental agencies (and all such returns are complete and fairly reflect its operations for tax purposes), and (ii) has timely paid all taxes owed or assessments by it.

5.1.16 The due diligence materials described in *Exhibit 7* will be true, correct and complete copies of all Due Diligence Materials (as defined below) in Seller's possession relating to the Property.

5.1.17 Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended and any related regulations.

5.1.18 The Other Property, nor any part thereof, is not necessary for the operation of the Property as it is currently operated, nor is the Other Property needed for the Property to comply with any applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, zoning, building, fire, environmental, land use, noise abatement, occupational health and safety or other laws, any building permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not.

"Seller's actual knowledge", "Seller's knowledge" or similar terms used herein means and is limited to the actual knowledge of Eric Spitz, Aaron Kushner, Rick Sant and Mike Webster. Seller represents and warrants that Rick Sant and Mike Webster are the employees of Seller who are most familiar with the condition of the Property. Purchaser expressly understands and agrees that said individuals are not personally liable to Purchaser for any representation or warranty set forth herein.

5.2    **Purchaser's Representations and Warranties**. Purchaser represents that it is a limited partnership validly existing and in good standing under the laws of the State of California, and all documents, including this Agreement, executed or to be executed by Purchaser, which are to be delivered to Seller prior to or at Closing, have been or will be

EXECUTION VERSION2

duly authorized, executed and delivered by Purchaser and are or will be legal, valid and binding obligations of Purchaser, and will not violate any provisions of any agreement to which Purchaser is a party or to which it is subject; and that Purchaser has full right, power and authority, without the necessity, consent or approval of any other person or entity, to enter into this Agreement and perform its obligations hereunder. Purchaser is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended and any related regulations.

5.3    It is a condition precedent of Purchaser's and Seller's respective obligations to close hereunder that all of the representations and warranties of the other party contained in this Agreement shall continue to be true in all respects as of the Closing Date. Unless otherwise specifically set forth in this Agreement, all of the representations and warranties contained in this Agreement and each party's liability therefor shall survive the Closing for a period of one (1) year.

6.    **PURCHASER'S INVESTIGATION.** Seller and Purchaser agree that Purchaser will proceed with an evaluation of the Property and an evaluation of the economic feasibility of proceeding with Purchaser's acquisition of the Property. From and after the Effective Date and at all times during the term of this Agreement, Purchaser and its agents and representatives shall be entitled to enter upon the Real Property (including entry into all Improvements) for inspection, soil tests, examination, and such other matters and investigations as Purchaser deems necessary and appropriate in Purchaser's sole judgment, all at Purchaser's sole cost and expense. Such right of entry shall not unreasonably interfere with Seller's business and Purchaser will coordinate its activities with a designated representative of Seller. Purchaser hereby covenants and agrees to indemnify and hold Seller harmless from any and all loss, liability, costs, claims, demands, damages, actions, causes of action, and suits (including without limitation, litigation costs and reasonable attorneys' fees whether incurred at or prior to trial or on appeal) resulting from any injury to any person or damage to the Property arising directly out of the exercise by Purchaser of Purchaser's right of entry under this **Section 6**. Purchaser's obligation to indemnify and hold Seller harmless shall survive Closing or any termination of this Agreement for a period of twelve (12) months from Closing or termination.

Notwithstanding any other provision of this Agreement, Purchaser shall have a period from June 12, 2014 through two (2) business days after Purchaser's receipt of (i) the Contracts, (ii) a proforma preliminary title report or title policy for Parcel 3 of the Lot Line Adjustment, (iii) a proforma preliminary title report or title policy for Parcels 1 and 2 of the Lot Line Adjustment, (iv) a copy of the Silver Point Note and Deed of Trust as the same shall be revised as of the Closing Date to be secured solely by Parcels 1 and 2, (v) the Judgment and any forbearance agreement executed in connection therewith referenced in Section 8.1(ii) below, and (vi) Seller's delivery of the Environmental Reports, to review and examine the Property and all matters relating to its proposed acquisition, and lease, of the Property (the "**Feasibility Period**"). Prior to the Effective Date, Seller delivered or made electronically available to Purchaser the due diligence materials described in *Exhibit 7* attached hereto (the "**Due Diligence Materials**"). At any time prior to the expiration of the Feasibility Period, Purchaser may terminate this Agreement if, in its sole discretion, Purchaser determines that the Property is not acceptable to Purchaser for any reason or no reason whatsoever. Purchaser may terminate this Agreement by delivering written notice thereof to Seller prior to the expiration of the Feasibility Period,

EXECUTION VERSION2

whereupon the Deposit plus interest shall be refunded in full to Purchaser and neither party shall have any further obligation or liability to the other under this Agreement except for those provisions which specifically survive the termination of this Agreement. If this Agreement is terminated, Purchaser agrees, upon payment by Seller to Purchaser of the out-of-pocket cost of such items, to provide Seller with copies of any and all surveys, environmental audits and engineering reports obtained by Purchaser during its due diligence review of the Property, but specifically excluding Purchaser's work product and/or analyses.

7.    **LEASE, CONTRACTS AND RELEASE OF SECURITY INTEREST**.

7.1    **Lot Line Adjustment**. Seller agrees, at its sole cost and expense, that it will take all the necessary steps to complete the Lot Line Adjustment ("LLA") shown on *Exhibit 1* as soon as possible after the execution of this Agreement. Seller and Purchaser agree that a reciprocal easement agreement ("REA") will be required for the LLA and the parties agree to cooperate in good faith to execute and record a "REA" consistent with the terms of *Exhibit 1-A*.

7.2    **Lease**. On or prior to the Closing Date, Seller shall deliver to Escrow Agent in escrow to be released to Purchaser at Closing four (4) true, correct, complete and original copies of the Lease executed by Seller. The Existing Lease shall remain in full force and effect on and after the Closing as a sublease between Tenant and the lessee under the Existing Lease. Upon Closing, Seller shall cause the Existing Lease to be assigned to and assumed by Tenant. The Existing Lease is hereby deemed approved by Purchaser as a sublease pursuant to the terms of the Lease.

7.3    **New Contracts**. After the Effective Date of this Agreement and except as otherwise specifically set forth in this Agreement, the Seller shall not execute any new Contracts without the express prior written approval of Purchaser in each instance. Such consent shall not be unreasonably withheld during the Feasibility Period but may be withheld in Purchaser's sole discretion after the Feasibility Period and prior to Closing. Seller shall give Purchaser prompt written notice and provide copies of each such modification, amendment or new contract or agreement, and all such new modifications, amendments, contracts or agreements shall become "Contracts" subject to this **Section 7**. Seller shall defend and indemnify Purchaser from and against any and all suits, claims, losses and expenses arising prior to Closing under any Contract not permitted hereunder and incurred by Purchaser and such indemnity shall survive Closing.

7.4    **Contracts**. Except as to the Contracts specifically listed on *Exhibit 3*, any Contracts entered into after the Effective Date which Purchaser has agreed in its sole discretion to have the Seller continue from and after the Closing, Seller, at Seller's sole cost and expense, shall terminate all property management agreements, service contracts or other contracts or agreements with respect to the Property as of the Closing, and the Seller shall not be obligated to assume any continuing obligations thereunder; provided, however, that Purchaser and Seller agree that concurrent with Closing, Seller shall enter into a Facilities Management Agreement with Caribou Industries, Inc. ("Caribou") in a form attached as an exhibit to the Lease, as its exclusive managing agent for the Facility to provide such Facility management services on behalf of the Tenant as are required to

be performed by Tenant under the Lease and pursuant to the Lease. This **Section 7.4** shall survive the Closing.

7.5 **No Contract Default.** Except as described in *Exhibit 3*, Seller has no knowledge of any default and has received no notices of default relative to any of the Contracts.

7.6 **Release of Security Interest in Fixtures and Personal Property.** On or before the Closing Date, Seller shall cause Silver Point Finance, LLC, a Delaware limited liability company ("**Silver Point**")and any other entity that has any security interest in the Fixtures or Personal Property to deliver to Escrow for filing and recording with the appropriate governmental agency and the Orange County Clerk/Recorder's Office UCC-3(s) and any other documents necessary or convenient to release all security interests in and to the Fixtures and Personal Property in a form reasonably acceptable to Purchaser in order to enable Seller to transfer the Fixtures and Personal Property to Purchaser free and clear of all liens and encumbrances.

8. **CONDITIONS PRECEDENT.**

8.1 The obligation of Purchaser under this Agreement to purchase the Property and enter into the Lease is subject to the fulfillment of the following at Closing unless waived in writing by Purchaser:

(i) Title Company shall issue an ALTA 2006 Owner's Extended Coverage Title Insurance Policy for the Real Property (together with all underlying documents in connection therewith) insuring the Real Property for the full amount of the Purchase Price, covering title to the Real Property on the Closing Date, showing title to the Real Property in Purchaser, subject only to the Permitted Exceptions and which will omit as an exception to the policy any mechanic's lien or any lien which was created based on work performed or commissioned by Seller, together with the following endorsements:

(i) ALTA 9.2 - Comprehensive, improved land.

(ii) ALTA 17 - Access and entry.

(iii) ALTA 3.1 - Zoning, improved land, modified to include parking.

(iv) ALTA 26 - Subdivision map act compliance.

(v) ALTA 25 - Land same as survey.

(vi) ALTA 22.1 - Description of improvements, address.

(vii) CLTA 103.2 - Easement; Damage, use or maintenance.

(viii) CLTA 100.24 - No Surface Rights, Lessee.

EXECUTION VERSION2

(ii)    Title Company shall issue an ALTA 2006 Lender's Title Policy for the Other Property vested in Seller insuring that Purchaser's Performance Holdback Deed of Trust, as defined in the Lease, in the amount of Two Million One Hundred Forty-Five Thousand Two Hundred Thirty-Nine Dollars and Twenty Cents ($2,145,239.20) is in a junior position subject and subordinate only to:

(1) a judgment in the amount of  $4,000,000, and

(2) a first deed of trust (the "Silver Point Deed of Trust") in favor of Silver Point Finance, LLC securing principal, accrued but unpaid interest and make-whole fees,

in the aggregate total amount of not more than Twenty Two Million One Hundred Seventy Thousand Dollars ($22,170,000.00) plus (i) protective advances related to the Other Property, (ii) expenses directly related to the Other Property or the enforcement of the Silver Point Deed of Trust, (iii) indemnity obligations under the terms of the Silver Point Deed of Trust, (iv) default interest, (v) advances in relation to a trustor bankruptcy (no other voluntary advances will be allowed) and (vi) any amount applied from collateral accounts holding real estate tax reserve amounts and interest reserve amounts securing the obligations secured by the Silver Point Deed of Trust (other than to the principal referenced in (2)) up to the amount of $3,122,256.27 (such aggregate total amount, the "Subordination Cap"), insuring title to the Other Property and the Seller subject only to the Exceptions approved by Purchaser prior to the end of the Feasibility Period and which will omit as an exception to the policy any mechanic lien, or any lien which was created based on work performed or commissioned by Seller together with the following endorsements: ALTA 1-06, ALTA 3-06, and ALTA 9-06.  Purchaser's lien pursuant to the Performance Holdback Deed of Trust shall be subordinate only to such portions of the obligations described in the foregoing clauses (1) and (2) to the extent of the Subordination Cap during any time prior to the reconveyance of Purchaser Performance Holdback Deed of Trust.

(iii)    UCC-3s have been received by Escrow for filing or recordation concurrently with the Closing releasing any security interest in the Fixtures or Personal Property conveyed to Purchaser by Silver Point and any other creditor having a security interest in the Fixtures or Personal Property.

(iv)    the representations and warranties of Seller shall be true and correct in all respects as of the Closing Date, and Seller shall have performed all covenants pursuant to this Agreement;

(v)    approval by Purchaser of (or waiver of objections to) the Property based upon its inspection and investigation pursuant to **Section 7** hereof, provided that Purchaser's right of termination set forth in **Section 7** will be waived unless it is exercised prior to the end of the Feasibility Period by notice given by Purchaser to Seller in writing thereof;

EXECUTION VERSION2

(vi)    execution and delivery by Seller of (a) a duly executed and acknowledged grant deed in the form attached hereto as *Exhibit 8*, conveying fee simple insurable title to the Property in favor of Purchaser (the "**Deed**"), subject only to the Permitted Exceptions and otherwise in accordance with the terms of this Agreement, (b) a Non-Foreign seller affidavit complying with the requirements of Section 1445 of the Internal Revenue Code and a California Form 593-C, and (c) four (4) originals of an Assignment of Contracts in the form attached hereto as *Exhibit 9* for those Contracts which Tenant is assuming in accordance with the terms of this Agreement (the "**Assignment of Contracts**");

(vii)    on or prior to the Closing Date, delivery by Seller to Escrow Agent in escrow to be released to Purchaser at Closing of four (4) true, correct, complete and original copies of the Lease executed by Seller;

(viii)    execution and delivery by Seller of such documents and instruments as are reasonably required by counsel for Purchaser and/or the Title Company to consummate the Closing;

(ix)    execution by Seller of a closing statement setting forth the Purchase Price with all adjustments shown (the "**Closing Statement**");

(x)    delivery by Seller of (i) true, correct and complete originals or copies of the Seller's articles or certificates of organization or formation, certified by the state officer responsible for issuing such certificates in the state(s) in which Seller and the Company are organized, respectively, and (ii) a true, correct and complete copy of the Seller's certificate of authority (or equivalent document) to transact business in the State of California certified by the state officer responsible for issuing such certificates;

(xi)    execution and delivery by Seller of the duly executed Facilities Management Agreement (as defined in the Lease);

(xii)    delivery by Tenant of all Insurance Policies and certificates of insurance in a form acceptable to Purchaser certifying all Insurance Policies are in full force and effect and designating Purchaser, Southwest Property Investments, Inc., Caribou Industries, Inc. and Michael F. Harrah as additional insureds;

(xiii)    execution and delivery by Tenant of a subordination, non-disturbance and attornment agreement in form and substance attached as *Exhibit 10*;

(xiv)    Tenant shall be in full occupancy of the leased premises pursuant to the Lease as evidenced by delivery of a tenant estoppel certificate executed by Tenant in form attached hereto as *Exhibit 11*;

(xv)    Tenant (through this Escrow from payments otherwise due to Seller) shall have (a) paid its first monthly payment of Fixed Rent (as defined in the Lease) under the Lease, (b) executed Performance Holdback Note (as defined

EXECUTION VERSION2

in the Note), and (c) delivered to Escrow Agent in escrow to be recorded at Closing the Performance Holdback Deed of Trust (as defined in the Lease) under the Lease;

(xvi)   delivery by Tenant of (i) true, correct and complete originals or copies of the Tenant's articles or certificates of organization or formation, certified by the state officer responsible for issuing such certificates in the state(s) in which Tenant is organized, (ii) a true, correct and complete copy of a certificate of good standing of Tenant from the state officer responsible for issuing such certificates in the state(s) in which Tenant is organized, (iii) a true, correct and complete copy of the Tenant's certificate of authority (or equivalent document) to transact business in the State of California certified by the state officer responsible for issuing such certificates, and (iv) appropriate resolutions of Tenant authorizing Tenant to enter into, and perform its obligations under, the Lease;

(xvii)   delivery by Seller of evidence reasonably satisfactory to Purchaser that Seller's broker and CII (as defined below) are being paid at Closing;

(xviii) acknowledgment and delivery by Tenant of an executed Memorandum of Lease in the form shown on *Exhibit 12* (the "Memorandum of Lease"); and

(xix)   execution and delivery by Seller of the Bill of Sale.

The conditions set forth in this **Section 8.1** are solely for the benefit of Purchaser and may be waived only by Purchaser. Purchaser shall, at all times prior to the termination of this Agreement, have the right to waive any of such conditions.

8.2   The obligation of Seller under this Agreement to sell the Property and enter into the Lease is subject to the fulfillment or waiver by Seller of the following:

(i)   delivery by Purchaser of the balance of the Purchase Price in accordance with the terms and provisions of **Section 2** of this Agreement;

(ii)   the representations and warranties of Purchaser shall be true and correct as of the Closing Date, and Purchaser shall have performed all covenants pursuant to this Agreement;

(iii)   execution and delivery by Caribou of the duly executed Facilities Management Agreement;

(iv)   execution and delivery by Tenant of the Assignment of Contracts;

(v)   on or prior to the Closing Date, delivery by Purchaser to Escrow Agent in escrow to be released to Seller at Closing of four (4) true, correct, complete and original copies of the Lease executed by Purchaser;

EXECUTION VERSION2

(vi)   execution and delivery by Purchaser of such documents and instruments as are reasonably required by counsel for Seller and/or the Title Company to consummate the Closing;

(vii)   execution by Purchaser of a counterpart to the Closing Statement;

(viii)   Title Company shall issue an ALTA 2006 Owner's Extended Coverage Title Insurance Policy for the Real Property (together with all underlying documents in connection therewith) insuring Tenant's leasehold interest in the Real Property with liability in the amount of Twenty Million Dollars ($20,000,000.00) on the Closing Date, showing the leasehold interest under the Lease in Tenant, subject only to the Permitted Exceptions, together with the same endorsements as issued to Purchaser with respect to its owner's title policy;

(ix)   Acknowledgment, execution and delivery by Purchaser of the Memorandum of Lease;

(x)   Acknowledgement, execution and delivery by Purchaser of a recordable Subordination Agreement in form attached as *Exhibit 13* provided the form is modified to include the ongoing Subordination Cap acknowledged by the Lender with respect to the Performance Holdback Deed of Trust; and

(xi)   execution and delivery by Purchaser of the Bill of Sale.

The conditions set forth in this **Section 8.2** are solely for the benefit of Seller and may be waived only by Seller. Seller shall, at all times prior to the termination of this Agreement, have the right to waive any of such conditions.

8.3   **Subdivision Map Act**. As a condition to the Closing for the benefit of both Purchaser and Seller, the Property shall consist of separately conveyable legal parcel(s), complying with the Subdivision Map Act. Neither Purchaser nor Seller can waive this condition.

9.   **TIME, PLACE AND EXPENSES OF CLOSING.**

9.1   The Closing hereunder shall take place in escrow through the Escrow Agent and Title Company no later than three (3) days after the recordation of the Lot Line Adjustment creating parcel 3 as depicted on *Exhibit 1* (the "**Closing Date**"). The term "**Closing**" shall mean the date the Deed is filed for record in the Official Records of the County of Orange, State of California.

9.2   Seller shall pay the cost of the premium for a ALTA standard coverage policy of title insurance with respect to the Property (formerly known as the "CLTA" policy) in the amount of the Purchase Price and the premium for Tenant's policy of title insurance, the premium for the Lender's policy of title insurance for the Performance Holdback Deed of Trust, any city or county documentary or transfer taxes payable on account of the conveyance of the Real Property, and the creation of the Lease and the

cost of all escrow fees which may be charged by Escrow Holder in connection with the closing of this transaction. Purchaser shall pay for the additional cost of the premiums for any additional or different title insurance coverage requested by Purchaser, including ALTA extended coverage, and any requested title endorsements and the cost of recording the Deed. Any other expenses or closing costs in connection with this transaction shall be paid by Seller.

9.3     Notwithstanding the foregoing, each party shall pay its own due diligence expenses and legal fees incurred in negotiating, preparing and closing the transaction contemplated hereby.

10.     **TERMINATION; DEFAULT; REMEDIES.**

10.1     In the event this Agreement is terminated pursuant to the terms hereof in the absence of a breach of this Agreement by either party, the Deposit plus interest shall be returned to Purchaser and neither of the parties shall have any further obligations to the other, other than as to such provisions hereof as expressly survive the termination of this Agreement.

10.2     If there is a default by Seller under this Agreement (including, without limitation, if Seller fails to cause Tenant to perform under this Agreement), Purchaser may elect one of the following remedies: (i) obtain a refund of its Deposit plus interest and Seller shall pay all out-of-pocket expenses incurred by Purchaser in connection with this Agreement not to exceed $300,000 and such obligation shall survive termination, or (ii) bring an action for specific performance of this Agreement. Purchaser shall make such election with ninety (90) days of such default (and failure to so elect shall be deemed Purchaser's election to proceed under clause (i) above). Purchaser hereby waives all other remedies.

10.3     PURCHASER AND SELLER, AFTER DUE NEGOTIATION, AGREE THAT SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT THAT PURCHASER DEFAULTS, AND SUCH DEFAULT CONTINUES FOR TEN (10) DAYS AFTER WRITTEN NOTICE THEREOF TO PURCHASER, SHALL BE TO TERMINATE THIS AGREEMENT AND TO RETAIN THE DEPOSIT (OR SO MUCH THEREOF AS HAS BEEN DEPOSITED BY PURCHASER IN ESCROW AT SUCH TIME) AS LIQUIDATED DAMAGES, SELLER WAIVING ALL OTHER RIGHTS OR REMEDIES IN THE EVENT OF SUCH DEFAULT BY PURCHASER. THE PARTIES ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT OF A DEFAULT BY PURCHASER UNDER THIS AGREEMENT WILL BE DIFFICULT TO ASCERTAIN, AND THAT SUCH LIQUIDATED DAMAGES REPRESENT A REASONABLE AND THE PARTIES' BEST ESTIMATE OF SUCH DAMAGES. THE RETENTION OF THE DEPOSIT (OR SO MUCH THEREOF AS HAS BEEN DEPOSITED BY PURCHASER IN ESCROW AT SUCH TIME) BY SELLER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE, AND SHALL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR

PENALTY WITHIN THE MEANING OF SECTION 3275 OR SECTION 3369 OF THE
CALIFORNIA CIVIL CODE OR ANY SIMILAR PROVISION.

_____     _____
Seller's Initials     Purchaser's initials.

10.4   In accordance with and subject to **Section 21** below, the prevailing party
shall be entitled to the recovery of attorneys' fees and court costs from the non-prevailing
party.

10.5   The provisions of this **Section 10** shall survive Closing or the termination
of this Agreement.

11.   **RISK OF LOSS.**   Except as set forth in **Section 16**, risk of loss to the Property or
any part thereof shall remain with the Seller until the Closing Date.

12.   **COVENANTS OF SELLER PRIOR TO CLOSING.**   Seller covenants and
agrees with Purchaser with respect to the Property that, from and after the Effective Date through
the Closing, unless Purchaser's prior written consent to any unpermitted action hereunder is first
obtained, in addition to other covenants specifically provided herein, Seller will (except as
specifically provided to the contrary herein):

12.1   Not transfer, sell, assign or lease any part of the Property or create on the
Property any easements, security interests or mortgages which will survive the Closing or
permit any changes to the zoning or other land use classification of the Real Property,
other than in connection with completion of the pending subdivision/lot line adjustment
application (the "Lot Line Adjustment").

12.2   Seller will complete the Lot Line Adjustment.

12.3   Continue to insure, operate, maintain and repair the Property in a manner
consistent with Seller's practices prior to the Effective Date, provided that during said
period, Seller shall not do, suffer, or permit, or agree to do, any of the following: (i) enter
into any transaction with respect to or affecting the Property out of the ordinary course of
business, including, but not limited to, listing or continuing to list the Property as "for
sale" on the commercial real estate market, or (ii) remove from the Real Property any of
the real estate fixtures thereon except if replaced with real estate fixtures of equal or
greater value and utility;

12.4   Comply with the terms of the Contracts and any easement or other
agreements affecting the Property; and

12.5   Immediately provide Purchaser with copies of any notices (of default, or
otherwise) to or from anyone or any party related to the operation of the Property, any
notices of default to or from any party to any Contract and any notices of violation or
noncompliance with applicable law or condemnation or rezoning notices from any
governmental authority.

EXECUTION VERSION2

13.    **NO PRORATIONS.** Purchaser and Seller agree that because of the arrangement regarding operating expenses (including taxes) under the Lease, customary prorations (e.g. of items such as taxes and utilities) will not be needed at Closing. Seller shall remain liable for all expenses (including taxes) of owning and operating the Property prior to Closing. Seller shall pay all real property taxes current as of the Closing. This **Section 13** shall survive Closing.

14.    **NOTICES.** Any notice, demand or request which may be permitted, required or desired to be given in connection herewith shall be given in writing and directed to Purchaser and Seller as follows:

Seller: c/o Freedom Communications, Inc.
     625 N. Grand Avenue
     Santa Ana, CA 92701
     Attention: Eric Spitz
        and Aaron Kushner
     Fax: (714) 835-5349
     Email: spitz@freedom.com

Purchaser:    OC Media Tower LP
     1103 North Broadway
     Santa Ana, CA 92701
     Attention: Michael F. Harrah
     Fax: (714) 543-9972
     Email: MFH@caribouind.com

With a copy to:
     William F. Meehan, Esq.
     Rutan & Tucker, LLP
     611 Anton Boulevard, 14th Floor
     Costa Mesa, CA 92626
     Fax: (714) 546-9035
     Email: wmeehan@rutan.com

With a copy to:
     Stephen L. Fingal, Esq.
     Fingal, Fahrney & Clark, LLP
     5120 Campus Drive, Suite 200
     Newport Beach, CA 92660
     Fax: (949) 723-8108
     Email: sfingal@ffc-law.com

or at such other address or to such other party which any party entitled to receive notice hereunder designates to the other in writing from time to time in accordance with this **Section 14**. Notices shall be (i) sent by certified or U.S. Express Mail, on a return receipt requested basis, or (ii) overnight courier, or (iii) hand delivery, or (iv) PDF via electronic transmission, or (v) telecopy and shall be deemed delivered on the earlier to occur of: (i) actual receipt; (ii) three (3) Business Days after mailing for notices sent by mail; (iii) one (1) Business Day after shipping for notices sent by U.S. Express Mail or overnight courier; or (iv) on the date transmitted if by PDF electronic transmission or telecopy (with original to follow as provided by any of the means set forth in (i), (ii), (iii) or (iv) above (as indicated by the addresses for the Purchaser and Seller listed in this **Section 14**) on a Business Day, or if after such time or on a day other than a Business Day, such notice shall be effective as of the next Business Day). If delivery is refused or delayed by the addressee, notices shall be deemed delivered on the date of refusal, in the case of refused delivery, or on the date specified in (i), (ii), (iii) or (iv) above, in the case of delay by the addressee.

15.    **FIRE OR OTHER CASUALTY; CONDEMNATION.**

15.1    **Fire or Other Casualty.** If the Property or any part thereof is damaged by fire or other casualty prior to the Closing Date, it shall constitute a "material adverse change" to the Property allowing Purchaser to terminate this Agreement by giving Seller written notice within ten (10) days after such determination, whereupon the Deposit plus

EXECUTION VERSION2

interest shall be refunded in full to Purchaser and neither party shall have any further obligation or liability to the other under this Agreement except for those provisions which specifically survive the termination of this Agreement. If Purchaser does not elect to terminate this Agreement with respect to the Property, then the Closing shall take place as herein provided with a reduction in the Purchase Price equal to the cost to repair such damage and the cost of rent replacement, if disrupted. Seller shall give notice to Purchaser promptly following any fire or other casualty affecting the Property prior to the Closing Date.

15.2   **Condemnation.** If any portion of the Property is taken in eminent domain proceedings after the Effective Date and prior to the Closing (or Seller receives a written notice of eminent domain proceedings to occur) such that Purchaser would reasonably expect to be unable to operate the Property as it is presently operated, or if, as a result thereof, the Tenant would be entitled to terminate the Lease or abate rent thereunder, it shall constitute a "material adverse change" to the Property allowing Purchaser to terminate this Agreement by giving Seller written notice within ten (10) days after such determination, whereupon the Deposit plus interest shall be refunded in full to Purchaser and neither party shall have any further obligation or liability to the other under this Agreement except for those provisions which specifically survive the termination of this Agreement. If Purchaser does not elect to terminate this Agreement with respect to the Property or if the taking does not constitute a "material adverse change", then the Closing shall take place as herein provided without abatement of the Purchase Price, and Seller shall deliver or assign to Purchaser on the Closing Date, all of Seller's right, title and interest in and to all condemnation awards paid or payable to Seller. Seller shall give notice to Purchaser within three (3) Business Days after Seller's receiving notice of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Property.

15.3   **Waiver of California Civil Code Section 1662.** Seller and Purchaser each expressly waive the provisions of California Civil Code Section 1662 and hereby agree that the provisions of this **Section 15** shall govern their obligations in the event of damage or destruction to the Property or condemnation of all or part of the Property.

16.   **COMPLETE AGREEMENT.** This Agreement embodies the complete agreement between the parties hereto and cannot be varied or terminated except by the written agreement of the parties.

17.   **ADDITIONAL DOCUMENTS.** Each party agrees that it will execute and deliver to the other such additional documents, certificates and other matters as may be reasonably requested by the other party or its attorney, whether before or subsequent to the Closing, in order to effectuate the transactions contemplated by this Agreement and to carry out the parties' intent as expressed in this Agreement, provided that such additional documents, certificates and other matters shall be provided without material expense or material additional exposure or liability to the party so providing such items.

18.   **PARTIES BOUND.** This Agreement shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective heirs, personal representatives, successors

and assigns. This Agreement and all rights and obligations hereunder shall not be assignable by Seller without the prior written consent of Purchaser. Purchaser shall not assign its rights and obligations under this Agreement, without the consent of Seller, which consent will not be unreasonably withheld or delayed.

19.   **COMMISSIONS.** Each party represents and warrants that, other than CBRE and Caribou Industries, Inc. ("CII"), neither party has retained any brokers, advisors, consultants or finders to represent its interests in connection with this transaction (including the Lease). The Seller's brokerage fee to CBRE required to be paid in connection with the sale ("CBRE Commission Agreement Amount") will be paid by separate agreement between CBRE and Seller through Escrow at Closing. Seller will pay three hundred sixty thousand dollars ($360,000.00) through escrow at Closing to CII as a capital markets advisory consulting fee ("CII Fee") for services performed representing the Purchaser.. Seller and CBRE will execute a separate agreement confirming the CII Fee ("CII Agreement") and Seller will deposit the CII Agreement into Escrow. Except as provided above, each party agrees to indemnify and hold the other harmless from and against all liabilities, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, resulting from any claims or fees or commissions, based upon agreements by it, if any, to pay any additional broker's commission, consultant fees and/or finder's fee other than as set forth in this Agreement. This **Section 19** shall survive Closing.

20.   **ATTORNEY'S FEES.** In the event of any litigation between the parties to enforce any provision or right under this Agreement, the unsuccessful party covenants and agrees to pay to the successful party all costs and expenses including, but not limited to, reasonable attorney's fees incurred by such party in connection with the litigation.

21.   **TIME.** Time is of the essence of this Agreement.

22.   **DATES.** If the final day of a period or date of performance under this Agreement falls on a day that is not a Business Day, then the final day of the period or the date of performance shall be deemed to fall on the next Business Day.

23.   **COUNTERPARTS.** This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. A version of this Agreement delivered by telecopy or in .pdf format shall have the same legal effect as an originally executed document.

24.   **GOVERNING LAW.** This Agreement is to be governed by and construed in accordance with the internal laws of the State of California. Venue for any litigation arising out of this Agreement shall lie in the State of California circuit courts in and for Orange County, California, or Federal courts situated in Orange County, California, and Seller and Purchaser intentionally submit to the jurisdiction of such courts. The parties hereto waive any right which either or both may have to receive a trial by jury with respect to any claims, controversies or disputes which arise out of this Agreement or the subject matter hereof.

25.   **"AS-IS".** Purchaser acknowledges that, other than those representations and warranties expressly set forth herein, Seller does not warrant or represent to Purchaser that the Property is fit for the purposes intended by Purchaser or for any other purpose or purposes

whatsoever, and Purchaser acknowledges that the Property is to be conveyed to Purchaser "as-is," "where is" in its existing condition on and as of the Closing Date, subject only to the matters set forth in this Agreement or in the instruments to be executed and delivered to Purchaser at Closing. Purchaser is buying the Property based solely on its own investigation, inspection, and evaluation and, except as specifically contained herein or in the instruments to be executed and delivered to Purchaser at Closing, neither Seller or any agent of Seller has made any representation or warranty, express or implied, concerning the Property or which induced Purchaser to execute this Agreement, any other representations and warranties are hereby expressly disclaimed by Seller. This provision shall survive Closing. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE PARTIES AGREE THAT CONCURRENTLY WITH THE CLOSING OF THIS AGREEMENT, THAT THE TENANT (AN AFFILIATE OF SELLER) SHALL LEASE BACK THE PROPERTY AND SHALL BE RESPONSIBLE FOR ALL THE MAINTENANCE AND REPAIR OF THE PROPERTY TO THE EXTENT PROVIDED IN THE LEASE AND COMPLIANCE WITH LAW, INCLUDING COMPLIANCE WITH ALL ENVIRONMENTAL STATUTES, ORDINANCES, AND REGULATIONS, AND FOR ALL DEFECTS TO THE FACILITY AND THE SITE WHETHER THESE CONDITIONS EXISTED PRIOR TO THE COMMENCEMENT OF THE LEASE OR NOT.    NOTHING IN THIS AGREEMENT SHALL LIMIT TENANT'S OBLIGATIONS UNDER THE LEASE RELATING TO ITS LIABILITY FOR ALL EXISTING CONDITIONS OF THE PROPERTY AS OF THE CLOSING DATE.

26.    **NO THIRD PARTY BENEFICIARY**.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity as a third party beneficiary, decree or otherwise.

27.    **RECORDING**.  In no event shall this Agreement or any memorandum of this Agreement be recorded.  Any such recordation or attempted recordation shall constitute a breach of this Agreement by the party performing such recordation or attempted recordation.

28.  **ESCROW**.

28.1    The Deposit shall be held in escrow by Escrow Agent, upon the following terms and conditions:

(i)    Escrow Agent shall deposit the Deposit in an interest-bearing account;

(ii)    Escrow Agent shall deliver to Seller the Deposit plus all interest accrued thereon at and upon the Closing; and

(iii)    If this Agreement is terminated in accordance with the terms hereof, or if the Closing does not take place under this Agreement by reason of the failure of either party to comply with such party's obligations hereunder, Escrow Agent shall pay the Deposit plus all accrued interest thereon to Seller and/or Purchaser, as the case may be, in accordance with the provisions of this Agreement.

28.2    It is agreed that:

EXECUTION VERSION2

(i)     The duties of Escrow Agent are only as herein specifically provided, and, except for the provisions of this **Section 28** hereof, are purely ministerial in nature, and Escrow Agent shall incur no liability whatsoever except for its own willful misconduct or negligence;

(ii)    Escrow Agent shall not be liable or responsible for the collection of the proceeds of any checks used to pay the Deposit;

(iii)   In the performance of its duties hereunder, Escrow Agent shall be entitled to rely upon any document, instrument or signature believed by it to be genuine and signed by either of the other parties or their successors;

(iv)    Escrow Agent may assume that any person purporting to give any notice of instructions in accordance with the provisions hereof has been duly authorized to do so;

(v)     Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless in writing and signed by Seller and Purchaser;

(vi)    Except as otherwise provided in this **Section 28** hereof, Seller and Purchaser shall jointly and severally reimburse and indemnify Escrow Agent for, and hold it harmless against, any and all loss, liability, costs or expenses in connection herewith, including reasonable attorneys' fees and disbursements, incurred without willful misconduct or negligence on the part of Escrow Agent arising out of or in connection with its acceptance of, or the performance of its duties and obligations under, this Agreement, as well as the reasonable costs and expenses of defending against any claim or liability arising out of or relating to this Agreement;

(vii)   Each of Seller and Purchaser hereby releases Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder;

(viii)  Escrow Agent may resign upon ten (10) days written notice to Seller and Purchaser. If a successor Escrow Agent is not appointed by Seller and Purchaser within such ten (10) day period, Escrow Agent may petition a court of competent jurisdiction to name a successor;

(ix)    Escrow Agent is not responsible for levies by taxing authorities based upon the taxpayer identification number used to establish this interest bearing account; and

(x)     Escrow Agent has no liability in the event of failure, insolvency, or inability of the depositary to pay said funds, or accrued interest upon demand for withdrawal.

28.3    Escrow Agent is acting as a stakeholder only with respect to the Deposit. Escrow Agent, except in the event of the Closing, shall not deliver the Deposit nor the interest accrued thereon except on seven (7) days' prior written notice to the parties and only if neither party shall object within such seven (7) day period. If there is any dispute as to whether Escrow Agent is obligated to deliver all or any portion of the Deposit and/or interest accrued thereon or as to whom such Deposit and/or interest accrued thereon is to be delivered, Escrow Agent shall not be required to make any delivery, but in such event Escrow Agent may hold the same until receipt by Escrow Agent of an authorization in writing, signed by all of the parties having any interest in such dispute, directing the disposition of the Deposit and/or interest accrued thereon, or in the absence of such authorization Escrow Agent may hold the Deposit and/or interest accrued thereon until the final determination of the rights of the parties in an appropriate proceeding. If such written authorization is not given or proceedings for such determination are not begun within thirty (30) days after the date Escrow Agent shall have received written notice of such dispute, and thereafter diligently continued, Escrow Agent may, but is not required to, bring an appropriate action or proceeding for leave to deposit the Deposit plus all interest accrued thereon in court pending such determination. Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements, by the party determined not to be entitled to the Deposit and/or interest accrued thereon, or if the Deposit and/or interest accrued thereon is split between the parties hereto, such costs of Escrow Agent shall be split, pro rata, between Seller and Purchaser, in inverse proportion to the amount of the Deposit and/or interest accrued thereon received by each. Upon making delivery of the Deposit and/or interest accrued thereon in the manner provided in this Agreement, Escrow Agent shall have no further obligation or liability hereunder.

28.4    Escrow Agent has executed this Agreement solely to confirm that Escrow Agent has received the Deposit (subject to collection) and will hold the Deposit, in escrow, pursuant to the provisions of this Agreement.

29.    **INDEMNIFICATION BY SELLER.** Seller shall indemnify, defend and hold Purchaser harmless against, and reimburse Purchaser on demand for, any and all losses, obligations, liabilities, claims, costs or expenses, including reasonable attorneys' fees, incurred by Purchaser (whether the claim therefor or proceeding relating thereto is made or commenced prior to or after the date of Closing) as a result of any claim of personal injury or property damage or under any other theory at law or in equity by any third party relating to any injury or damage suffered on the Real Property by any third party before the date of Closing excluding claims of damages resulting from or arising out of any activities of Purchaser on the Property prior to the Closing.

30.    **OUTSIDE CLOSING DATE.** Notwithstanding any other provisions of this Agreement, this Agreement must close no later than August 1, 2015.

31.    **EXCHANGE.** Seller and Purchaser acknowledge and agree that the purchase and sale of the Real Property may be part of a tax-free exchange under Section 1031 of the Internal Revenue Code for either Seller or Purchaser. Each party hereby agrees to take all commercially reasonable steps necessary before, on or after the Closing Date to facilitate such

EXECUTION VERSION2

exchange if requested by the other party; provided, that the party making such accommodation shall not be required to acquire any substitute property or incur any cost, expense or other obligation in connection with such exchange, and provided, further, that the Closing shall not be delayed.

[SIGNATURES ON FOLLOWING PAGE]

EXECUTION VERSION2

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates written below.

SELLER:

FREEDOM SPV II, LLC,
a Delaware limited liability company

By:  FREEDOM COMMUNICATIONS, INC.,
     a Delaware corporation
     its Managing Member

By: _____
Name: Aaron Kushner, Chief Executive Officer

By: _____
Name:  Eric Spitz,  _president_
Date: _____

PURCHASER:

OC MEDIA TOWER L.P.,
a California limited partnership

By:   Southwest Property Investments, Inc., a
California corporation, its General Partner

    By: _____
    Name:  Michael F. Harrah
    Title:  President
Date: _____

Escrow Agent executes below to evidence its agreement to act as Escrow Agent hereunder and to hold and disburse the Deposit in the manner provided herein:

**ESCROW AGENT:**

FIRST AMERICAN TITLE COMPANY

By: _____
Name: ____NATHAN THOMPSON____
Title: ____comm s/o____
Date: _____

EXECUTION VERSION2

EXHIBIT LIST

| | |
|---|---|
| EXHIBIT 1 | Lot Line Adjustment |
| EXHIBIT 1-A | Easements, Set Backs And Notice Rights To Be Contained In The Reciprocal Easement Agreement |
| EXHIBIT 2 | Assignment and Bill of Sale Personal Property |
| EXHIBIT 3 | Contracts |
| EXHIBIT 4 | Lease |
| EXHIBIT 5 | Environmental Studies/Report List |
| EXHIBIT 6 | Insurance Policies |
| EXHIBIT 7 | Due Diligence Materials |
| EXHIBIT 8 | Grant Deed |
| EXHIBIT 9 | Assignment of Contracts |
| EXHIBIT 10 | SNDA |
| EXHIBIT 11 | Estoppel Certificate |
| EXHIBIT 12 | Memorandum of Lease |
| EXHIBIT 13 | Silver Point SNDA |

# EXHIBIT 1
## LAND AND LOT LINE ADJUSTMENT



LOT LINE ADJUSTMENT NO. LL 2014
(MAP)

| OWNERS | EXISTING PARCELS A.P. NUMBER | PROPOSED PARCELS REFERENCE NUMBER |
|---|---|---|
| FREEDOM SPV II, LLC. | PARCEL 1 OF PM NO. 90-377, P.M.B. 207/7-11 | PARCELS 1 AND 3 |
| | PTN LOT 1 OF M.M. 1/20-22 | PARCEL 2 |
| | A.P.N. 398-061-01 THRU 08, 398-391-18, 25 | |
| | 398-111-03 THRU 06, 13, 15, 17, 19, 21, 23 | |

SHEET 1 OF 7                                              SCALE: 1"=240'

ROBERT L. WHEELER IV, LS 8639        DATE

SEE SHEETS 4, 5, 6 AND 7
FOR EASEMENT NOTES

LICENSED LAND SURVEYOR
ROBERT L. WHEELER IV
No. 8639
STATE OF CALIFORNIA

LEGEND

—————— LOT LINE BOUNDARY
—————— REVISED LOT LINE
- - - - - LOT LINES TO BE REVISED
—————— LOT LINES TO REMAIN
(#)  INDICATES SHEET NUMBER

H&A LLA NO. 1335
DWG BY: Y. SU
CHECKED BY: R. WHEELER
I:\OCReg\LLA\1335\SHT01.dwg

INDEX SHEET

## EXHIBIT 1-A
## EASEMENTS, SET BACKS AND NOTICE RIGHTS TO BE CONTAINED
## IN THE RECIPROCAL EASEMENT AGREEMENT

The following setbacks, temporary easements, permanent easements, and notice requirements shall be set forth in a reciprocal easement agreement (the "REA") executed by Purchaser and Seller:

1.    Permanent Easements/Rights:

    a.    Setback easement for the benefit of Parcel 3 (Harrah Parcel) on the southerly portion of the office building where the office building and the warehouse meet.

    b.    Utility easement to pass over Parcel 3 for the benefit of Parcel 1 (Freedom Retained Parcel) for wet and dry utilities.

2    Temporary Easements/Rights:

    a.    Easement for the benefit of Parcel 1 on the southerly portion of the warehouse building for ingress/egress to building via stairwell and sidewalk (temporary – terminates when warehouse building is razed).

    b.    Reciprocal utility easement for shared services to both warehouse and office building (temporary – terminates when warehouse building is razed).

    c.    Easement for ingress/egress for the benefit of Parcel 1 to pass over Parcel 3 for operation of the business (delivery trucks, etc.). Trucks can continue to access 6th Street over the current route, the exact location to be set forth in the REA (temporary – terminates when warehouse building is razed).

    d.    Construction Easement to raze warehouse building and related improvements provided no construction traffic will be allowed over Parcel 3. All construction traffic must use the Fruit Street access only (temporary during demolition/construction period).

3.    City of Santa Ana:

    a.    City to receive notice of termination of the Temporary Easements/Rights specified in Section 2, above.

    b.    Demolition and/or Building permits for Parcel 1 and Parcel 3 cannot be obtained until property owner makes demonstration of compliance with building and fire codes (including requirements for domestic water, sewer, irrigation, and fire access).

**EXHIBIT 2**
**ASSIGNMENT AND BILL OF SALE**
**PERSONAL PROPERTY**


**[SEE ATTACHED]**

## ASSIGNMENT AND BILL OF SALE
## PERSONAL PROPERTY

THIS ASSIGNMENT AND BILL OF SALE ("Bill of Sale") is made this _19_ day of September, 2014, by and between Freedom SPV II, LLC, a Delaware limited liability company ("**Seller**"), and OC Media Tower L.P., a California Limited Partnership, or its permitted assigns ("**Purchaser**").

### R E C I T A L S

A.    Seller and Purchaser have entered into that certain Agreement of Purchase and Sale dated as of September _19_, 2014 (the "Agreement") concerning the purchase by Purchaser from Seller of that certain improved real property (the "Real Property"), described in Exhibit "A" attached hereto and incorporated herein.

B.    Pursuant to Section 1.3 of the Agreement, Seller is making this Bill of Sale to convey the Personal Property (as defined in the Agreement) used in connection with the Real Property or located on the Real Property which is not Excluded Personal Property (as defined in the Agreement) to Purchaser.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller agrees as follows:

1.    Effective as of the Closing Date, Seller hereby gives, grants, bargains, sells, transfers, sets over, conveys, and delivers to Purchaser the Personal Property, but excluding the Excluded Personal Property.

2.    Seller hereby covenants that Seller shall, at any time and from time to time upon written request therefore, execute and deliver to Purchaser such documents as Purchaser may reasonably request in order to fully transfer to and vest the Personal Property in Purchaser.

3.    Seller does hereby warrant to Purchaser as of the date hereof, that Seller has good and marketable title to the Personal Property, free and clear of all liens, mortgages and encumbrances, other than the Permitted Exceptions, and that Seller has the legal right, power and authority to transfer the Personal Property to Purchaser.

4.    Capitalized terms used and not otherwise defined herein have the meanings given then in the Agreement.

EXECUTION VERSION2

**IN WITNESS WHEREOF,** Purchaser and Seller have executed this Agreement as of the day and year first above written.

**SELLER:**

FREEDOM SPV II, LLC,
a Delaware limited liability company

By: FREEDOM COMMUNICATIONS, INC.,
    a Delaware corporation
    its Managing Member

By: _____

    Name: Aaron Kushner
    Title: Chief Executive Officer

By: _____

    Name: Eric Spitz
    Title: President

Date: _____

**PURCHASER:**

OC MEDIA TOWER L.P.,
a California limited partnership

By: Southwest Property Investments, Inc., a
California corporation, its General Partner

    By: _____
    Name: Michael F. Harrah
    Title: President
    Date: _____

**EXHIBIT 3**
**CONTRACTS**

| VENDOR NAME |
| --- |
| Simplex Grinnell |
| Mr. Clean Up |
| Schindler Elevator Corp |
| Linc Mechanical Services |
| UPS Security |
| California Dining Services |
| KDOC |
| Tom's Trucking (dirt lot lease) |
| KKPC / Southern CA. Public Radio |
| Unison (for roof cell site) |

**EXHIBIT 4**
**LEASE**

**[SEE ATTACHED]**

LEASE

Between

OC Media Tower, L.P.

as Landlord

and

Freedom Communications, Inc., initially; and anticipated to be assigned to New Age Media Enterprises, Inc. upon its formation, capitalization, and acquisition of assets from Freedom Communications, Inc. and other assets.

As Tenant

EXECUTION VERSION2

1.    DEFINITIONS, CONSENTS AND CALCULATIONS..............................................1
      1.1    Definitions...................................................................................................1
      1.2    Consents......................................................................................................5
      1.3    Rentable Square Foot Calculations..........................................................5
2.    DEMISE OF PREMISES; QUIET ENJOYMENT ...............................................6
3.    USE ..............................................................................................................................7
4.    TERM ..........................................................................................................................8
5.    RENTAL ......................................................................................................................8
6.    TAXES .......................................................................................................................11
7.    NET LEASE; NON-TERMINABILITY ..............................................................12
8.    SERVICES ................................................................................................................13
9.    REPAIRS AND MAINTENANCE ........................................................................13
10.   DESTRUCTION OF OR DAMAGE TO PREMISES .........................................14
11.   INSURANCE, HOLD HARMLESS AND INDEMNIFICATION ......................16
      11.1   Release and Indemnification...................................................................16
      11.2   Insurance ................................................................................................18
12.   COMPLIANCE WITH LAWS, COVENANTS....................................................20
13.   CONDEMNATION ..................................................................................................21
      13.1   Condemnation .........................................................................................21
14.   DEFAULT ................................................................................................................23
15.   RESULTS OF DEFAULT .......................................................................................24
      15.1   Remedies.................................................................................................24
      15.2   Cure by Landlord ....................................................................................26
16.   SUBORDINATION AND TITLE ..........................................................................27
      16.1   Nondisturbance and Notice.....................................................................27
      16.2   Tenant's Consent to Assignment for Indebtedness.................................28
17.   LANDLORD'S RIGHT OF ENTRY; PARKING; SIGNAGE; ROOF RIGHTS..........30
18.   NOTICES ..................................................................................................................31
19.   ESTOPPEL CERTIFICATE; FINANCIAL DATA ..............................................31
20.   LIENS .......................................................................................................................33
21.   END OF TERM ........................................................................................................34
      21.1   Surrender.................................................................................................34
      21.2   Return of Premises...................................................................................34

22.   ALTERATIONS ................................................................. 35

23.   NOTICE OF LEASE ......................................................... 37

24.   SUBLETTING/ASSIGNMENT ........................................ 37

    24.1   Rights and Obligations of Tenant ............................ 37

    24.2   Assignment of Rents ............................................... 38

25.   HAZARDOUS MATERIAL ............................................. 39

26.   PERMITTED CONTESTS ................................................ 41

27.   COVENANTS OF TENANT ............................................ 41

    27.1   Services .................................................................... 41

    27.2   Premises Maintenance ............................................. 42

    27.3   Compliance With Laws ............................................ 42

28.   ARBITRATION ................................................................ 42

29.   MANAGEMENT ............................................................... 43

30.   PERFORMANCE HOLDBACK ...................................... 43

31.   MISCELLANEOUS PROVISIONS ................................ 45

EXHIBITS

A.   PLANS AND SPECIFICATIONS

B.   NNN OFFICE BUILDING AND PARKING RATE CALCULATIONS

C.   LAND

D.   FACILITIES MANAGEMENT AGREEMENT

E.   PERFORMANCE HOLDBACK NOTE

F.   PERFORMANCE HOLDBACK DEED OF TRUST

THIS LEASE, made and entered into on September _14_, 2014 (together with all amendments and supplements hereto, this "**Lease**"), by and between OC Media Tower, L.P., ("**Landlord**"), a California limited partnership with an office at 1103 North Broadway, Santa Ana, CA 92701; and Freedom Communications, Inc., ("**Tenant**"), a Delaware corporation, with an office at 625 North Grand Avenue, Santa Ana, CA 92701, as the initial tenant, required to be assigned to New Age Media Enterprises, Inc. ("**New Age Media**") upon its formation, capitalization and acquisition of assets from Freedom Communications, Inc. and other assets.

## 1.    DEFINITIONS, CONSENTS AND CALCULATIONS:

1.1    <u>Definitions</u>.    The following terms shall have the following meanings for all purposes of this Lease and shall be equally applicable to both the singular and plural forms of the terms herein defined.

(a)    "**625 Building**" shall mean that certain building located at 625 North Grand Avenue, Santa Ana, CA 92701.

(b)    "**Additional Rent**" shall mean all amounts, liabilities and obligations, other than Fixed Rent, which Tenant assumes or agrees to pay under this Lease to Landlord or others.

(c)    "**Affiliate**" shall mean a Person controlled by; controlling; or under common control with, the Person in question.

(d)    "**Applicable Laws**" shall have the meaning given to such term in Section 12(a).

(e)    "**Appraiser**" shall mean an individual having not less than ten (10) years current experience specializing in commercial properties of a nature and type similar to that of the Premises in the geographic area where the Premises is located.

(f)    "**Assignment of Lease**" shall have the meaning given to such term in Section 16.2.

(g)    "**Base Building**" shall mean the office building containing 184,086 rentable square feet as more particularly described in the Plans and Specifications attached hereto as Exhibit A.

(h)    "**Building**" shall mean a five (5) floor office building plus a basement, containing an aggregate of approximately 184,086 rentable square feet, plus the Parking Garage, plus the Central Building Plant, which currently exist in accordance with the Plans and Specifications attached as Exhibit A.

(i)    "**Business Day**" shall mean any day except Saturdays, Sundays and the days observed by state chartered banks and national banks in the State of California as public holidays.

EXECUTION VERSION2

(j)     "**Central Building Plant**" shall mean that building adjacent to the parking structure housing the HVAC and other mechanical systems servicing the 625 Building.

(k)     "**Commencement Date**" shall be the date Landlord acquires the Land.

(l)     "**Effective Date**" shall mean the date of execution of this Lease, as set forth on the first page hereof.

(m)     "**Environmental Laws**" shall mean the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§6901, et seq. (RCRA), as amended, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 et seq. (CERCLA), as amended, the Toxic Substance Control Act, as amended, 15 U.S.C. §§2601 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, as amended, 7 U.S.C. §§136 et seq., the Clean Air Act, the Hazardous Materials Transportation Act, and all applicable federal, state and local environmental laws, ordinances, rules and regulations, as any of the foregoing may have been or may be from time to time amended, supplemented or supplanted, and any other federal, state or local laws, ordinances, rules and regulations, now or hereafter existing relating to regulations or control of Hazardous Materials.

(n)     "**Event of Default**" shall mean any of the events set forth in Section 14.

(o)     "**Fixed Rent**" shall mean the rental amounts specified on Exhibit B.

(p)     "**Fixture**" shall mean any item of property permanently attached to the Building, Building Plant, Parking Area or the Land as defined in Civil Code §660.

(q)     "**Guarantor**" shall mean NONE.

(r)     "**Hazardous Materials**" shall mean substances defined as "hazardous substances", "hazardous materials", "hazardous wastes" or "toxic substances" in any applicable federal, state or local statute, rule, regulation or determination, including but not limited to Environmental Laws; and asbestos, pcb's, radioactive substances, methane, volatile hydrocarbons, petroleum or petroleum-derived substances or wastes, radon, industrial solvents or any other material as may be specified in Applicable Laws.

(s)     "**Imposition**" shall mean the various tax and other charges referred to in Section 6 herein and the present and future governmental laws and regulations more specifically described in Section 12 herein.

(t)     "**Improvements**" shall mean the Base Building, the Building and all of the structures, improvements, and all Fixtures therein (including, without limitation, parking areas (as defined in subsection 17(b) and driveways) now or hereafter located on the Land.

(u)     "**Insurance Premiums**" shall mean the premium payable on all insurance required to be maintained by Tenant pursuant to Article 11 of the Lease.

(v)     "**Land**" shall mean the land described on Exhibit C hereto.

(w)     **"Landlord's Representatives"** shall mean Landlord's partners, members, shareholders, agents, contractors, managers, directors, officers, employees, invitees or licensees.

(x)     **"Late Fee"** shall have the meaning assigned to it in Section 5(d) below.

(y)     **"Lease Expiration Date"** shall mean the twentieth (20th) anniversary of the first day of the month following the Commencement Date (or if the Commencement Date is the first day of the month, the twentieth (20th) anniversary of such date).

(z)     **"Lease Year"** shall mean a 12 month period, with the first Lease Year commencing on the Commencement Date and subsequent Lease Years on the annual anniversary thereof, as may be applicable; provided, however, that, if the Commencement Date is a day other than the first day of a calendar month, then the first Lease Year shall include that period of time from the Commencement Date up to the first day of the next calendar month plus the following 12 month period, and any subsequent Lease Year shall be the 12 month period beginning on the first day of such month.

(aa)    **"Mortgage"** shall mean any mortgage or deed of trust on the Premises given by Landlord to a Mortgagee to secure a loan encumbered by Landlord's interest in the Premises.

(bb)    **"Mortgagee"** shall mean any holder of a Mortgage with respect to the Premises or any part thereof.

(cc)    **"Notice of Lease"** shall mean a memorandum of this Lease in recordable form executed by Landlord and Tenant to impart constructive notice of this Lease under Applicable Laws.

(dd)    **"Other Taxes"** shall mean all taxes, assessments, excises, levies, fees and charges, whether or not now customary or within the contemplation of Landlord and Tenant, that are levied, assessed, charged, confirmed or imposed by any public or government authority upon, or measured by, or reasonably attributable to, or payable by or imposed upon Landlord with respect to:(i) the Premises; (ii) the cost or value of Tenant's Trade Fixtures; (iii) the cost or value of any leasehold improvements made in or to the Premises by or for Tenant, regardless of whether title to such improvements is vested in Tenant or Landlord; (iv) any Rent payable under this Lease, including any gross income tax or excise tax levied by any public or government authority with respect to the receipt of any such Rent; (v) the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of any portion of the Premises; or (vi) this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises. Other Taxes shall not include federal, state or local income, documentary transfer or inheritance taxes of Landlord, unless levied or assessed against Landlord in whole or in part in lieu of, as a substitute for any Other Taxes.

(ee)    **"Overdue Rate"** shall mean ten percent (10%) per annum.

(ff)    **"Parking Garage"** shall mean the garage structure existing which is contiguous to the 625 Building and which provides parking for the Building as set forth in the Plans and Specifications in Exhibit A. The Parking Garage currently contains 456 spaces.

EXECUTION VERSION2

(gg)    "**Permitted Encumbrances**" shall mean:

(i)     Any liens for taxes, assessments and other governmental charges which are not due and payable;

(ii)    The easements, rights-of-way, encroachments, encumbrances, restrictive covenants or other matters affecting the title to the Premises or any part thereof of record as of the Effective Date of this Lease,  and any Mortgage, Subordination Agreement, Assignment of Lease or other security agreement encumbering the Premises permitted pursuant to the terms of this Lease;

(iii)   This Lease and the rights of Tenant hereunder;

(hh)    "**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, trustee(s) of a trust, unincorporated organization, or government or governmental authority, agency or political subdivision thereof.

(ii)    "**Plans and Specifications**" shall mean those certain plans and specifications for the Building attached as Exhibit A.

(jj)    "**Premises**" shall mean the Land, the Improvements, together with any easements, rights and appurtenances in connection therewith or belonging to the Land and Improvements.  No easement for light, air or view is included with or appurtenant to the Premises.  The foregoing disclaimer has been negotiated by Landlord and Tenant, and is intended as a complete negation of any representation or warranty by Landlord, express or implied with respect to any such easement.

(kk)    "**Primary Term**" shall mean the period beginning on the Effective Date and ending on the Lease Expiration Date.

(ll)    "**Proceeds Trustee**" shall mean a First Mortgagee.  If there is no Mortgagee, then a commercial bank or a trust company so long as such commercial bank or such trust company is licensed to do business in the State of California and has a tangible net worth determined in accordance generally accepted accounting principles of not less than $200,000,000.

(mm) "**Property Taxes**" shall mean all taxes, assessments, excises, levies, fees and charges (and any tax, assessment, excise, levy, fee or charge levied wholly or partly in lieu thereof or as a substitute therefore or as an addition thereto) of every kind and description, general or special, ordinary or extraordinary, foreseen or unforeseen, secured or unsecured, whether or not now customary or within the contemplation of Landlord and Tenant, that are levied, assessed, charged, confirmed or imposed by any public or government authority on or against, or otherwise with respect to, the Premises or any part thereof or any personal property owned or leased by Tenant and used in connection with the Premises.  Property Taxes shall not include federal, state or local income, documentary transfer or inheritance taxes of Landlord, unless levied or assessed against Landlord in whole or in part in lieu of or as a substitute for any

EXECUTION VERSION2

Property Taxes, but shall, for purposes of clarity, specifically <u>include</u> any increase in any of the foregoing amounts payable with respect to the Premises or any part thereof arising out of or as a result of any sale, transfer, encumbrance or other change in ownership directly or indirectly by Landlord or any person or entity comprising Landlord or any of its constituent members, investors, shareholders or otherwise.

 (nn) "**REA**" shall mean: None.

 (oo) "**Renewal Notice**" shall have the meaning given to such term in Section 4(b).

 (pp) "**Renewal Terms**" shall have the meaning given to such term in Section 4(b).

 (qq) "**Rent**" shall mean Fixed Rent and Additional Rent.

 (rr) "**Site Assessment**" shall have the meaning given to that term in Section 25(d).

 (ss) "**Site Reviewers**" shall have the meaning given to that term in Section 25(d).

 (tt) "**Subordination Agreement**" shall have the meaning given to that term in Section 16.1(a).

 (uu) "**Superior Mortgage**" shall have the meaning given to that term in Section 16.1(a).

 (vv) "**Tenant's Representatives**" shall mean Tenant's subtenants, shareholders, agents, directors, officers, employees, contractors, invitees or licensees.

 (ww) "**Tenant's Trade Fixtures**" shall mean all personal property of Tenant in or on the Premises which is not a Fixture or is not in any way permanently attached to the Premises.

 (xx) "**Term**" shall mean the Primary Term and the exercised Renewal Terms.

 1.2 <u>Consents</u>.  Except as otherwise provided herein, whenever in this Lease a party's approval or consent shall be required, same shall not be unreasonably withheld, conditioned or delayed.  If given, such approval or consent shall be given in writing in the manner required for notices under Section 18 herein.

 1.3 <u>Rentable Square Foot Calculations</u>.  During the Term it will be assumed that the Premises contains 184,086 rentable square feet.

2.    DEMISE OF PREMISES; QUIET ENJOYMENT:

(a)    This Lease shall be a binding agreement in full force and effect as of the Effective Date and Tenant has the obligation to pay Fixed and Additional Rent and to perform all of the covenants and agreements set forth in this Lease beginning on the Commencement Date.

(b)    Landlord hereby demises and leases to Tenant and Tenant hereby leases and rents from Landlord the Premises, on the terms and conditions set forth in this Lease.

(c)    As material consideration for entering into this Lease, Tenant agrees to use its commercially reasonable efforts to cause a new entity to be formed tentatively named "New Age Media Enterprises, Inc." and New Age Media will be capitalized with some or all of the assets of: (i) Freedom Communication, Inc., (ii) Manchester Lynch Integrated Media, including The San Diego Union Tribune, (iii) New Age Media Enterprises, Inc. including the Los Angeles Newspaper Group, (iv) The Orange County Register, (v) the Press Enterprise, (vi) the Excelsior, Coast, (vii) Freedom Printing, (viii) Los Angeles Daily News, (ix) Daily Breeze, (x) Press Telegram, (xi) Pasadena Star News, and (xii) the Los Angeles Sun (the "Contemplated Reorganization"). The Contemplated Reorganization may also be completed through creation of a similar company ("Similar Company") capitalized with some or all of Tenant and The San Diego Union Tribune.

(d)    Notwithstanding any other provision of this Lease, Tenant, its employees, customers, and invitees are only allowed, on a non-exclusive basis, to use the 456 parking spaces in the Parking Garage and are not allowed to park vehicles on any other area of the Premises.

(e)    Upon the payment of the Rent and the performance of all the terms of this Lease, Tenant shall at all times during the Term peaceably and quietly enjoy the Premises without any disturbance from Landlord or from any person claiming by, through, or under Landlord, subject to the terms of this Lease and to the terms of any Mortgage encumbering the Premises in existence as of the Effective Date or to which Tenant shall subsequently subordinate as provided in this Lease. Exercise by Landlord of its rights to enter upon the Premises at the times and in the manner as set forth in this Lease shall not constitute a violation of this subsection.

(f)    Landlord and Tenant acknowledge and agree that Landlord owns all Fixtures and all property that is permanently attached to the Premises at any time during the term of this Lease and Tenant has no right or interest in and to any Fixtures or any such permanently attached property.

Tenant acknowledges that Tenant's affiliate previously owned the Premises and sold the Premises to the Landlord and Tenant is fully familiar with the physical condition of the Premises and that Landlord makes no representation or warranty, express or implied, with respect to same or the location, use, description, design, merchantability, fitness for use for a particular purpose, condition or durability thereof, or as to quality of the material or workmanship therein, or as to Landlord's title thereto or ownership thereof, or otherwise; and all risks incidental to the occupancy and operation of the Premises shall be borne by Tenant whether such matter arose prior to or during the Term of this Lease or the occupancy of the Premises by Tenant. Landlord

leases and Tenant accepts the Premises as is with all faults and in the event of any defect or deficiency of any nature in the Premises or any fixture or other item constituting a portion thereof, whether patent or latent, neither Landlord nor Mortgagee shall have any responsibility or liability with respect thereto. TENANT AGREES THAT IT SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE WITH ALL LAWS, INCLUDING ENVIRONMENTAL, ALL LAWS AND REGULATIONS, WHETHER A VIOLATION OF LAWS OR ENVIRONMENTAL REGULATIONS OCCURRED PRIOR TO THE TERM OF THE LEASE OR NOT. FURTHER, TENANT AGREES THAT IT IS SOLELY RESPONSIBLE FOR ANY DAMAGE, REPAIR, MAINTENANCE OF THE PREMISES WHETHER OR NOT DAMAGE IS COVERED BY INSURANCE OR IS AN UNINSURED LOSS. TENANT COMPLETELY WAIVES AND RELEASES THE LANDLORD FROM ANY RESPONSIBILITY FOR THE CONDITION OF THE PROPERTY AS OF THE COMMENCEMENT DATE OF THE LEASE, AND ANY MAINTENANCE OBLIGATION PRIOR TO OR WHICH ARISES DURING THE TERM OF THE LEASE. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION BY LANDLORD OF, AND LANDLORD DOES HEREBY DISCLAIM ANY AND ALL WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO THE PREMISES OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, WHETHER ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

3.    USE:

(a)    Tenant may use and occupy the Premises only for general office use and uses accessory or ancillary thereto. In all events, Tenant shall not use or occupy the same, or knowingly permit them to be used or occupied, contrary to any Applicable Laws; or in any manner which would violate any certificate of occupancy affecting the same; or which would cause structural injury or waste to the Premises or cause the value or usefulness of the Premises, or any portion thereof, to diminish by more than a deminimus amount; or; or materially increase the risk of violation of Environmental Laws; or which would constitute a public or private nuisance or waste. Tenant shall promptly, upon discovery of any such use, take all necessary steps to compel the discontinuance of such use, subject to Tenant's right to contest same, as provided in Section 26 herein.

(b)    In performing its obligations under this Lease, Landlord shall not act contrary to any Applicable Laws; or in any manner which would violate any certificate of occupancy affecting the same; or which would cause structural injury or waste to the Premises or cause the value or usefulness of the Premises, or any portion thereof, to diminish; or increase the risk of violation of Environmental Laws; or which would constitute a public or private nuisance or waste.

(c)    Nothing contained in this Lease and no action by Landlord shall be construed to mean that Landlord has granted to Tenant any authority to do any act or make any agreement that may create any third party or public right, title, interest, lien, charge or other encumbrance upon the estate of Landlord in the Premises.

EXECUTION VERSION2

4.     TERM:

       (a)     The Primary Term shall be for a period beginning on the Effective Date and ending on the Lease Expiration Date, or such earlier or later date as hereinafter provided.

       (b)     Tenant shall have the right, at its option, to renew the Term of this Lease for two (2) renewal terms (collectively, the "**Renewal Terms**"), the first of which shall renew the Term for an additional ten (10) years and the second of which shall renew the Term for an additional four (4) years and eleven (11) months. Each Renewal Term shall commence on the day after the expiration of the preceding term and shall expire on the tenth (10th) anniversary of the last day of the preceding term for the first Renewal Term, and on the last day of the fourth (4th) year and eleventh (11th) month of the second Renewal Term. The option to renew the Term of this Lease as described above shall be exercisable by Tenant giving notice to Landlord (the "**Renewal Notice**") not less than twenty-four (24) months prior to the Lease Expiration Date or not less than twenty-four (24) months prior to the expiration of the previous Renewal Term, as the case may be. Time shall be of the essence with respect to the date of exercising the option, any principle of law to the contrary notwithstanding. The terms and conditions of this Lease shall apply to each Renewal Term with the same force and effect as if such Renewal Term had originally been included in the Primary Term of this Lease. The right of Tenant to the Renewal Terms shall be conditioned upon the following: (i) no Event of Default shall have occurred and remain uncured as of the last date on which the Renewal Notice can be delivered and as of the commencement date of such Renewal Term; and (ii) this Lease being in full force and effect as of the Lease Expiration Date or expiration of the previous Renewal Term, as the case may be.

       (c)     Each notice of election to extend given in accordance with the provisions of this Section 4 shall, subject to the other provisions of this Section, automatically extend this Lease for the Renewal Term, without further writing, provided, however, either party, upon request of the other, will execute and acknowledge, in form suitable for recording as an amendment to the Notice of Lease, an instrument confirming any such extension. Time shall be of the essence with respect to the giving of notice by Tenant to extend this Lease. Tenant shall have no right to extend this Lease except as provided in this Section 4.

5.     RENTAL:

       (a)     Tenant shall pay to Landlord the following amounts as Rent for the Premises:

       (i)     Beginning on the Commencement Date and thereafter on the first day of each month during the Primary Term, Tenant shall pay to Landlord, as annual rent, the monthly Fixed Rent specified on Exhibit B hereto, payable in advance in equal monthly installments (pro-rated for any partial month).

       (ii)    During any exercised Renewal Term, Tenant shall pay to Landlord, as annual rent, the monthly Fixed Rent specified on Exhibit B hereto, payable in advance in equal monthly installments.

EXECUTION VERSION2

> (iii)    Throughout the Term, Tenant shall pay all Additional Rent, whether or not such amounts of money or charges are designated Additional Rent.

(b)    It is the intention of Landlord and Tenant that the Fixed Rent payable during the entire Term shall be absolutely net of all costs and expenses incurred in connection with the management, operation, maintenance and repair of the Premises in accordance with this Lease. Except to the limited extent expressly provided in this Lease, Landlord shall have no obligations or liabilities whatsoever with respect to the ownership, management, operation, maintenance or repair of the Premises (and except as specified in this Lease, no right to incur expenses reimbursable by Tenant) during the Term of this Lease. Tenant shall operate, maintain, and repair the Premises in accordance with this Lease and shall pay all costs and expenses incurred in connection therewith before such costs or expenses become delinquent. Without limiting the generality of the foregoing, beginning on the Commencement Date and throughout the entire Term, Tenant shall pay, as Additional Rent, all Property Taxes, all Other Taxes, and Insurance Premiums that accrue during or are allocable to the Term of this Lease.

(c)    Commencing on the first day of the seventeenth (17th) month and continuing on the first day of each month thereafter, Tenant's fixed rent designated on Exhibit "B" shall be increased by fifty thousand dollars ($50,000.00) per month unless and until Tenant (or New Age Media or Similar Company if the Lease has been assigned to New Age Media or Similar Company) meets one of the following Rental Reduction Benchmarks (as defined below):

> (1)    The Tenant, New Age Media or Similar Company is rated BBB- by Standards and Poors, or

> (2)    Tenant, New Age Media or Similar Company generated at least one hundred million dollars ($100,000,000.00) in revenue and twenty-eight million dollars ($28,000,000.00) in EBITDA for the prior twelve (12) months period which revenue and EBITDA must originate in whole or in part from the merged assets of the San Diego Union Tribune; or

> (3)    The Tenant, New Age Media or Similar Company delivers a guarantor for the entire lease term with a minimum $250,000,000.00 net worth verified by audited financial statements for such guarantor;

> Sections 5(c)(1), 5(c)(2) and 5(c)(3) are collectively referred to as the "Rental Reduction Benchmarks".

Commencing on the first day of the seventeenth (17th) month after Lease Commencement Date and continuing on the first day of each month thereafter until Tenant achieves one of the Rental Reduction Benchmarks, Tenant shall pay an additional fifty thousand dollars ($50,000.00) per month in fixed rent. Commencing on the first day of the seventeenth 17th) month and the first day of each month thereafter until the last day of the third (3rd) Lease year, Landlord shall pay itself the additional fifty thousand dollars ($50,000.00) of fixed rent by deducting the additional fifty thousand dollars ($50,000.00) per month from Tenant's

Performance Holdback. Thereafter, the fifty thousand dollars ($50,000.00) per month rental increase shall be paid directly by Tenant.

In addition, commencing on the first day of the calendar month following the occurrence of either of the events specified in Section 30(b)(i) or (ii) and continuing through the earlier of November 1, 2017 or the date of reconveyance of the first deed of trust in favor of Silver Point Finance, LLC referred to in Section 30(a) below, Tenant shall pay to Landlord additional fixed rent in the amount of $17,877.00 (the "Alternative Performance Rent") which Alternative Performance Rent shall be added to and considered part of fixed rent then due, and paid on a current basis.

(d)    Except as described in Section 5(c) above, Tenant shall pay all Fixed Rent to an account designated by Landlord, in advance, on or before 11 a.m. Pacific Time on the first day of each and every calendar month during the Term of this Lease without notice, by wire transfer or other electronic means (or otherwise so there are collected funds available to Landlord on the due date). Interest at the Overdue Rate shall accrue and be payable by Tenant on Fixed Rent not paid by the due date thereof, from the due date thereof to the date of actual payment. Tenant shall pay all Additional Rent when due to the Person entitled thereto.

(e)    Tenant hereby acknowledges that late payment by Tenant of Fixed Rent and/or Additional Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by any Lender. Accordingly, if any Fixed Rent or Additional Rent shall not be received by Landlord within five (5) days after such amount shall be due, then, without any requirement for notice to Tenant, Tenant shall immediately pay to Landlord a one-time late charge equal to five percent (5%) of each such overdue amount. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.

(f)    In no event shall such late payment charges be deemed to grant to Tenant a grace period or extension of time within which to pay any Rent or prevent Landlord from exercising any right or enforcing any remedy available to Landlord upon Tenant's failure to pay all Rent due under this Lease in a timely fashion, including the right to terminate this Lease.

(g)    If any day on which Fixed Rent is due falls on a day which is not a Business Day, Fixed Rent shall be due and payable on the next succeeding Business Day without interest or penalty if paid on such Business Day.

(h)    In the event of any failure by Tenant to pay or discharge any amount of Additional Rent, Landlord shall have all rights, powers and remedies provided for herein or by law or otherwise in the case of nonpayment of Fixed Rent. Tenant shall pay Additional Rent directly to the Person entitled thereto.

EXECUTION VERSION2

6.    TAXES:

(a)    Tenant shall pay, as Additional Rent, all Property Taxes prior to the assessment of any interest or penalty for late payment.

(b)    Tenant shall pay, as Additional Rent, all Other Taxes prior to the assessment of any interest or penalty for late payment.

(c)    Except for any tax on the net income derived from the Fixed Rent and Additional Rent, if at any time during the Term, any method of taxation shall be such that there shall be levied, assessed or imposed on Landlord, or on the Fixed Rent or Additional Rent, or on the Premises, or any portion thereof, a capital levy, gross receipts tax, occupational license tax or other tax on the Rents received therefrom, or a franchise tax, or an assessment, gross receipts levy or charge measured by or based in whole or in part upon such gross Rents, Tenant, to the extent permitted by law, covenants to pay and discharge the same, it being the intention of the parties hereto that the Fixed Rent to be paid hereunder shall be paid to Landlord absolutely net without deduction or charge of any nature whatsoever, foreseeable or unforeseeable, ordinary or extraordinary, or of any nature, kind, or description, except as otherwise expressly provided in this Lease.

(d)    Except as set forth in subsection (c), Tenant shall pay all Property Taxes and Other Taxes directly to the appropriate taxing authorities.  Tenant shall furnish Landlord, within 15 days after payment of Property Taxes and Other Taxes, official receipts of the appropriate taxing authority, if any, or other appropriate proof reasonably satisfactory to Landlord, evidencing the payment of the same.  The certificate, advice or bill of the appropriate official designated by law to make or issue the same or to receive payment of any Imposition may be relied upon by Landlord or Tenant as sufficient evidence that such Imposition is due and unpaid at the time of making or issuance of such certificate, advice or bill.  Landlord shall use reasonable efforts to provide Tenant with timely notice, together with copies, of any tax bills, invoices or other payment demands within five (5) Business Days of receipt thereof by Landlord.

(e)    During the continuance of an Event of Default hereunder or if there are more than two (2) Tenant Defaults in any twelve (12) month period, Landlord may deliver to Tenant Landlord's reasonable estimate of the Property Taxes, Other Taxes, and Insurance Premiums which it anticipates will be paid or incurred for the ensuing calendar year or fiscal year, as Landlord may reasonably determine, and Tenant shall pay to Landlord (or if Landlord so directs, to Landlord's Mortgagee) an amount equal to the estimated amount of such Property Taxes, Other Taxes, and Insurance Premiums for such year in equal monthly installments during such year with the installments of Fixed Rent.  Payment by Tenant of estimated amounts of Property Taxes, Other Taxes, and Insurance Premiums under this subsection shall be considered as performance of such obligation under the provisions of subsections (a) and (b) above.  If Landlord shall have elected to bill Tenant for Property Taxes, Other Taxes, and Insurance Premiums on an estimated basis in accordance with this provision, Landlord will furnish to Tenant within 120 days following the end of the applicable calendar or fiscal year, as the case may be, a statement setting forth (i) the amount of such Property Taxes, Other Taxes, and Insurance Premiums paid during the just ended calendar or fiscal year, and (ii) the amount that Tenant has paid to Landlord for credit against such expenses for the stated period, Landlord

EXECUTION VERSION2

shall, at its election, either (i) credit the amount of any overpayment toward the next ensuing payment or payments of Property Taxes, Other Taxes, and Insurance Premiums that would otherwise be due or (ii) refund in cash to Tenant the amount of such overpayment. If such year end statement shall show that Tenant did not pay its obligation for such Property Taxes, Other Taxes, and Insurance Premiums in full, then Tenant shall pay to Landlord the amount of such underpayment within 30 days from Landlord's billing of same to Tenant. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

(f)     Tenant shall have the right to contest the amount or validity, in whole or in part, of any Property Tax or Other Tax or Other Impositions or to seek a reduction in the valuation of the Premises as assessed for real estate property tax purposes by appropriate proceedings diligently conducted in good faith pursuant to Section 26 herein. Landlord shall not be required to join in any proceeding referred to in this subsection unless required by law, in which event Landlord shall, upon written request by Tenant, join in such proceedings or permit the same to be brought in its name. Tenant covenants that Landlord shall not suffer or sustain any costs or expenses (including, but not limited to, counsel fees) or any liability in connection with any such proceeding. No such consent shall subject Landlord to any material civil liability or the risk of any criminal liability, or result in any lien being placed on the Premises.

7.     NET LEASE; NON-TERMINABILITY:

(a)     This is an absolutely net lease, and the Rent and all other sums payable hereunder by Tenant shall be paid without notice (except as expressly provided herein), demand, set-off, counterclaim, abatement, suspension, deduction or defense. It is the intention of the parties hereto that the Fixed Rent shall be an absolutely net return to Landlord throughout the Term of this Lease. In order that such Fixed Rent shall be absolutely net to Landlord, Tenant shall pay when due, and save Landlord harmless from and against, any and all costs, charges and expenses attributable to the Premises and allocable to the Term, including but not limited to, each fine, fee, penalty, charge (including governmental charges), assessments, sewer rent, Impositions, insurance premiums, Property Taxes, utility expenses, carrying charges, costs, expenses and obligations of every kind and nature whatsoever, general and special, ordinary or extraordinary, foreseen or unforeseen, the payment for which Landlord or Tenant is, or shall become liable by reason of any rights or interest of Landlord or Tenant in, to or under the Premises or this Lease or in any manner relating to the ownership, leasing, operation, management, maintenance, repair, rebuilding (whether the rebuilding is covered by insurance or not) use or occupation of the Premises, or of any portion thereof, Other Taxes, utility expenses; provided, however, that nothing herein contained shall be construed as imposing upon Tenant any obligation to pay any income, estate, inheritance, succession or transfer tax of Landlord growing out of, or levied in connection with, this Lease or Landlord's right or interest in the Premises.

(b)     This Lease shall not terminate, nor shall Tenant have any right to terminate this Lease, nor shall Tenant be entitled to any abatement or reduction of Rent hereunder, nor shall the obligations of Tenant under this Lease be affected, by reason of (i) any damage to or destruction of all or any part of the Premises from whatever cause; (ii) subject to Section 13 herein, the taking of the Premises or any portion thereof by condemnation, requisition or otherwise; (iii) the prohibition, limitation or restriction of Tenant's use of all or any part of the

EXECUTION VERSION2

Premises, or any interference with such use; (iv) any eviction by paramount title or; (v) any default on the part of Landlord under this Lease, or under any other agreement to which Landlord and Tenant may be parties; or (vi) any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements; that the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events except as expressly provided in this Lease; and that the obligations of Tenant hereunder shall continue unaffected unless the requirement to pay or perform the same shall have been terminated pursuant to any express provision of this Lease. Tenant agrees that Tenant will not be relieved of the obligations to pay Fixed Rent or any Additional Rent in case of damage to or destruction of the Premises.

(c)     Tenant shall remain obligated under this Lease in accordance with its terms, and will not take any action to terminate, rescind or avoid this Lease, notwithstanding the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution or winding-up or other proceeding affecting Landlord or its successor in interest.

(d)     Except as otherwise expressly provided herein, Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or the Premises or any part thereof; or (ii) to any abatement, suspension, deferment or reduction of the Rent or any other sums payable under this Lease.

8.     SERVICES:

Tenant shall, at Tenant's sole cost and expense, supply the Premises with electricity, heating, ventilating and air conditioning, water, natural gas, lighting, replacement for all lights, restroom supplies, telephone service, window washing, security service, janitor, scavenger and disposal services (including hazardous and biological waste disposal), and such other services as Tenant determines to furnish to the Premises. Landlord shall not be in default hereunder or be liable for any damage or loss directly or indirectly resulting from, nor shall the Fixed Rent or Additional Rent be abated or a constructive or other eviction be deemed to have occurred by reason of, the installation, use or interruption of use of any equipment in connection with the furnishing of any of the foregoing services, any failure to furnish or delay in furnishing any such services, whether such failure or delay is caused by accident or any condition beyond the control of Landlord or Tenant or by the making of repairs or improvements to the Premises, or any limitation, curtailment, rationing or restriction on use of water, electricity, gas or any form of energy serving the Premises, whether such results from mandatory governmental restriction or voluntary compliance with governmental guidelines. Tenant shall pay the full cost of all of the foregoing services and all other utilities and services supplied to the Premises as Additional Rent.

9.     REPAIRS AND MAINTENANCE:

(a)     Tenant shall, at its expense, keep the Premises in good order and condition at all times during the Term of this Lease to a standard not lower than that of owners and operators of similar first class properties in Orange County, California. Tenant shall promptly and adequately repair the Premises and all its component parts, and replace or repair all damaged

or broken fixtures (including Tenant's Trade Fixtures) and appurtenances. In addition, Tenant shall timely and properly maintain, repair and to the extent necessary in Landlord's reasonable judgment, replace the Premises, so as to maintain the same in good condition and repair, but in all events so as to preserve the effectiveness of any warranty relating thereto. The parties shall arrange an annual inspection by Landlord's representatives to review compliance with Tenant's obligations hereunder. If any building system or component shall become obsolete, Tenant shall remove such item from the Premises and, promptly replace it with a new item of comparable value and function. Tenant shall obtain Landlord's prior written consent before making any change in the structure of the Improvements or any building system. Landlord shall have no obligation, to repair or maintain the Premises (or any equipment therein), whether ordinary or extraordinary.

(b)      Tenant shall maintain on the Premises and Tenant shall turn over to Landlord upon expiration or termination of this Lease, current operating manuals for the equipment now or hereafter located on the Premises. Upon expiration or earlier termination of this Lease, Tenant will also provide Landlord with copies of any operating manuals in Tenant's possession relating to (i) all current equipment and any new equipment added to the Premises by Tenant after the Commencement Date and (ii) replacement equipment added to the Premises after the Commencement Date, as well as (iii) updates and supplements to any operating manuals relating to equipment located on the Premises. Tenant shall not install any underground storage tank on the Land.

10.    DESTRUCTION OF OR DAMAGE TO PREMISES:

(a)      If the Premises, or any part thereof, are damaged by fire or other casualty during the Term, whether such damage is covered by insurance or is an uninsured loss, Tenant shall diligently repair such damage and restore the Premises to substantially the same or better condition as existed before the occurrence of such fire or other casualty, using materials of the same or better grade than that of the materials being replaced, and this Lease shall remain in full force and effect. Such repair and replacement by Tenant shall be done in accordance with Sections 9 and 22 herein, subject to then Applicable Laws, and Tenant shall, at its expense, obtain all permits required for such work. In no event shall Fixed Rent or Additional Rent abate, nor shall this Lease terminate by reason of such damage or destruction. Provided that no Event of Default has occurred hereunder and is continuing and no default described in Sections 14(a), (c), (d) or (e) has occurred and is continuing, and provided Tenant has (i) delivered to Landlord plans and specifications and a budget for such repair and restoration (all of which Landlord shall have approved in its reasonable judgment), and (ii) deposited with Landlord or the Proceeds Trustee hereinafter mentioned cash in the sum equal to the excess, if any, of the total cost set forth in such approved budget over the amount of insurance proceeds received on account of such casualty, then Landlord shall make available to Tenant all insurance proceeds actually received by Landlord and not paid over to the Proceeds Trustee on account of such casualty, for application to the costs of such approved repair and restoration, as set forth below. Tenant's obligations under this Section 10 shall survive the termination or expiration of this Lease. If this Lease shall terminate by its terms prior to completion of Tenant's renovation obligations, Fixed Rent shall continue to be payable hereunder until substantial completion of the restoration, at the same rate as the Fixed Rent for the last month of the Term, and Tenant's obligations hereunder, including payment of Additional Rent, shall continue until completion of the restoration.

EXECUTION VERSION2

(b)     Notwithstanding anything to the contrary contained in Section 10(a), in the event that (i) the Premises are damaged or destroyed, (ii) Tenant is required to repair and restore the Premises as provided above, and (iii) the time reasonably necessary for Tenant to repair and restore the Premises as provided above (including time reasonably anticipated for design, planning, Landlord's and any Mortgagee's approvals, permitting and construction) is reasonably estimated to exceed the then remaining term of the Lease (inclusive or any then exercised or exercisable extension option), then Tenant upon written notice to Landlord given within 90 days of such damage or destruction may extend the term of this Lease to that date which is two (2) years after the reasonably anticipated date of completion of Tenant's repair and restoration of the Premises upon all of the then applicable terms and conditions of this Lease.

(c)     Subject to any procedures set forth in any Mortgage, in the event the estimated cost of reconstruction is in excess of $250,000.00, all insurance proceeds shall be paid to or deposited with the Proceeds Trustee in the name of the Proceeds Trustee as trustee for Landlord and Tenant and disbursed in the manner hereinafter provided. If no Mortgage is then in effect, the Proceeds Trustee shall be designated by Landlord and reasonably approved by Tenant. Insurance proceeds shall be deposited in an interest bearing account and interest shall be distributed to Tenant upon completion of portions of said installation, repair, replacement or rebuilding, provided no Event of Default has occurred and is continuing hereunder. Provided that no Event of Default has occurred and is continuing hereunder, insurance proceeds shall be disbursed to Tenant by the Proceeds Trustee under the following procedure:

(i)     No more frequently than once per calendar month, Tenant may request that the Proceeds Trustee reimburse Tenant out of such insurance proceeds for costs incurred by Tenant for completed work to repair and restore the Premises during the immediately preceding calendar month, less customary retainage retained by Tenant from the contractor, as reflected in the contractor's request for payment. Tenant's request shall include a certification by Tenant, Tenant's independent, licensed architect and its general contractor that all work for which reimbursement is requested was performed in compliance with the plans and specifications approved by Landlord pursuant to Section 22 herein and all Applicable Laws, and shall include reasonably satisfactory evidence of the costs incurred by Tenant and lien releases in form and substance reasonably satisfactory to the Proceeds Trustee executed by all mechanics, materialmen, laborers, suppliers and contractors who performed any portion of the repair work or supplied materials, to the extent that such waivers are permitted under Applicable Laws.

(ii)     Within 10 days after receiving Tenant's request, the Proceeds Trustee shall approve or disapprove Tenant's request, which approval shall not be unreasonably withheld, by notice to Tenant. If the Proceeds Trustee approves all or any portion of a request and the Proceeds Trustee has received (and not previously disbursed) insurance proceeds, then the Proceeds Trustee's approval shall

include a check in the amount approved by the Proceeds Trustee. If the Proceeds Trustee disapproves all or any portion of a request, then the Proceeds Trustee's notice shall state the reasons for that disapproval. The Proceeds Trustee's failure to deliver a notice approving or disapproving a request within such 10 day period shall be conclusively deemed the Proceeds Trustee's approval of the request. In addition, the Proceeds Trustee shall have the right to impose other conditions upon disbursement so long as they are consistent with customary construction loan disbursement practices.

(iii)    In addition, prior to commencement of restoration and at any time during restoration, if the estimated cost of restoration, as reasonably determined by the Proceeds Trustee, exceeds the then amount of the proceeds account, the amount of such excess shall be paid by Tenant to the Proceeds Trustee promptly after Tenant's receipt of written notice and be added to the proceeds account. Any sum which remains in the proceeds account upon the completion of restoration shall be paid to Tenant.

(d)    In the event that the Premises suffers an insured loss, and the Mortgagee requires insurance payments to pay down the principal of the Note, rather than making insurance proceeds available to rebuild the Property, the Tenant's obligation to rebuild the Premises shall be excused until or unless the Mortgagee or Landlord makes an amount equal to the insurance proceeds available to rebuild the Premises and in which event and only in such event (i) Tenant may terminate this Lease if such damage or destruction shall result in the Premises being economically impracticable for the use being made at the time of such damage or destruction, and (ii) if this Lease is not terminated as provided in (i) above, the Fixed Rent payable under this Lease shall be equitably reduced.

## 11.    INSURANCE, HOLD HARMLESS AND INDEMNIFICATION:

### 11.1    Release and Indemnification.

(a)    Landlord shall not be liable to Tenant for any damage to or loss or theft of any property or for any bodily or personal injury, illness or death of any person in, on or about the Premises arising at any time on and after the Commencement Date and from any cause whatsoever except (i) to the extent caused by the gross negligence or willful misconduct of Landlord or Landlord's Representatives, and (ii) any act or omission of Landlord, Landlord's Representatives or any Mortgagee or of its agents, contractors, employees or invitees, which results in a knowing violation of any Applicable Law. This subsection shall in no way modify the obligations of Tenant which are set forth in subsection 7(a) herein. Except as specified above, Tenant waives all claims against Landlord arising from any liability described in this subsection. For the purposes of clarity, Caribou Industries, Inc. and all of its agents, contractors, employees, and invitees, while acting in its capacity as the Facilities Manager of the Premises, shall be deemed Tenant's Agent and Representative, and not Landlord's Representative.

EXECUTION VERSION2

(b)    Tenant shall pay and indemnify and defend Landlord, Landlord's Representatives and any Mortgagee against and hold Landlord, Landlord's Representatives and any Mortgagee harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising during the Term and arising from or related to (i) any use or occupancy of the Premises, (ii) any condition of the Premises, (iii) any damage to any property (including property of employees and invitees of Tenant) or any bodily or personal injury, illness or death of any person (including employees and invitees of Tenant) from any cause whatsoever, occurring in, on or about the Premises or any part thereof or any part of the Improvements or the Land constituting a part of the Premises or occurring outside the Premises when such damage, bodily or personal injury, illness or death is caused by any act or omission of Tenant or Tenant's Representatives, except, in the case of (i) through (iii) above, to the extent caused by (w) the gross negligence or willful misconduct of Landlord or Landlord's Representatives; (x) the gross negligence or willful misconduct of any Mortgagee, or its agents, contractors, employees or invitees; (y) any act or omission of Landlord, Landlord's Representatives or any Mortgagee or of its agents, contractors, employees or invitees, which results in a knowing violation of any Applicable l Law. This subsection (b) shall in no way modify the obligations of Tenant which are set forth in subsection 7(a) herein. This Section shall survive the termination of this Lease with respect to any event arising or occurring during the Term. Except as specified in this Section, the waiver provision in subsection (a) and the indemnity provision in this subsection are intended to exculpate and indemnify Landlord, Landlord's Representatives and the Mortgagee and its agents (i) from and against the consequences of their own negligence or fault to the extent such party is negligent or contributorily, partially, jointly, comparatively or concurrently negligent with Tenant or any other person and (ii) from and against any liability of Landlord, Landlord's Representatives or the Mortgagee and its agents based on any applicable doctrine of strict liability.

(c)    Should any event occur for which any Person is entitled to indemnification pursuant to subsection (b) above or other provisions of this Lease, such Person shall provide prompt written notice to Tenant describing the nature of such claim (provided, however, that the failure by such Person to so notify Tenant shall not limit or otherwise affect the obligations and liabilities of Tenant hereunder provided that such failure does not prevent or materially impair Tenant from so indemnifying such Person). Tenant may assume responsibility for any action to be taken to contest the claim, provided that Tenant will notify the indemnified Person in writing of its intention to contest such claim within ten (10) days after receipt of notice of the claim. Tenant, at its sole expense, may control all proceedings relating to such contest, provided that no Event of Default is continuing and that Tenant has acknowledged its obligation to provide indemnification hereunder relating to the applicable claim. The indemnified Person will cooperate with Tenant in contesting such claim, provided that Tenant indemnifies and holds harmless the indemnified Person for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) relating to contesting such claim. Any counsel selected by Tenant hereunder shall be reasonably acceptable to the indemnified Person, and the indemnified Person, at its option, shall have the right to contest such claim through separate counsel in the event any claims against or defenses of such Person are in conflict under the applicable standards of professional conduct with those of Tenant, and Tenant shall be obligated to pay for all reasonable costs and expenses (including without limitation reasonable attorneys' fees and expenses) actually incurred relating to any such separate contest of such claim.

EXECUTION VERSION2

11.2   <u>Insurance.</u>

(a)   Tenant shall, at all times beginning on the Commencement Date and during the Term, at Tenant's sole expense, obtain and keep in force and shall not alter the following with respect to the Building:

(i)   comprehensive commercial general liability insurance, including contractual liability (specifically covering this Lease), fire legal liability, and premises operations, all on an "occurrence" policy form, with a minimum combined single limit in the amount of $1,000,000 per occurrence for bodily or personal injury to, illness of, or death of persons and damage to property occurring in, on or about the Premises, and such insurance shall name Landlord and the Mortgagee as additional insureds. Tenant shall maintain excess or umbrella liability insurance in an amount not less than $25,000,000 written on an occurrence basis (i.e. not claims made basis) providing coverage limits in excess of the insurance limits required under this subsection (a). Such insurance shall follow from the primary insurance and the aggregate and drop down in case of exhaustion of underlying limits and /or damages where insurable under Applicable Laws. Tenant shall, at Tenant's expense, be responsible for insuring Tenant's furniture, equipment, fixtures, computers, office machines and personal property. At the end of every year of the Lease Term, in the event that the foregoing requirements of this subsection shall be below then current industry standards for first class office buildings in Orange County, California, Tenant shall, at Landlord's request, increase the required amount of liability insurance to such then prevailing industry standard. If Tenant voluntarily carries any greater amount of liability insurance than required hereunder and applicable to the Premises, such insurance shall comply with the requirements of this Section;

(ii)   worker's compensation and employer's liability insurance;

(iii)   insurance against loss (including terrorism, and flood excluding earthquake) or damage to the Premises by fire and all other risks of physical loss covered by insurance of the type now known as "all risk," with difference in conditions coverage, in an amount not less than the full replacement cost of the Premises (without deduction for depreciation), including the cost of debris removal and such endorsements as Landlord may reasonably require, including without limitation, insurance in amounts and against such other risks as the Mortgagee may reasonably require and against such risks as are customarily insured against by operators of similar properties in Orange County, California excluding earthquake coverage.

EXECUTION VERSION2

    (iv)    insurance for boilers and pressure vessels or equipment located on the Premises in a minimum amount of $2,000,000 per occurrence;

    (v)    business interruption insurance covering one (1) year of Fixed Rent and Additional Rent; and

    (vi)    such other insurance, in such amounts and against such risks, as is customarily maintained by owners and operators of similar properties.

    (b)    All insurance required to be maintained by Tenant under this Section and all renewals thereof shall be issued by good and responsible companies qualified to do and doing business in the State of California and having Standard & Poor's Corporation claims paying ability rating of at least "A" and shall be reasonably satisfactory to Landlord and Mortgagee. In the event that Tenant's insurance company's Standard & Poor's Corporation claims paying ability rating falls below an "A" rating, unless Landlord and Mortgagee consent to an insurance company with a lower rating, Tenant shall promptly, after becoming aware of the insurance company's downgrade, acquire all insurance required to be maintained by Tenant hereunder from a new insurance company having Standard & Poor's Corporation claims paying ability rating of at least "A"; provided however, that at no time shall Tenant permit any insurance policy to lapse. Deductible amounts in excess of (i) $250,000 for "all risk" property insurance required by Section 11.2(a)(iii) and insurance required under Section 11.2(a)(iv), and (ii) $1,000,000 for all insurance required by Section 11.2(a)(ii) and (iii) shall be subject to Landlord's and Mortgagee's prior written approval. In the event payment is made on any policy where a deductible amount is in effect, Tenant shall pay such deductible amount to the recipient of the insurance proceeds at the time such insurance proceeds are paid to such recipient. Each policy to be maintained by Tenant shall expressly provide that the policy shall not be canceled without thirty (30) days' prior written notice to Landlord and Mortgagee and shall remain in effect notwithstanding any such cancellation until such notice shall have been given to Landlord and Mortgagee and such period of thirty (30) days shall have expired. All property and casualty insurance shall list Landlord, Southwest Property Investments, Inc., Caribou Industries, Inc., Michael F. Harrah and Mortgagee as an additional insured and Mortgagee as "loss payee", and all other insurance (excluding workers compensation insurance) under this Section to be maintained by Tenant shall name Landlord and the Mortgagee as additional insureds. All insurance shall be primary and noncontributing with any insurance which may be carried by Landlord, shall afford coverage for all claims based on any act, omission, event or condition that occurred or arose (or the onset of which occurred or arose) during the policy period, and shall expressly provide that Landlord, although named as an additional insured, shall nevertheless be entitled to recover under the policy for any loss, injury or damage to Landlord. Tenant may carry such insurance under "blanket" policies, provided such policies specifically allocate coverage amounts for the Premises equal to the amount required by this Lease. Upon the issuance of each such policy to be maintained by Tenant, Tenant shall deliver a certificate thereof (Accord 27 form) to Landlord for retention by Landlord or the Mortgagee. Landlord and/or Mortgagee, shall have the right, upon reasonable notice to Tenant, to inspect, review and make copies of all insurance policies required to be maintained by Tenant at Tenant's corporate headquarters or such other location where Tenant keeps said policies provided that Landlord and Mortgage shall keep and maintain all such information and copies as confidential.

(c)     Landlord and Tenant each hereby waives its respective right of recovery against the other and each releases the other from any claim arising out of loss, damage or destruction to the Premises and contents thereon or therein, to the extent of net insurance proceeds actually received by the releasing party or the Proceeds Trustee, whether or not such loss, damage or destruction may be attributable to the fault or negligence of either party, or any of its respective partners, agents, invitees, contractors or employees, or any agents, invitees, contractors or employees of any partner or member of Landlord. The property insurance policy shall include a waiver of the insurer's rights of subrogation. If such waiver is not available at reasonable cost, Tenant shall promptly notify Landlord of such fact. Each party shall look first to the proceeds of its respective property insurance policy (and to its own funds to the extent it is self-insured) to compensate it for any such loss, damage or destruction.

(d)     Tenant shall not obtain or carry separate insurance concurrent in form or contributing in the event of loss with that required in this Section 11.2 to be furnished by Tenant, unless Landlord and Mortgagee are named as loss payee on all property and casualty policies and Landlord and Mortgagee are included therein as additional insureds on all other policies, with loss payable as in this Lease provided. Tenant shall immediately notify Landlord whenever any such separate insurance is obtained and shall deliver to Landlord and Mortgagee the policy or policies or certificates evidencing the same.

(e)     Tenant shall comply with all of the terms and conditions of each insurance policy maintained pursuant to the terms of this Lease, and shall not use the Premises in any manner which would void or otherwise adversely affect any insurance then in force with respect thereto.

12.     COMPLIANCE WITH LAWS, COVENANTS:

(a)     Throughout the Term, Tenant shall, with respect to Tenant's use, occupancy and maintenance of the Premises and all other matters, promptly comply and cause the Premises to comply with or remove or cure any violation of any and all present and future laws, including, without limitation, the Americans with Disabilities Act of 1990, as the same may be amended from time to time, ordinances (zoning or otherwise), orders, rules, regulations and requirements of all Federal, State, municipal and other governmental bodies having jurisdiction over the Premises and the appropriate departments, commissions, boards and officers thereof, and the orders, rules and regulations of the Board of Fire Underwriters where the Premises are situated, or any other body now or hereafter constituted exercising lawful or valid authority over the Premises, or any portion thereof, or exercising authority with respect to the use or manner of use of the Premises, and whether the compliance, curing or removal of any such violation and the costs and expenses necessitated thereby shall have been foreseen or unforeseen, ordinary or extraordinary, and whether or not the same shall be presently within the contemplation of Landlord or Tenant or shall involve any change in governmental policy, or require structural or extraordinary repairs, alterations or additions by Tenant and irrespective of the amount of the costs thereof. Tenant, at its sole cost and expense, shall comply with all agreements, contracts, easements, restrictions, reservations or covenants, if any, encumbering the Land or the Improvements, including the REA, or hereafter created by Tenant or consented to, in writing, by Tenant or requested, in writing, by Tenant. Tenant shall also comply with, observe and perform all provisions and requirements of all policies of insurance maintained by Tenant

EXECUTION VERSION2

with respect to the Premises under the terms of Section 11 herein and shall comply with all development permits issued by governmental authorities issued in connection with development of the Premises. The laws, ordinances, rules, regulations and requirements referred to in this Section 12 are collectively referred to as "Applicable Laws". It is the intent of the parties that throughout the Term Tenant shall be responsible for compliance with Applicable Laws which require any physical modifications to the Building.

(b)     If Tenant shall at any time fail to pay any Imposition in accordance with the provisions of this Lease, or to take out, pay for, maintain and deliver any of the insurance policies or certificates of insurance provided for in Section 11 herein, or shall fail to make any other payment or perform any other act on its part to be made or performed hereunder, then Landlord, after 30 days' prior notice to Tenant (or without notice in situations where Landlord determines that delay is likely to cause harm to Landlord's interest in the Premises), and without waiving or releasing Tenant from any obligation of Tenant contained in this Lease, may, but shall be under no obligation to do so, cure such non-performance for the account of Tenant in accordance with the provisions of Section 15.2 herein, and any amount of reasonable costs so incurred by Landlord shall be reimbursed by Tenant to Landlord within 30 days following Landlord's statement therefore, together with interest from the date incurred by Landlord to the date of full reimbursement by Tenant at the Overdue Rate.

(c)     Landlord may enter upon the Premises for any such purpose described in subsection (b) above and take all such action therein or thereon as may be necessary therefore provided that Landlord shall provide Tenant with not less than two (2) Business Days prior notice of any entry into the Premises (except in the case of an emergency, where no notice shall be required), shall allow a Tenant's Representative to be present to monitor all such activities, and Landlord shall keep and maintain all information concerning Tenant's business operations obtained or observed as confidential. All sums, reasonable under the circumstances, actually so paid by Landlord and all costs and expenses, including reasonable attorneys' fees incurred by Landlord in connection with the performance of any such act, shall be paid by Tenant to Landlord within 30 days after Landlord's statement therefore and submission of reasonable evidence of such expenditures, together with interest from the date incurred by Landlord to the date of full reimbursement by Tenant at the Overdue Rate. Landlord shall not be limited in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force insurance as aforesaid, to the amount of the insurance premium or premiums not paid or incurred by Tenant, and which would have been payable upon such insurance, but Landlord shall also be entitled to recover, as damages for such breach, the uninsured amount of any loss, damages, costs and expenses of suit, including reasonable attorneys' fees, suffered or incurred by reason of damage to or destruction of the Premises, or any portion thereof or other damage or loss which Tenant is required to insure against hereunder, occurring during any period when Tenant shall have failed or neglected to provide insurance as aforesaid.

13.    CONDEMNATION:

13.1    <u>Condemnation</u>. In the case of taking by exercise of any right of eminent domain or condemnation or the giving of a deed in lieu thereof (each, a "Taking") of the Premises, the following provisions shall control:

EXECUTION VERSION2

(a)    In the event of a Taking of the entire Premises (a "Total Taking"), this Lease shall terminate as of the date on which such Taking shall be effective, or shall continue, in accordance with this Section 13 as follows:

(i)    In the case of a Taking (excluding a temporary Taking) of such substantial part of the Premises as shall result in the Premises remaining after such Taking (even if restorations were made) being economically impractical for the use being made at the time of such Taking, then in any such event, a Total Taking shall be deemed to have occurred, and Tenant, at its option, may terminate this Lease by written notice given to Landlord within sixty (60) days after such Total Taking with no further obligation to Landlord as of the date of Taking.

(b)    In case of a Taking of the Premises other than a Total Taking (herein a "Partial Taking"), this Lease shall remain in full force and effect as follows:

(i)    This Lease shall remain in full force and effect as to the remaining portion of the Premises and any net condemnation award will be applied by Landlord to prepayment of any Mortgage, and there will be an equitable reduction in Fixed Rent based upon the remaining usable square footage and parking spaces.

(ii)    If and to the extent that the awards or payments, if any, on account of such Partial Taking shall be sufficient for Tenant to economically restore and occupy the Premises, to the extent such awards or payments are made available to Tenant, Tenant will promptly commence and complete restoration of the Premises and Parking Area as nearly as possible to its condition and character immediately prior to such Partial Taking, any net condemnation award will be applied by Landlord to prepayment of any Mortgage, and there will be an equitable reduction of Rent; provided that in case of a Partial Taking for temporary use not to exceed 3 months, Tenant shall not be required to effect such restoration until such Partial Taking is terminated.

(c)    The entire compensation or award attributable to any Taking in whole or in part shall belong to Landlord without any deduction therefrom for any present or future estate or other right of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest in and to any such award. Tenant shall, however, be entitled to such award as may be allowed for moving expenses, fixtures and other equipment installed by it and any other compensation allowed to a tenant of a condemned property under Applicable Laws, but only if such award or other compensation shall be in addition to the award otherwise available to or for the benefit of Landlord.

EXECUTION VERSION2

(d)     Notwithstanding anything contained herein to the contrary, it is agreed and understood that Tenant shall not initiate any condemnation proceedings during the term of this Lease against the Premises in its own name or in the name of any related municipal authority.

14.    DEFAULT:

The occurrence of any one or more of the following events (each an "Event of Default") shall constitute a breach of this Lease by Tenant:

(a)     Tenant fails to pay any Fixed Rent as and when such Fixed Rent becomes due and payable and said failure continues for five (5) days after notice to Tenant, or Tenant fails to pay any Additional Rent within ten (10) days after notice thereof to Tenant; or

(b)     Tenant fails to perform or breaches any other agreement or covenant of this Lease to be performed or observed by Tenant as and when performance or observance is due and such failure or breach continues for more than 30 days after notice thereof to Tenant; provided, however, that if, by the nature of such agreement or covenant, such failure or breach is capable of being cured, cannot reasonably be cured by the payment of money and cannot reasonably be cured within such period of 30 days, an Event of Default shall not exist as long as Tenant commences with due diligence and dispatch the curing of such failure or breach within such period of 30 days and, having so commenced, thereafter prosecutes with diligence and dispatch and completes the curing of such failure or breach within a reasonable time, to be not later than one hundred twenty (120) days following receipt of such notice; or

(c)     Tenant or Guarantor (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction, (ii) makes an assignment for the benefit of its creditors, or (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers, with respect to Tenant or Guarantor or of any substantial part of Tenant's or Guarantor's property; or

(d)     Without consent by Tenant or Guarantor, as applicable, a court or government authority enters an order, and such order is not vacated within 90 days, (i) appointing a custodian, receiver, trustee or other officer with similar powers with respect to Tenant or Guarantor or with respect to any substantial part of Tenant's or Guarantor's property, or (ii) constituting an order for relief or approving a petition for relief or reorganization or arrangement or any other petition in bankruptcy, insolvency or other debtors' relief law of any jurisdiction, or (iii) ordering the dissolution, winding-up or liquidation of Tenant or Guarantor; or

(e)     This Lease or any estate of Tenant hereunder is levied upon under any attachment or execution and such attachment or execution is not vacated within 60 days; or

(f)     Any of Tenant's representations or warranties contained in this Lease or in any certificate or other writing delivered pursuant hereto or thereto shall have been incorrect in any material adverse respect when made;

EXECUTION VERSION2

(g)     Tenant fails to maintain insurance in accordance with Section 11.2 hereof and said failure continues for five (5) business days.

Landlord may treat the occurrence of any one or more of the foregoing Events of Default as a breach of this Lease.  For so long as such Event of Default continues, Landlord, at its option and with or without notice or demand of any kind to Tenant or any other person, may have any one or more of the remedies provided in this Lease, in addition to all other remedies and rights provided at law or in equity.

## 15.   RESULTS OF DEFAULT:

15.1   Remedies.   In the event of any Event of Default, Landlord may, in addition to, and not in derogation of any remedies for any preceding breach, with or without notice of demand (except as otherwise expressly provided herein) and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such Event of Default, exercise any one or more of the following remedies:

(a)     Landlord shall have the right at any time to give a written termination notice to Tenant and, on the date specified in such notice, Tenant's right to possession shall terminate and this Lease shall terminate and Tenant shall immediately quit the Premises.  Upon such termination, Landlord shall have the right to recover from Tenant:

(i)     The worth at the time of determination of all unpaid Rent which had been earned at the date of termination;

(ii)    The worth at the time of determination of the amount by which all unpaid Rent which would have been earned after termination until the time of determination exceeds Landlord's net income from the Premises, as determined pursuant to subsection (b) below;

(iii)   The worth at the time of determination of the amount by which all unpaid Rent for the balance of the Term of this Lease after the time of determination exceeds the rent actually received by Landlord from reletting the Premises, as determined pursuant to subsection (b) below; and

(iv)    All other amounts reasonably necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform all of Tenant's obligations under this Lease which in the ordinary course of events would be likely to result therefrom, including but not limited to the costs of recovering possession of the Premises, expenses of reletting, including necessary renovation or alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commissions paid by Landlord in connection with this Lease applicable to the unexpired Term of the Lease and any prepayment penalty, make whole premium, or fee however denominated, payable under the mortgage. The "worth at the time of determination" of the amounts referred to in clause (i)

above shall be computed by allowing interest at the discount rate of the New York Federal Reserve Bank at the time of award plus one percent (1%). The "worth at the time of determination" of the amount referred to in clauses (ii) and (iii) above and subsection (b) below shall be computed by discounting such amount at the discount rate of the New York Federal Reserve Bank at the time of award plus one percent (1%). For the purpose of determining unpaid Rent under clause (i), (ii) and (iii) above, the Rent reserved in this Lease shall be deemed to be the total Rent payable by Tenant under this Lease, and it shall be presumed that Additional Rent for the balance of the Term shall increase a certain percentage per annum, which shall be the same percentage as the average of the annual percentage increase in Additional Rents for each of the last full five (5) Lease Years prior to the Lease termination exceeded Additional Rent for the immediately preceding Lease Year. Efforts by Landlord to mitigate damages caused by Tenant's breach of this Lease shall not waive Landlord's right to recover any damages to which Landlord is otherwise entitled. If the termination of this Lease is obtained by the provisional remedy of unlawful detainer, Landlord shall have the right to recover in such proceeding all unpaid rent and damages as are recoverable therein, or Landlord may reserve the right to recover all or any portion thereof in a separate suit.

(b)     At the time of such termination, whether or not Landlord shall have collected any monthly deficiencies as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord damages for Tenant's default, an amount equal to the worth at the time of determination of the difference between the Rent reserved hereunder for the then unexpired portion of the Term and the then fair and reasonable rental value of the Premises for the same period. It shall be presumed that Additional Rent for the balance of the Term shall increase by the same percentage described in the last sentence of subsection (a)(iv) above. Nothing herein contained shall limit or prejudice the right of Landlord to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above. Any Rent or damages not paid by Tenant within 30 days after the due date thereof shall thereafter be payable with interest at the Overdue Rate in effect from time to time, from the due date to the date of full payment.

(c)     Even though Tenant has breached this Lease, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the right to enforce all its rights and remedies under this Lease, including the right to recover all Rent as it becomes due under this Lease. Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession unless notice of termination is given by Landlord to Tenant. If Landlord elects to relet the Premises, this Lease shall be deemed terminated and any net income (after reasonable

EXECUTION VERSION2

costs of preparing the Premises for reletting including marketing costs, the cost of alterations and improvements paid by Landlord, brokerage commissions, attorneys' fees and other costs incurred in connection with reletting) shall be deducted from the amount Tenant is obligated to pay under this Section.

(d)     If Tenant abandons or surrenders the Premises, or is dispossessed by process of law or otherwise, any movable furniture, equipment, trade fixtures or personal property belonging to Tenant and left in the Premises shall be deemed to be abandoned, at the option of Landlord, and Landlord shall have the right to sell or otherwise dispose of such personal property in any commercially reasonable manner at Tenant's expense

(e)     To the extent permitted by, and subject to the requirements of, Applicable Laws, each and every right, power and remedy herein specifically given to Landlord or otherwise in this Lease shall be cumulative and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute. Each and every right, power and remedy, whether specifically herein given or otherwise existing, may be exercised from time to time and as often and in such order as may be deemed expedient by Landlord, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any right, power or remedy. No delay or omission by Landlord in the exercise of any right, power or remedy or in the pursuit of any remedy shall impair any such right, power or remedy or be construed to be a waiver of any default on the part of Tenant or to be an acquiescence therein. Landlord's consent to any request made by Tenant shall not be deemed to constitute or preclude the necessity for obtaining Landlord's consent, in the future, to all similar requests. No express or implied waiver by Landlord of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default. To the extent required by Applicable Laws, and only to such extent, Landlord shall use reasonable efforts to mitigate any damages suffered by Landlord that result from an Event of Default.

(f)     If an action shall be brought for the enforcement of any provision of this Lease, in which it shall be determined that an Event of Default has occurred, Tenant shall pay to Landlord all costs and other expenses which may become payable as a result thereof, including reasonable attorneys' fees and expenses. If Landlord shall, without fault on its part, be made a party to any litigation commenced against Tenant, at Tenant's sole option, shall be required either to defend Landlord in such litigation with counsel reasonably acceptable to Landlord or pay all costs and reasonable attorneys' fees actually incurred or paid by Landlord in connection with such litigation.

15.2   Cure by Landlord.  All agreements and covenants to be performed or observed by Tenant under this Lease shall be at Tenant's sole cost and expense and without any abatement of Fixed Rent or Additional Rent. If Tenant fails to pay any sum of money to be paid by Tenant or to perform any other act to be performed by Tenant under this Lease as and when due or required to be performed, and such failure continues beyond 30 days' written notice to Tenant, except in the event of emergencies (when only immediate notice shall be required), Landlord shall have the right, but shall not be obligated, and without waiving or releasing Tenant from any obligations of Tenant, to make any such payment or to perform any such other act on behalf of Tenant in accordance with this Lease. All reasonable sums so paid by Landlord and all

EXECUTION VERSION2

necessary incidental costs shall be deemed Additional Rent hereunder and shall be payable by Tenant to Landlord within 30 days following Landlord's statement therefore and submission of reasonable evidence of such expenditures, together with interest thereon from the date paid by Landlord to the date of full reimbursement from Tenant at the Overdue Rate.  Landlord shall have the same rights and remedies in the event of the nonpayment of such sums plus interest by Tenant as in the case of default by Tenant in the payment of Rent.

16.    SUBORDINATION AND TITLE:

16.1    Nondisturbance and Notice.

(a)    Tenant shall at any time hereafter, and from time to time within 30 days of written request of Landlord, execute and deliver to Landlord an instrument in the form customarily used by institutional first Mortgagees subjecting and subordinating this Lease to the lien of any mortgage, deed of trust, security instrument, ground or underlying lease or other document of like nature (hereinafter collectively referred to as "**Superior Mortgage**") which at any time may be placed upon the Premises, or any portion thereof, by Landlord, and to any replacements, renewals, amendments, consolidations, modifications, extensions or refinancings thereof, and to each and every advance made under any Superior Mortgage provided that so long as there exists no Event of Default, such subordination agreement or other instrument, release or document (herein "**Subordination Agreement**") shall provide that the Mortgagee under the Superior Mortgage shall not interfere with, hinder or reduce Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises, and all portions thereof, and to conduct its business thereon in accordance with the covenants, conditions, provisions, terms and agreements of this Lease.  The costs of preparing and recording such document after the date of this Lease shall be borne by Landlord.

(b)    If any Mortgagee shall succeed to the rights of Landlord under this Lease or to ownership of the Premises, whether through possession or foreclosure or the delivery of a deed to the Premises in lieu of foreclosure, then such Mortgagee shall automatically be deemed to have recognized this Lease and to assume the obligations of Landlord hereunder accruing on and after the date such Mortgagee acquired title to the Premises, and Tenant shall attorn to and recognize such Mortgagee as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument that such Mortgagee may reasonably request to evidence such attornment (whether before or after the making of the Mortgage).  In the event of any other transfer of Landlord's interest hereunder, such transferee shall automatically be deemed to have recognized this Lease and to assume the obligations of Landlord hereunder accruing on and after the date of such transfer, Tenant shall attorn to and recognize such transferee as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument that such transferee and Landlord may reasonably request to evidence such attornment.

(c)    Notwithstanding the provisions of subsection (a), the holder of any Mortgage to which this Lease is subject and subordinate shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

EXECUTION VERSION2

16.2   <u>Tenant's Consent to Assignment for Indebtedness</u>.   Tenant acknowledges that in order to secure Landlord's obligations under any Mortgage debt documents, Landlord will be required to agree in an assignment of lease and/or in the Mortgage (an "**Assignment of Lease**"), among other things, to the assignment (to the extent provided therein) to the Mortgagee of Landlord's right, title and interest to this Lease and to the undertakings of Tenant in this Section. While the Assignment of Lease and the Mortgage are in effect, Tenant hereby:

    (a)    consents to such assignment;

    (b)    upon written notice from Mortgagee that such payment shall be required and only with respect to one such Mortgage at any one time, covenants to make in full to Mortgagee, in Mortgagee's name, when due (without offset, deduction, defense, deferment, abatement or diminution, except as provided in this Lease), by wire transfer of immediately available funds in accordance with the terms of this Lease, in full satisfaction of Tenant's obligations under the Lease for payment of any sums so paid:

        (i)    each payment of Fixed Rent and, to the extent not directly payable by Tenant to third parties or governmental authorities, all Additional Rent.

        (ii)    all other sums payable to Landlord under this Lease.

    (c)    agrees from and after the date Tenant receives written notice of the Assignment of Lease or Mortgage:

        (i)    to deliver to the Mortgagee copies of all notices and other communications which Tenant is required to deliver to the Mortgagee pursuant to this Lease;

        (ii)    that all consents to be delivered by Landlord pursuant to this Lease shall not be effective unless consent is also given by the Mortgagee, to the extent Mortgagee consent is required by the debt documents;

        (iii)    to deliver to the Mortgagee copies of all written notices and other communications delivered to Landlord pursuant to this Lease, in accordance with this Lease, of the making of any election, the exercise of any right to terminate all or any portion of this Lease, and the exercise of any option;

        (iv)    to deliver to the Mortgagee, at such address as the Mortgagee shall designate, all such payments and sums specified in subparagraph (b) above and all such notices and other communications specified in subparagraphs (i) and (iii) above;

        (v)    that it shall not, except as provided in this Lease or under applicable law, seek to recover from the Mortgagee any moneys paid to the Mortgagee by virtue of the Assignment of Lease and

EXECUTION VERSION2

the foregoing provisions; provided, however, that neither the Assignment of Lease nor the foregoing provisions shall limit Tenant's right to recover (x) any duplicate payment made to the Mortgagee, whether due to computational or administrative error or otherwise, if the Mortgagee has received such payment; (y) all or any portion of a payment in excess of the amount then due under this Lease or otherwise owed by Tenant to Landlord under this Lease, if the Mortgagee has received such payment or amount; and (z) any amounts that have been paid to or are actually held by the Mortgagee that are required to be refunded to, repaid, or otherwise released to or for the benefit of Tenant under this Lease;

(vi)     that no payment of Rent (other than payments required by this Lease to be paid to third parties) required pursuant to subparagraph (b) above or delivery of such notices or other communications required pursuant to subparagraphs (i) and (iii) above by Tenant shall be of any force or effect unless paid to the Mortgagee or delivered to the Mortgagee as provided above;

(vii)    that Tenant shall not pay any Rent more than thirty 30 days prior to such payment's scheduled due date except as provided in this Lease;

(viii)   that Tenant shall not enter into any agreement subordinating or (except as expressly permitted by the terms of this Lease as in effect on the date hereof) terminating this Lease without the prior written consent of the Mortgagee, and any such attempted subordination or termination without such consent shall be void;

(ix)     that Tenant shall not enter into any amendment or modification of this Lease without the prior written consent of the Mortgagee, and any such attempted amendment or modification without such consent shall be void;

(x)      that if this Lease shall be amended, it shall continue to constitute collateral under the Mortgage without the necessity of any further act by Landlord, Tenant or the Mortgagee;

(xi)     that except as expressly provided in this Lease, Tenant shall not take any action to terminate, rescind or avoid this Lease, notwithstanding, to the fullest extent permitted by law, the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution or other proceeding affecting Landlord or any assignee of Landlord and notwithstanding any action with respect to the Lease which may be taken by an assignee, trustee or receiver of Landlord or of any such assignee or by any court in any such proceedings; and

(xii)   that the Mortgagee is entitled to all rights and benefits, including without limitation rights to indemnification, specifically referencing Mortgagee as set forth in this Lease, notwithstanding the fact that Mortgagee is not a party to this Lease.

The parties acknowledge and agree that any Mortgagee shall be a third party beneficiary of the provisions contained in this Section.

17.    LANDLORD'S RIGHT OF ENTRY; PARKING; SIGNAGE; ROOF RIGHTS:

(a)    Landlord and Landlord's Representatives shall have the right to enter the Premises at any time during normal business hours in order to perform its obligations under this Lease, and any part of the Premises for any other reason on two (2) Business Days' advance notice and to inspect the same, post notices of non-responsibility, post notices required by Applicable Laws, exhibit the Premises to prospective purchasers and mortgagees, and examine Tenant's books and records pertaining to the Premises, insurance policies, certificates of occupancy and other documents, records and permits in Tenant's possession with respect to the Premises, all of which shall be customary and adequate and reasonably satisfactory to Landlord, and Tenant's Representative shall be allowed to be present to monitor all such entry, and Landlord, Landlord's Representatives and any other Person entering the Premises with Landlord or Landlord's Representatives shall keep and maintain all information concerning Tenant's business operations obtained or observed as confidential.

(b)    Tenant shall have the exclusive use of 456 parking spaces currently existing in the parking Garage and Tenant shall pay as additional parking rent $75 per space per month for the first year of the Term ("**Additional Parking Rent**"). This Additional Parking Rent shall increase at the rate of three percent (3%) per year during the Term as outlined in Exhibit B. The location of Tenant's parking spaces shall be as designated in the Plans and Specifications. Subject to zoning approval, Tenant may designate all or any portion of the parking areas as reserved.

(c)    Tenant shall have the right to name the Premises. Tenant shall have the right to monument and exterior building signage, provided such signage is in accordance with Applicable Laws, for Tenant's exclusive use as currently existing on the 625 Building. Tenant shall have the right to determine the exterior building signage on the Premises subject to Landlord's consent, provided that such signage is in accordance with Applicable Laws. Other than signage which must be installed by Tenant in order to comply with Applicable Laws, Tenant shall have the exclusive right to determine and establish all interior signage within the Premises. Upon Landlord's request not less than three (3) months prior to the Lease Expiration Date or the end of a Renewal Term, or within ten (10) days after an earlier termination of this Lease, as the case may be, Tenant at its own expense prior to the effective date of expiration or termination shall remove all such signage and restore any damage to the Premises resulting from such removal.

(d)    Tenant shall have the exclusive right, at Tenant's expense, to install, access and maintain an antenna, satellite dish or other communications devices on the roof of the Building, subject to compliance with Applicable Laws, in a manner reasonably acceptable to

Landlord and so as to not adversely affect the character of the Building. Tenant shall take all actions necessary to prevent any such installations from adversely affecting applicable warranties with respect to the roof, and will indemnify and hold harmless Landlord with respect to any actions which adversely affect such warranties.

18.    NOTICES:   Notices, statements, demands, or other communications required or permitted to be given, rendered or made by either party to the other pursuant to this Lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Lease) and shall be deemed to have been properly given, rendered or made, when received by registered mail with return receipt or overnight courier delivery with receipt of delivery, or facsimile or email transmission with a confirmation copy sent on the same day by overnight courier delivery addressed to the other parties, as follows:

To Landlord:
    OC Media Tower, L.P.
    ATTN: Michael F. Harrah
    1103 North Broadway
    Santa Ana, CA 92701
    Fax No. 714-543-9484
    Email: MFH@caribouind.com

To Tenant:
    Freedom Communications, Inc.
    625 N. Grand Avenue
    Santa Ana, CA 92701
    Attention: Eric Spitz
        and Aaron Kushner
    Fax: (714) 835-5349
    Email: spitz@freedom.com

With a copy to:
    Stephen L. Fingal, Esq.
    Fingal, Fahrney & Clark, LLP
    5120 Campus Drive, Suite 200
    Newport Beach, CA 92660
    Fax: (949) 723-8108
    Email: sfingal@ffc-law.com

With a copies to:
Freedom Communications, Inc.
    ATTN: Corporate Counsel
    625 North Grand Avenue
    Santa Ana, CA 92701
    Fax No. (714) 835-5349
    Email: spitz@freedom.com

    William F. Meehan, Esq.
    Rutan & Tucker, LLP
    611 Anton Boulevard, 14th Floor
    Costa Mesa, CA 92626
    Fax: (714) 546-9035
    Email: wmeehan@rutan.com

Any party listed in this Section may, by notices as aforesaid, designate a different address for addresses for notices, statements, demands or other communications intended for it.

19.    ESTOPPEL CERTIFICATE; FINANCIAL DATA:

       (a)    At any time and from time to time, Tenant shall, within fifteen (15) days after written request by Landlord or a Mortgagee, execute, acknowledge and deliver to Landlord and/or such Mortgagee a certificate certifying: (i) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification); (ii) the Commencement Date,

the Lease Expiration Date and the date, if any, to which all Rent and other sums payable hereunder have been paid; (iii) the amount of Fixed Rent currently payable monthly, (iv) that no notice has been received by Tenant of any default by Tenant hereunder which has not been cured, except as to defaults specified in such certificate; (v) to Tenant's knowledge that Landlord is not in default under this Lease, except as to defaults specified in such certificate; and (vi) such other factual matters as may be reasonably requested by Landlord or any current or prospective purchaser or mortgage lender. Any such certificate may be relied upon by Landlord and any current or prospective purchaser or mortgage lender of the Premises or any part thereof.

(b)    At any time and from time to time, Landlord shall, within fifteen (15) days after written request by Tenant, execute, acknowledge and deliver to Tenant a certificate certifying: (i) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification); (ii) the Commencement Date, the Lease Expiration Date and the date, if any, to which all Rent and other sums payable hereunder have been paid; (iii) the amount of Fixed Rent currently payable monthly, (iv) that no notice has been provided by Landlord of any default by Tenant hereunder which has not been cured, except as to defaults specified in such certificate; (v) to Landlord's knowledge that Tenant is not in default under this Lease, except as to defaults specified in such certificate; and (vi) such other factual matters as may be reasonably requested by Tenant, any prospective assignee of this Lease, or other party then dealing with Tenant. Any such certificate may be relied upon by Tenant, any prospective assignee of this Lease, or other party then dealing with Tenant.

(c)    Upon request by Landlord or any actual or prospective Mortgagee, Tenant shall deliver to Landlord and any such Mortgagee the following information with respect to Tenant and/or Guarantor, and, all of which, if not generally available to the public, shall be received and maintained by the recipient thereof in confidence, at the following times:

(1)    within 180 days after the end of each fiscal year of Guarantor, (i) an audited balance sheet of Tenant and Guarantor and its consolidated subsidiaries, if any, at the end of such year, (ii) an audited statement of profits and losses of Tenant and Guarantor and its consolidated subsidiaries for such year, and (iii) an audited statement of cash flows of Tenant or Guarantor and its consolidated subsidiaries, if any, setting forth in each case, in comparative form, the corresponding figures for the preceding fiscal year in reasonable detail and scope and certified by independent chartered accountants of recognized international standing selected by Tenant or Guarantor;

(2)    within 45 days after the end of each of the first three (3) fiscal quarters of Tenant (i) a balance sheet of Tenant and its consolidated subsidiaries at the end of such quarter, (ii) statements of profits and losses of Tenant and its consolidated subsidiaries for such quarter and (iii) a statement of cash flows of Tenant and its consolidated subsidiaries for such quarter, setting forth in each case, in comparative form, the corresponding figures for the similar quarter of the preceding year, in reasonable detail and scope, and certified to be true and complete by a financial officer of Tenant, as applicable having knowledge thereof; the foregoing financial statements all being prepared in accordance with generally accepted accounting principles or international accounting principles, as applicable, consistently applied.

EXECUTION VERSION2

       (3)    if applicable, within the filing period required by the Securities and Exchange Commission, a Form 20-F for Tenant as distributed to the United States Securities and Exchange Commission.

20.    LIENS:

       (a)    Tenant shall not suffer or permit any mechanic's lien or other lien, security interest or encumbrance to be filed or recorded against the Premises, the Rent, equipment or materials supplied or claimed to have been supplied to the Premises, other than Permitted Encumbrances. If any such mechanic's lien or other lien or encumbrance shall at any time be filed or recorded against the Premises, or any portion thereof, Tenant shall cause the same to be discharged of record (by bonding off or otherwise) within thirty (30) days after the date of filing or recording of the same. However, in the event Tenant desires to contest the validity of any lien it shall, within the thirty (30) day period referred to above, (i) notify Landlord, in writing, that Tenant intends to so contest same and (ii) deposit with Landlord or Mortgagee a bond or other security (in form and content reasonably satisfactory to Landlord and the Mortgagee) for the payment of the full amount of such lien, and from time to time deposit additional security so that, at all times, adequate security will be available for the payment of the full amount of the lien together with all interest, penalties, costs and other charges in respect thereof.

       (b)    If Tenant complies with the foregoing, and Tenant continues, in good faith, to contest the validity of such lien in accordance with the requirements of Section 26, Tenant shall be under no obligation to pay such lien until such time as the same has been decreed, by court order, to be a valid lien on the Premises. Any surplus deposit retained by Landlord, after the payment or discharge of the lien shall be repaid to Tenant. Tenant shall indemnify and defend Landlord and any Mortgagee against and save Landlord and any Mortgagee and the Premises, and any portion thereof, harmless from and against all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including without limitation, reasonable attorneys' fees, resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien or the attempt by Tenant to discharge same as above provided.

       (c)    All materialmen, contractors, artisans, engineers, mechanics, laborers and any other Person now or hereafter furnishing any labor, services, materials, supplies or equipment to Tenant with respect to the Premises, or any portion thereof, are hereby charged with notice that they must look exclusively to Tenant to obtain payment for the same. Notice is hereby given that Landlord shall not be liable for any labor, services, materials, supplies, machinery, fixtures or equipment furnished or to be furnished to Tenant upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Landlord in and to the Premises, or any portion thereof.

       (d)    In the event of the failure of Tenant to discharge any charge, lien, security interest or encumbrance as aforesaid, Landlord may, if not discharged by Tenant within three (3) Business Days after notice to Tenant, discharge such items by payment or bond or both, and Tenant will repay to Landlord, upon demand, any and all amounts paid by Landlord therefore, or

EXECUTION VERSION2

by reason of any liability on such bond, and also any and all incidental expenses, including reasonable attorneys' fees, actually incurred by Landlord in connection therewith, together with interest at the Overdue Rate.

21.    END OF TERM:

21.1    Surrender.

(a)    Upon the expiration or earlier termination of the Term of this Lease, Tenant shall surrender the Premises to Landlord in the same condition and suitable for the same use in which the Premises were on the Commencement Date, except (X) to the extent, if any, provided in Section 10 herein, and (Y) as repaired, rebuilt or altered as required or permitted by this Lease (or, in the case of termination pursuant to Section 13 herein, as condemned), and in all cases except for ordinary wear and tear, and shall surrender keys to the Premises to Landlord at the place then fixed for notices to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any. Except as otherwise provided herein, Tenant shall at such time remove all of its property. All property of Tenant not removed on or before the last day of the Term of this Lease shall be deemed abandoned. Landlord may remove all property of Tenant from the Premises upon termination of this Lease and cause its transportation and storage, at the sole risk of Tenant, all at Tenant's sole cost and expense, and Landlord shall not be liable for damage, theft, misappropriation or loss thereof and Landlord shall not be liable in any manner in respect thereto and Landlord shall be entitled to dispose of such property, as Landlord deems fit, without the requirement of an accounting. The provisions of this Section 21.1 shall survive termination of this Lease.

(b)    If the Premises are not surrendered as above set forth, Tenant shall indemnify, defend and hold Landlord harmless from and against any actual out of pocket costs or expenses reasonably incurred by Landlord resulting from the delay by Tenant in so surrendering Premises, including, without limitation, any claim made by any succeeding occupant founded on such delay. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease. If Tenant holds possession of the Premises after expiration of the Term of this Lease, Tenant shall remain liable for payment of all Additional Rent and in addition Tenant shall pay to Landlord a sum equal to 125% of the Fixed Rent for the first month and 150% of the Fixed Rent payable hereunder immediately prior to the termination thereafter, during each month or pro-rata portion thereof for which Tenant shall remain in possession of the Premises or any part thereof after the termination of the Term or of Tenant's rights of possession, whether by lapse of time or otherwise. The provisions of this subsection shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein, at law or at equity, and shall survive termination of this Lease.

(c)    Except for surrender upon the expiration or earlier termination of the Term hereof as expressly provided herein, no surrender to Landlord of this Lease or of the Premises shall be valid or effective unless agreed to and accepted in writing by Landlord and Mortgagee.

21.2    Return of Premises.

Tenant shall, upon the expiration or termination of this Lease, and at its own expense, return the Premises to Landlord by surrendering the same into the possession of Landlord:

     (a)    Free and clear of all liens, except Permitted Encumbrances and liens created or caused by Landlord or Landlord's Representatives; and

     (b)    In all material respects in compliance with all Applicable Laws and with the maintenance conditions required by this Lease.

     (c)    Upon the return of the Premises, Tenant shall deliver therewith:

        (i)    all transferable licenses, permits and the like by general assignment, on an "as-is" basis, without warranty as to the transferability or otherwise and without recourse;

        (ii)    as-built drawings including plans for HVAC, mechanical and electrical systems, to the extent in Tenant's possession or control;

        (iii)    keys to the Premises; and

        (iv)    an assignment of maintenance contracts designated by Landlord and existing warranties by general assignment, on an "as-is" basis, without warranty as to assignability or otherwise and without recourse.

     (d)    Tenant shall have the right, but not the obligation, to remove any of its trade or specialty fixtures, cabling, security system, phone equipment and other telecommunication equipment upon the expiration or earlier termination of the Term.

22.    ALTERATIONS:

     (a)    Tenant shall not make any alterations, additions or improvements in or to the Premises or any part thereof, or attach any fixtures or equipment thereto, without Landlord's prior written consent. Notwithstanding the preceding sentence, Tenant may make such alterations, additions or improvements without Landlord's consent only if (i) such alterations, additions or improvements will be in compliance with all Applicable Laws and any requirements of the REA; (ii) such alterations, additions or improvements will not reduce the fair market value of the Premises or materially and adversely change the character or reduce the useful life of the Building or materially or adversely change the Building; (iii) such alterations, additions or improvements will not affect in any way the structural, exterior or roof elements of the Premises or mechanical, electrical, plumbing, utility or life safety systems of the Premises or require any material demolition, and (iv) such alterations are reasonably estimated to have a cost (with respect to any particular project) of less than $100,000. Tenant shall give prior notice of any such alterations, additions or improvements (regardless of whether consent is required) to Landlord. In no event shall Tenant be permitted to install underground storage tanks or fuel systems on the Premises.

EXECUTION VERSION2

(b)    All alterations, additions or improvements proposed by Tenant and requiring Landlord's consent shall be made at Tenant's sole cost and expense as follows:

(i)    Tenant shall submit to Landlord complete plans and specifications for all work to be done by Tenant. Such plans and specifications shall be prepared by the licensed architect(s) and engineer(s), shall comply with all Applicable Laws, shall not adversely affect the structural elements of the Building and shall be in a form sufficient to secure the approval of all government authorities with jurisdiction over the Premises.

(ii)   With respect to alterations for which Landlord's approval is required, within ten (10) Business Days after receipt of the complete plans and specifications described above, Landlord shall notify Tenant in writing whether Landlord approves or disapproves such plans and specifications; and Landlord shall describe the reasons for any such disapproval. Landlord's failure to deliver a notice within the time period specified above approving or disapproving such plans and specifications shall be conclusively deemed Landlord's approval of such plans and specifications. Tenant may submit to Landlord revised plans and specifications for Landlord's prior written approval, which approval shall be deemed granted if Landlord shall fail to object, describing the reasons for disapproval, within five (5) Business Days. Tenant shall pay all costs, including the fees and expenses of the licensed architect(s) and engineer(s), in preparing such plans and specifications.

(iii)  All material changes in the plans and specifications required to be approved by Landlord shall be subject to Landlord's prior written approval, and changes not requiring Landlord's approval will be provided to Landlord prior to commencement of the construction described therein. For the purpose of this subsection a "material change" shall be one which (x) exceeds $100,000, and/or (y) adversely affects the structure or the building systems of the Building. If Tenant wishes to make a change in approved plans and specifications, Tenant shall have such architect(s) and engineer(s) prepare plans and specifications for such change and submit them to Landlord. For alterations requiring Landlord's approval, Landlord shall notify Tenant in writing promptly whether Landlord approves or disapproves such change; and, if Landlord disapproves such change, Landlord shall describe the reasons for disapproval. Tenant may submit to Landlord revised plans and specifications for such change for Landlord's written approval. Landlord's failure to respond within ten (10) days shall be deemed approval of the proposed change. After Landlord's written approval or deemed approval of such change, such change

EXECUTION VERSION2

shall become part of the plans and specifications approved by Landlord.

(iv)    Tenant shall obtain and comply with all building permits and other government permits and approvals required in connection with the work, and shall comply with the REA.  Tenant shall, through Tenant's licensed contractor, perform the work in a good and workman like manner substantially in accordance with the plans and specifications prepared as set forth above.  Tenant shall pay, as Additional Rent, the entire cost of all work (including the cost of all utilities, permits, fees, taxes, and property, worker's compensation and liability insurance premiums in connection therewith) required to make the alterations, additions or improvements.  Under no circumstances shall Landlord be liable to Tenant for any damage, loss, cost or expenses incurred by Tenant on account of any plans and specifications, contractors or subcontractors, design of any work, construction of any work, or delay in completion of any work, whether or not Landlord had approved the plans and specifications.

(v)    No Event of Default shall have occurred and be continuing prior to commencement of any such alterations.

(c)    Tenant shall give written notice to Landlord of the date on which construction of any work to be done by outside contractors will be commenced at least ten (10) days prior to such date.  Tenant shall keep the Premises free from mechanics' and materialmen's liens arising out of any work performed, labor supplied, materials furnished or other obligations incurred by Tenant in accordance with the requirements of Section 20.

(d)    All alterations, additions, fixtures and improvements, whether temporary or permanent in character, made in or to the Premises by Tenant, shall become part of the Premises and Landlord's property.  Termination of this Lease shall not affect the obligations of Tenant pursuant to this Section to be performed after such termination.  Under no circumstances shall Tenant be required to remove any Tenant Improvements, alterations, additions or other improvements to the Premises made by Tenant.

23.    NOTICE OF LEASE: The parties shall promptly execute a Notice of Lease in recordable form, and either of the parties shall have the right, without notice to the other party, to record such Notice of Lease.

24.    SUBLETTING/ASSIGNMENT:

24.1    Rights and Obligations of Tenant.

(a)    Tenant may not mortgage, pledge or otherwise encumber its interest in this Lease or in any sublease of the Premises or any part thereof or the rentals payable thereunder except as may be required pursuant to the terms of the existing financing agreements to which Tenant is currently subject.  Any such mortgage, pledge or encumbrance, made in violation of

EXECUTION VERSION2

this Section shall be void.  Provided that no Event of Default has occurred and is continuing, Tenant may sublease the Premises or any portion thereof with Landlord's consent, and the interest of Tenant in this Lease may be assigned with Landlord's consent, provided that any such sublease or assignment shall expressly be subject and subordinate to the provisions of this Lease and no such sublease shall permit the tenant thereunder to pay rent in advance for a period of more than one (1) month, and provided, further, that no such sublease or assignment shall affect or reduce any obligations of Tenant or any rights of Landlord hereunder, and all obligations of the then current Tenant hereunder shall continue in full effect as the obligations of a principal and not of a guarantor or surety, to the same extent as though no assignment or sublease had been made.  If Tenant assigns its interest in this Lease, the assignee shall, in an instrument delivered to Landlord at the time of such assignment, expressly assume all the obligations of Tenant hereunder.  Tenant shall, within ten (10) days after the execution of any such sublease or assignment, deliver an executed copy thereof to Landlord.  This Lease shall not, nor shall any interest herein, be assignable as to the interest of Tenant involuntarily or by operation of law without the prior written consent of Landlord, and any such assignment without the prior written consent of Landlord shall be void and shall, at the option of Landlord, constitute a default that entitles Landlord to terminate this Lease, provided, that a merger, consolidation or similar reorganization of Tenant where Tenant's obligations are assumed by the successor entity by operation of law shall not be deemed to be an assignment hereunder.  Notwithstanding anything to the contrary contained in this Lease, without Landlord's consent, Tenant (i) shall assign its interest in this Lease to New Age Media pursuant to the terms of Section 2(c) above, and (ii) may sublease or assign its interest in this Lease to one or more entities owned or controlled by Tenant or New Age Media, or under common ownership or control with Tenant or New Age Media, provided that no such sublease or assignment shall relieve Tenant or New Age Media of any of its obligations under this Lease all of which shall continue in full effect as the obligations of a principal and not of a guarantor or surety, to the same extent as though no assignment or sublease had been made.

(b)   No assignment or sublease whatsoever shall release Tenant from Tenant's obligations and liabilities under this Lease (which shall continue as the obligations of a principal and not of a guarantor or surety) or alter the primary liability of Tenant to pay all Rent and to perform all obligations to be paid and performed by Tenant.  The acceptance of Rent by Landlord from any other person or entity shall not be deemed to be a waiver by Landlord of any provision of this Lease.  If any assignee, subtenant or successor of Tenant defaults in the performance of any obligation to be performed by Tenant under this Lease, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against such assignee, subtenant or successor.

(c)   Tenant will be entitled to retain the profits, if any, of any sublease of part or all of the Premises and of any assignment of this Lease.

24.2  <u>Assignment of Rents</u>.  Tenant hereby assigns to Landlord all Performance Holdbacks and rents due or to become due from any subtenant, provided, that provided no Event of Default has occurred and is continuing, Landlord grants to Tenant a revocable license to collect such rents.  No collection of Rent by Landlord from an assignee of this Lease or from a subtenant shall constitute a waiver of any of the provisions of this Section 24 or an acceptance of the assignee or subtenant as a tenant or a release of Tenant from performance by Tenant of its

obligations under this Lease. Tenant shall not directly or indirectly collect or accept any payment of subrent under any sublease more than one (1) month in advance of the date when the same shall become due. Each sublease shall require the subtenant to attorn to Landlord, at Landlord's request, in the event Tenant shall default under this Lease. Upon and only during the pendency of an Event of Default by Tenant under this Lease, Landlord shall have the right to require subtenants to make their rent payments directly to Landlord.

25.    HAZARDOUS MATERIAL:

(a)    Tenant shall (i) comply, and cause the Premises to comply, with all Environmental Laws applicable to the Premises (including the making of all submissions to governmental authorities required by Environmental Laws and the carrying out of any remediation program specified by such authority); (ii) prohibit the use of the Premises for the generation, manufacture, refinement, production, or processing of any Hazardous Material or for the storage, handling, transfer or transportation of any Hazardous Material (other than in connection with the operation, business and maintenance of the Premises and in commercially reasonable quantities as a consumer thereof and in compliance with Environmental Laws); (iii) not install or permit the installation on the Premises of any surface impoundments, underground storage tanks, pcb-containing transformers or asbestos-containing materials; and (iv) cause any alterations of the Premises to be done in a way so as to not expose in an unsafe or illegal manner the persons working in or visiting the Premises to Hazardous Materials, and in connection with any such alterations shall remove any Hazardous Materials present upon the Premises which are not in compliance with Environmental Laws.

(b)    Tenant shall protect, defend, indemnify and hold harmless Landlord, its direct and indirect members, partners, shareholders, beneficiaries, managers, Mortgagees, directors, officers, employees and agents, and any successors and assigns from and against any and all liability, including all foreseeable and all unforeseeable damages, including but not limited to attorneys' and consultants' fees, fines, penalties and civil or criminal damages, and including loss of value, directly or indirectly arising out of the use, generation, storage, treatment, release, threatened release, discharge, spill, presence or disposal of Hazardous Materials from, on, at, to or under the Premises occurring either prior to or during the Term of this Lease, including without limitation, the cost of any required or necessary repair, response action, remediation, investigation, cleanup or detoxification and the preparation of any closure or other required plans, whether such action is required or necessary prior to or following transfer of title to the Premises, except to the extent caused by the gross negligence or willful misconduct of Landlord or Landlord's Representatives. This agreement to indemnify and hold harmless shall be in addition to any other obligations or liabilities Tenant may have to Landlord at common law, under all Applicable Laws or otherwise, and shall survive expiration or termination of this Lease, with respect to liability that accrues prior to or during the Term of this Lease. The representations, warranties and covenants made and the indemnities stated in this Lease are not personal to Landlord, and the benefits under this Lease shall be automatically assigned to subsequent parties in interest to the chain of title to the Premises and Mortgagees, which subsequent parties in interest may proceed directly against Tenant to recover pursuant to this Lease. Tenant, at its expense, may institute appropriate legal proceedings with respect to environmental matters of the type specified in this Section or any lien for such environmental matters, not involving Landlord or its Mortgagee as a defendant (unless Landlord, Landlord's

Representatives or Landlord's Mortgagee is the alleged cause of the damage), conducted in good faith and with due diligence, provided that such proceedings shall not in any way materially impair the interests of Landlord or Mortgagee under this Lease. Counsel to Tenant in such proceedings shall be reasonably approved by Landlord if Landlord is a defendant in the same proceeding. Landlord shall have the right to appoint co-counsel, which co-counsel will cooperate with Tenant's counsel in such proceedings. The fees and expenses of such co-counsel shall be paid by Landlord, unless such co-counsel are appointed because the interests of Landlord and Tenant in such proceedings, in such counsel's reasonable opinion, are or have become adverse, or Tenant or Tenant's counsel is not conducting such proceedings in good faith or with due diligence, in which events the reasonable fees and expenses of such co-counsel shall be paid by Tenant.

(c)    Tenant, upon not less than two (2) days' prior notice, shall permit such persons as Landlord or Mortgagee may designate and (unless an Event of Default has occurred and is continuing) approved by Tenant ("Site Reviewers") to visit the Premises from time to time and perform an environmental site investigation and assessment ("Site Assessment") on the Premises for the purpose of determining whether there exists on the Premises any environmental condition which may result in any liability, cost or expense to Landlord or any other owner or occupier of the Premises. Such Site Assessments may include both above and below the ground testing for environmental damage or the presence of Hazardous Materials on the Premises and such other tests on the Premises as may be necessary to conduct the Site Assessments in the reasonable opinion of the Site Reviewers. Tenant shall supply to the Site Reviewers such historical and operational information regarding the Premises in Tenant's possession or under Tenant's control as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments and shall make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters. Landlord may require a Site Assessment at Tenant's expense once every five (5) years during the Term of the Lease. In addition, provided that when it orders an additional Site Assessment, Landlord has reasonable cause to believe that there may be a violation of Environmental Laws with respect to the Premises for which Tenant is responsible under this Section, the reasons for which shall be set forth in a notice from Landlord to Tenant, or if an Event of Default has occurred and is continuing, the cost of performing and reporting such Site Assessment shall be paid by Tenant within 30 days after demand by Landlord. Landlord, promptly after written request by Tenant and payment by Tenant to the extent required as aforesaid, shall deliver to Tenant copies of reports, summaries, or other compilations of the results of such Site Assessments.

(d)    Tenant shall notify Landlord in writing, promptly upon Tenant's actual knowledge thereof, of any:

(i)    notice or claim to the effect that Tenant or any other Person is or may be liable to any Person as a result of the release or threatened release of any Hazardous Material into the environment from the Premises;

(ii)    notice that Tenant or any other Person is subject to investigation by any governmental authority evaluating whether any remedial

action is needed to respond to the release or threatened release of any Hazardous Material into the environment from the Premises;

(iii) notice that the Premises are subject to an environmental lien; or

(iv) notice of violation or actual knowledge of Tenant of any violation of applicable Environmental Law that could have a material adverse effect upon the Premises or the value of the Premises.

(v) Release of Hazardous Materials on the Premises or presence of Hazardous Materials on the Premises in violation of Environmental Laws.

26.    <u>PERMITTED CONTESTS</u>:  Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Applicable Law, (iii) remove any lien or encumbrance, (iv) take any action with respect to any encroachment, hindrance, obstruction, violation or impairment referred to in this Lease, or (v) discontinue a particular use under subsection 3(a) herein,  so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its liability therefore, by appropriate proceedings which shall operate during the pendency thereof to prevent (W) the collection of, or other realization upon, the tax, assessment, levy, fee, rent or charge or lien, encumbrance or charge so contested; (X) the sale, forfeiture or loss of the Premises, or any part thereof, or the Fixed Rent or any Additional Rent, or any portion thereof; (Y) any interference with the use or occupancy of the Premises or any part thereof; and (Z) any interference with the payment of the Fixed Rent or any Additional Rent, or any portion thereof.  While any such proceedings are pending, Landlord shall not have the right to pay, remove or cause to be discharged the tax, assessment, levy, fee, rent or charge or encumbrance or charge thereby being contested.  Each such contest shall be promptly prosecuted by Tenant to a final conclusion.  Tenant shall pay, and save Landlord and the Mortgagee harmless against, any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final settlement, compromise or determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interests, costs and expenses thereof or in connection therewith, and perform all acts, the performance of which shall be ordered or decreed as a result thereof; provided, however, that nothing herein contained shall be construed to require Tenant to pay or discharge any lien, encumbrance or other charge created by any act or failure to act of Landlord or the payment of which by Tenant is not otherwise required hereunder, or to perform any act which Tenant is not otherwise required to perform hereunder.  No such contest may subject Landlord or the Mortgagee to the risk of any criminal or civil liability.

27.    COVENANTS OF TENANT:

27.1    <u>Services</u>.  During the Term, Tenant is responsible for all maintenance (including capital expenditures as outlined herein), including: interior painting, glass, floor coverings and wall coverings; interior plumbing, lighting, elevator, HVAC and other systems; sewer lines, fire mains and drainage facilities; signage; parking areas; snow removal; landscaping and grounds

EXECUTION VERSION2

upkeep; exterior lighting; exterior plumbing, storm water, waste water and utility lines; traffic control systems and the costs of repairs or replacements to all structural elements of the 625 Building and Premises. All of the above services will be provided at a level similar to those provided by owners and operators of similar first class office properties in the Orange County area.

27.2    Premises Maintenance. During the Term, Tenant at its own expense shall make all repairs and replacements, including capital expenditures, necessary to maintain the Premises as a first class office building and associated improvements (subject to ordinary wear and tear), including any roof repair or replacement that is considered a capital expenditure according to generally accepted accounting principles (including Tenant paying for any cost resulting from its installation or maintenance of its roof-top antenna, satellite dish or other communication devices), exterior wall and foundation repair and replacement (including maintenance items such as cleaning, caulking and window repair and replacement), Parking Garage and parking areas structural repair or replacement, and capital replacements to the HVAC system, as well as capital expenditures (as determined under generally accepted accounting principles) or non-capital expenditures, it being the agreement between Landlord and Tenant that Tenant is solely responsible for all maintenance and repair of the Premises.

27.3    Compliance With Laws. Tenant will be responsible for making any changes, repairs or modifications to the Building necessary in order for the Building to comply with Applicable Laws. Tenant shall during the term of this Lease, at Tenant's sole cost, maintain the mechanical system in accordance with present and future ASHRAE standards and maintain the life safety system in accordance with present and future NFPA 101 standards.

28.    ARBITRATION:

Any dispute between Landlord and Tenant relating to this Lease shall be settled by arbitration, and any arbitration hereunder shall be conducted in accordance with the then prevailing rules of the JAMS, or the successor party thereto from time to time in existence. The fees and expenses of the arbitrator shall be divided equally between Landlord and Tenant. Landlord and Tenant shall each bear their own expenses (including, but not limited to, attorney's fees and expenses of witnesses) in any arbitration proceedings. The arbitration proceeding shall be held in Orange County, California.

If a dispute shall arise between the parties hereto, and the same is not resolved between the parties, such dispute shall be settled by arbitration pursuant to this Section 28. In such event, either party hereto may serve upon the other party a written notice demanding that the dispute be resolved pursuant to this Section 28. Within fifteen (15) days after the giving of such notice, the parties shall mutually agree to an arbitrator or, failing such agreement, an arbitrator shall be appointed by JAMS. The arbitrator selected must have substantial experience with respect to the general subject matter of the issue under dispute. The arbitrator shall afford to Landlord and Tenant a hearing and the right to submit evidence, with the privilege of cross-examination and the right to compel testimony by applying for subpoena powers to appropriate judicial authority, on the question at issue, and shall, with all possible speed, make a determination in writing and shall give notice to the parties hereto of such determination. The determination of the arbitrator

shall be binding upon the parties hereto and shall be enforceable in any court having jurisdiction, without right of appeal.

29.   MANAGEMENT.

(a)      Landlord and Tenant acknowledge that Caribou Industries, Inc. ("CII"), will act as the initial manager of the Premises pursuant to the terms of a facilities management agreement in form attached hereto as Exhibit D executed between Tenant and CII (the "Facilities Management Agreement"). Pursuant to the Facilities Management Agreement, CII may manage the Premises either through employees of CII or through "contract" or "out-sourced" employees who are employed by an independent employee out-sourcing or management company but work at the Premises exclusively for CII. Pursuant to the Facilities Management Agreement, CII shall provide to Landlord and Tenant, on a monthly basis by not later than the 15th day of each month, a manager's report of repairs and maintenance activity, a detailed operating statement for the Premises for the preceding month, setting forth all items of operating expenses, insurance costs, utility charges and Taxes in a form and with such detail as is customarily prepared by managers of first class office buildings in the Orange County, California market, and at Landlord or Tenant's request, CII shall provide copies of service contracts, access to maintenance logs and utility usage charts and other material as reasonably requested by Landlord or Tenant.   In addition, pursuant to the Facilities Management Agreement, within ninety (90) days after the end of each year, CII will provide Landlord and Tenant with a summary operating statement, showing a similar level of detail, for the prior year.   For purposes of the Lease, CII shall be Tenant's agent and shall not be deemed Landlord's representative.

30.   PERFORMANCE HOLDBACK.

(a)      As a holdback for the faithful and prompt performance of its obligations under the Lease, Tenant hereby deposits or shall cause to be deposited with the Landlord upon execution of this Lease (i) the sum of Four Million Two Hundred Ninety Thousand, Four Hundred Seventy-Eight Dollars and Forty Cents ($4,290,478.40), (hereinafter referred to as "**Cash Performance Holdback**"), and (ii) an executed promissory note in the form attached hereto as Exhibit E in the amount of Two Million One Hundred Forty-Five Thousand, Two Hundred Thirty Nine Dollars and Twenty Cents ($2,145,239.20) (the "**Performance Holdback Note**"). The Performance Holdback Note shall be secured by a recordable deed of trust in form attached here to as Exhibit F (the "**Performance Holdback Deed of Trust**") in the amount of Two Million One Hundred Forty-Five Thousand, Two Hundred Thirty-Nine Dollars and Twenty Cents ($2,145,239.20) (collectively, the Cash Performance Holdback and the Performance Holdback Deed of Trust are referred to as the "**Performance Holdback**") encumbering certain additional real property adjoining the Premises (the "Other Property") owned or controlled by Tenant or an affiliate of tenant which Performance Holdback Deed of Trust shall be subject and subordinate only to:

(1)      a judgment in the amount of $4,000,000.00, and

(2)      a first deed of trust (the "Silver Point Deed of Trust") in favor of Silver Point Finance, LLC securing principal, accrued but unpaid interest and make-whole fees,

EXECUTION VERSION2

in the aggregate total of not more than $22,170,000.00, plus (i) protective advances related to the Other Property, (ii) expenses directly related to the Other Property or the enforcement of the Silver Point Deed of Trust, (iii) indemnity obligations under the terms of the Silver Point Deed of Trust, (iv) default interest, (v) advances in relation to a trustor bankruptcy (no other voluntary advances will be allowed) and (vi) any amount applied from collateral accounts holding real estate tax reserve amounts and interest reserve amounts securing the obligations secured by the Silver Point Deed of Trust (other than to the principal referenced in (2)) up to the amount of $3,122,256.27, (such aggregate total amount, the "Subordination Cap").

Landlord's lien pursuant to the Performance Holdback Deed of Trust shall be subordinate only to such portion of the obligations described in the foregoing clauses (1) and (2) to the extent of the Subordination Cap during any time prior to the reconveyance of the Performance Holdback Deed of Trust.

Landlord shall not be required to keep the Cash Performance Holdback segregated from its general accounts. The Performance Holdback shall serve as security for the prompt, full and faithful performance by Tenant of each and every provision of the Lease and of all obligations of Tenant hereunder.

(b)    Landlord may draw on the Performance Holdback pursuant to Section 5(c) above or if Tenant fails to perform any of its obligations under this Lease (beyond any applicable notice and cure periods), Landlord may (X) draw on the Cash Performance Holdback in full or in part as damages or for the payment of (1) any Base Rent or Additional Rent or other sums of money which Landlord may not have paid when due (2) any sum expended by Landlord on Tenant's behalf in accordance with the provisions of the Lease, or (3) any sum which Landlord may expend or be required to expend by reason of Tenant's default, including, without limitation, any damage or deficiency in or from the reletting of the Premises, and (Y) in the event that Landlord draws upon the Cash Performance Holdback, and Tenant fails to replenish the Cash Performance Holdback within thirty (30) days of written notice from Landlord, then Tenant shall be required to immediately repay the Performance Holdback Note and the Performance Holdback Deed of Trust. If (i) Tenant fails to do so within ten (10) days of written notice, or (ii) Tenant fails to repay the Performance Holdback Note within sixteen (16) months of the Effective Date of the Lease, Tenant shall be in default under the terms of the Performance Holdback Note and the Performance Holdback Deed of Trust and Landlord may enforce the Performance Holdback Note and enforce the Performance Holdback Deed of Trust with the proceeds to Landlord therefrom (including, without limitation, any amounts successfully credit bid by Landlord at any foreclosure sale thereunder) being deemed added to the Cash Performance Holdback for all purposes; provided, however, if following the occurrence of either of the events specified in (i) or (ii) immediately above shall occur, Tenant shall not be in default under the terms of the Performance Holdback Note and the Performance Holdback Deed of Trust and Landlord shall not be entitled to enforce the Performance Holdback Note and enforce the Performance Holdback Deed of Trust through the earlier of November 30, 2017 or the date of reconveyance of the first deed of trust in favor of Silver Point Finance, LLC referred to in Section 30(a) above provided Tennant shall pay to Landlord the Alternative Performance Rent as provided in Section 5(c) above. The use, application or retention of the Performance Holdback, or any portion thereof, by Landlord shall not prevent Landlord from exercising any recovery to which Landlord may otherwise be entitled. If any portion of the Cash Performance Holdback is used, applied or

EXECUTION VERSION2

retained by Landlord for the purposes set forth above, Tenant agrees, within ten (10) days after the written demand therefore is made by Landlord to restore the Performance Holdback to its original amount.

(c)      The Cash Performance Holdback, or such remaining portion thereof if Landlord has used same to cure Tenant default, shall be returned to Tenant, and the Performance Holdback Deed of Trust released and reconveyed of record, within thirty (30) days after the expiration of the Term or upon any later date of which Tenant has vacated the Premises. Said Performance Holdback shall not be deemed an advance payment of rent or measure of Landlord's damages for any default hereunder by Tenant. In the absence of evidence satisfactory to Landlord of any permitted assignment of the right to receive the Performance Holdback, or of the remaining balance thereof, Landlord may return the same to the original Tenant, regardless of one or more assignments of Tenant's interest in the Lease. In such event, upon the return of the Performance Holdback or the remaining balance thereof to the original Tenant, Landlord shall be completely relieved of liability under this Paragraph or otherwise with respect to the Performance Holdback.

(d)      Tenant acknowledges that Landlord has the right to transfer or mortgage its interest in the Building and in this Lease and Tenant agrees that in the event of any such transfer or mortgage, Landlord shall have the right to transfer or assign the Performance Holdback to the transferee or mortgagee, at Landlord's sole cost and expense.

(e)      Notwithstanding anything contained herein to the contrary, (a) upon payment to Landlord of the additional sum of Two Million One Hundred Forty-Five Thousand, Two Hundred Thirty Nine Dollars and Twenty Cents ($2,145,239.20) (which sum shall be added to the Cash Performance Holdback) whether upon the earlier of (i) sale of the real property encumbered by the Performance Holdback Deed of Trust or (ii) sixteen (16) months from the Effective Date of the Lease, Landlord shall mark the Performance Holdback Note "Paid", return the original of the Performance Holdback Note to Tenant and release and reconvey of record the Performance Holdback Deed of Trust within five (5) business days from Tenant's request.

(f)      Any remaining Cash Performance Holdback will be reduced to $1,608,929, any Cash Performance Holdback held by Landlord in excess of $1,608,929 shall be repaid by Landlord to Tenant and the Performance Holdback Deed of Trust shall be released and reconveyed of record, if during the first three (3) Lease Years (1) there shall not have occurred any uncured Event of Default, and (2) Tenant and if the Lease is assigned to New Age Media or Similar Company, New Age Media or Similar Company has met, on the last day of the Third Year of the Lease, one of the Rental Reduction Benchmarks. If all conditions described above do not occur by the end of the third (3rd) Lease Year, the Performance Holdback shall not be reduced (other than by the terms of Section 5(c) above) and shall remain $6,435,716.60 during the Term of the Lease. Notwithstanding any other provision of this Lease, neither Tenant nor any other person or entity shall have any right to the Performance Holdback or the return of the Performance Holdback except as specifically provided in this Section 30.

EXECUTION VERSION2

31.   MISCELLANEOUS PROVISIONS:

(a)   This Lease and all of the covenants and provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and the heirs, personal representatives, successors and permitted assigns of the parties.

(b)   The titles and headings appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend or affect the provisions thereof.

(c)   This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, and may not be amended except by an instrument in writing signed by Landlord and Tenant and consented to by Mortgagee (if any) and by Guarantor. Any amendment not consented to by Mortgagee (if any) and by Guarantor shall be void and have no force and effect.

(d)   Any provision or provisions of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect.

(e)   This Lease may be executed in one or more counterparts, and may be signed by each party on a separate counterpart, each of which, taken together, shall be an original, and all of which shall constitute one and same instrument.

(f)   The term "Landlord" as used in this Lease shall mean only the owner or owners at the time in question of the Premises. In the event of any transfer of such title or interest, Landlord named in this Lease (and in case of any subsequent transfers, the then grantor) shall be relieved from and after the date of such transfer of all liability as respects Landlord's obligations thereafter to be performed hereunder, provided that any funds in the hands of Landlord or the then grantor at the time of such transfer, in which Tenant has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Landlord shall, subject as aforesaid, be binding on Landlord's successors and assigns, only during their respective periods of ownership.

(g)   This Lease shall be governed by, and construed in accordance with, the laws of the State of California.

LANDLORD AND TENANT HEREBY SUBMIT TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF CALIFORNIA (AND ANY APPELLATE COURTS TAKING APPEALS THEREFROM) FOR THE ENFORCEMENT OF SUCH PERSON'S OBLIGATIONS HEREUNDER AND WAIVE ANY AND ALL PERSONAL RIGHTS UNDER THE LAW OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH STATE FOR THE PURPOSES OF SUCH ACTION, SUIT, PROCEEDING OR LITIGATION TO ENFORCE SUCH OBLIGATIONS OF TENANT OR LANDLORD. WITH RESPECT TO A SUIT COMMENCED IN A COURT LOCATED IN THE STATE OF CALIFORNIA, LANDLORD AND TENANT HEREBY WAIVE AND AGREE NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING

EXECUTION VERSION2

ARISING OUT OF OR RELATING TO THIS LEASE (i) THAT IT IS NOT SUBJECT TO SUCH JURISDICTION OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN THOSE COURTS OR THAT IT IS EXEMPT OR IMMUNE FROM EXECUTION; (ii) THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM; OR (iii) THAT THE VENUE OF THE ACTION, SUIT OR PROCEEDING IS IMPROPER.  IN THE EVENT ANY SUCH ACTION, SUIT, PROCEEDING OR LITIGATION IS COMMENCED, LANDLORD AND TENANT AGREE THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER LANDLORD AND TENANT OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH LITIGATION BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED UPON LANDLORD AND TENANT AT THE ADDRESS FOR NOTICE TO SUCH PERSON IN THIS LEASE.   TENANT AND LANDLORD EACH HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATED TO THE ENFORCEMENT OF THIS LEASE.

(h)     Any claim based on or in respect of any liability of Landlord under this Lease shall be enforced against Landlord only to the extent of Landlord's interest in the Premises and not against any other assets, properties or funds of (i) Landlord or any manager, director, officer, trustee shareholder, general partner, limited partner, member, beneficiary or direct or indirect partners, employees or agents of Landlord or its managers (or any legal representative, heir, estate, successor or assign of any thereof); (ii) any predecessor or successor Person of Landlord or its managers, either directly or through Landlord or its predecessor or successor Person of Landlord or its general partners; and (iii) any other Person.

(i)     Without the written approval of Landlord and Tenant, no Person other than Landlord (including its direct and indirect partners), Mortgagee, Tenant and their respective successors and assigns shall have any rights under this Lease.

(j)     There shall be no merger of the leasehold estate created hereby by reason of the fact that the same Person may own directly or indirectly, (i) the leasehold estate created hereby or any interest in this Lease or such leasehold estate and (ii) the fee estate in the Premises. Notwithstanding any such combined ownership, this Lease shall continue in full force and effect until terminated by an instrument executed by both Landlord and Tenant.

(k)     Without the prior written consent of Landlord, Tenant will not, directly or indirectly, consolidate with or merge into any corporation, association, partnership or other business organization or permit any corporation, association, partnership or other business organization to consolidate with or merge into it, or sell or otherwise transfer all or substantially all of its properties and assets, or acquire all or substantially all of the assets of any corporation, association, partnership or other business organization or individual, unless (i) Tenant shall be the entity surviving such consolidation, merger or other action, or the surviving entity or transferee shall enter into an assumption of this Lease and the other agreements contemplated by this transaction in form and substance reasonably satisfactory to Landlord; (ii) immediately prior to such action, no Event of Default shall have occurred and be continuing; and (iii) immediately after giving effect to such action, no Event of Default shall exist under this Lease as a consequence of such action; provided, however, that upon its formation and capitalization, New

EXECUTION VERSION2

Age Media shall acquire the assets from Freedom Communications, Inc. including, without limitation, this Lease.

(l)     During the two year period preceding the date on which the Term of this Lease shall terminate or otherwise expire, Landlord may show the Premises to prospective tenants or purchasers at such reasonable times during normal business hours as Landlord may select upon reasonable prior notice to Tenant, provided that Landlord takes precautions not to unreasonably inconvenience Tenant or any persons occupying the Premises in accordance with this Lease and is accompanied by an employee or other representative of Tenant at all times during such entry.

(m)     In the event of the termination of this Lease as herein provided, the obligations and liabilities of Landlord and Tenant, as the case may be, actual or contingent, under this Lease which arose at or prior to such termination shall survive such termination.

(n)     This Lease is intended as, and shall constitute, a true lease, and Landlord and Tenant shall report their interests herein of accounting, tax and all other purposes as a true lease and shall not take any action or position inconsistent therewith.

(o)     In the event that any Mortgagee reasonably requests changes, modifications or amendments to this Lease or otherwise requires additional documentation from Tenant as a condition to providing a loan to Landlord secured by a Mortgage on the Premises, Tenant agrees to make any such changes, modifications or amendments so long as they do not have a material adverse effect on the rights or obligations of Tenant hereunder or in any way increase the financial obligations of the Tenant hereunder.

(p)     With the prior consent of Tenant, Landlord may grant easements, licenses, rights of way or similar rights, or release or amend any such easements or rights with respect to the Premises, so long that such actions do not interfere with the benefits or increase the duties of Tenant hereunder. Tenant agrees to reasonably cooperate with Landlord in connection therewith, at no cost to Tenant.

(q)     From and after the Commencement Date, if performance of any obligation of Tenant or Landlord required hereunder, other than an obligation which can be accomplished by the payment of money, is prevented or substantially impeded by a strike, labor troubles, material shortages, riots, acts of God, including without limitation governmental preemption in connection with a national emergency, any rule, order or regulation of any department or subdivision of any government agency, conditions of supply and demand which are affected by war, an act of terrorism or any other emergency, the time given to a party to comply with such obligation shall be extended for the period of time equal to the period of delay resulting from any of the foregoing causes or events, provided that such party gives notice to the other party of the occurrence of such event describing the nature thereof, as promptly as is reasonably possible following discovery of the existence of such event.

(r)     There shall be no merger of this Lease or of any leasehold or subleasehold estate hereby or thereby created with the fee or any other estate or interest or ownership interest in the Premises or any part thereof by reason of the fact that the same person, firm, corporation

EXECUTION VERSION2

or other entity may acquire or own or hold, directly or indirectly, (a) this Lease or any leasehold or subleasehold estate created hereby or thereby or any interest in this Lease or in any such leasehold or subleasehold estate and (b) the fee estate or other estate or interest or ownership interest in the Premises or any part thereof, and this Lease shall not be terminated for any cause except as expressly provided herein.

**[Signature Page and Exhibits Follow]**

EXECUTION VERSION2

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have caused this Lease to be duly executed by their authorized agents and officers as of the day and year first above written.

LANDLORD:

OC MEDIA TOWER, L.P.,
a California limited partnership

By: Southwest Property Investments, Inc.,
    a California corporation,
    its General Partner

    By: _____
        Michael E. Harrah, President

TENANT:

FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation

By: _____
Name: Aaron Kushner
Title: Chief Executive Officer

By: _____
Name: Eric Spitz
Title: _President_

EXECUTION VERSION2

## EXHIBIT A

## PLANS AND SPECIFICATIONS

Plans and Specifications as contained in that certain removable stick drive provided by Seller to Purchaser on August 19, 2014

## EXHIBIT B

## NNN OFFICE BUILDING AND PARKING RENTAL RATE CALCULATIONS

Base Year 1 Office Building Net Net Net Rent Calculation:
Monthly:  184,086 rentable square feet x $1.2709 per rentable square feet per month =
$233,954.90 Base Year 1 NNN Monthly Rent
Yearly:  $233,954.90 monthly rent x 12 months = $2,807,458.80 Base Year 1 NNN Annual Rent

Base Year 1 Parking Space Net Net Net Rent Calculation:
Monthly: 456 spaces x $75 per space per month x 12 months = $34,200.00 Base Year 1 NNN
Monthly Parking Rent
Yearly:  $34,200.00 x 12 months = $410,400.00 Base Year 1 NNN Annual Parking Rent

Total Base Year Office Building and Parking Space Net Net Net Rent Calculation:

## TOTAL BASE YEAR 1 MONTHLY OFFICE AND PARKING NNN RENT

| | |
|---|---|
| Year 1 NNN Monthly Rent: | $233,954.90 |
| Base Year 1 NNN Monthly Parking Rent: | $  34,200.00 |
| Total Monthly Base Year 1 NNN Office and Parking Rent: | $268,154.90 |

## TOTAL BASE YEAR 1 YEARLY OFFICE AND PARKING NNN RENT

| | |
|---|---|
| Year 1 NNN Annual Rent: | $2,807,458.80 |
| Base Year 1 NNN Annual Parking Rent: | $  410,400.00 |
| Total Annual Base Year 1 NNN Office and Parking Rent: | $3,217,858.80 |

Annual Escalation to Base Year 1 Office and Parking NNN Rent:

All NNN Office and Parking Net Net Net rent shall increase annually in the same proportion as
the consumer price index ("CPI") over the same year but in no event less than 3% per year.

Office Building. If the Month 1-12 Net Net Net monthly rent is $1.2709 per square foot and the
CPI is 4% for the first year of the lease term, the month 13-24 monthly rent will be $1.2709 x
1.04 = $1.3217 per square foot.  If however, Month 1-12 Net Net Net monthly rent is $1.2709
per square feet and the CPI is 2% for the first year of the lease term, the month 13-24 monthly
rent will be $1.2709 x 1.03 = $1.3090 per square foot.

Parking Spaces.  If the Month 1-12 Net Net Net monthly rent is $75.00 per space and the CPI is
4% for the first year of the lease term, the month 13-24 monthly rent will be $75.00 x 1.04 =
$78.00 per space.  If however, Month 1-12 Net Net Net monthly rent is $75.00 per square feet
and the CPI is 2% for the first year of the lease term, the month 13-24 monthly rent will be
$75.00 x 1.03 = $77.25 per space.

## EXHIBIT C

## LAND

**Parcel 3A**

In the City of Santa Ana, County of Orange, State of California, being a portion of Parcel 1 as shown on Parcel Map No. 90-377 filed in Book 270, Pages 7 through 11, inclusive, of Parcel Maps in the Office of the County Recorder of said County, described as follows:

**Beginning** at the southwesterly most corner of said parcel; thence along the southerly most line of said parcel North 89°52'32" East 215.00 feet to a line which is parallel with and distant 215.00 feet easterly from the easterly line of Grand Avenue as shown on said Parcel Map No. 90-377; thence along said parallel line North 0°00'15" West 551.40 feet; thence South 89°51'31" West 150.47 feet; thence North 0°08'29" West 256.49 feet; thence South 89°51'31" West 63.89 feet to the boundary of said parcel; thence along the boundary of said parcel the following courses: South 306.46 feet to a curve concave northeasterly having a radius of 25.00 feet, southeasterly 39.32 feet along said curve through a central angle of 90°07'28", non-tangent from said curve South 89°52'32" West 25.06 feet, South 30.00 feet and South 0°00'15" East 446.31 feet to the **Point of Beginning**.

Containing an area of 2.591 acres, more or less.

# EXHIBIT D

## FACILITIES MANAGEMENT AGREEMENT

[see attached]

<u>FACILITIES MANAGEMENT AGREEMENT</u>

FREEDOM COMMUNICATIONS, INC.
625 NORTH GRAND AVENUE
SANTA ANA, CALIFORNIA 92701

Prepared for

FREEDOM COMMUNICATIONS, INC.
a Delaware corporation

By

CARIBOU INDUSTRIES, INC.
a Nevada corporation
1103 N. Broadway
Santa Ana, CA 92701

EXECUTION VERSION2

## TABLE OF CONTENTS

ARTICLE 1 – COMMENCEMENT DATE ................................................................ 1
ARTICLE 2 – FACILITIES MANAGER'S RESPONSIBILITIES ............................. 1
  2.1    MANAGEMENT ........................................................................................ 1
  2.2    APPROVED OPERATING BUDGET ......................................................... 2
  2.3    MAINTENANCE AND REPAIRS ............................................................. 2
  2.4    SERVICE CONTRACTS ............................................................................ 3
  2.5    FUNDING OF MAINTENANCE REPAIR AND MANAGEMENT FEE
  OBLIGATIONS ...................................................................................................... 3
  2.6    BANK ACCOUNTS AND DISBURSEMENTS ......................................... 4
  2.7    REPORTS; RECORD KEEPING ................................................................ 5
    A.    Reports ................................................................................................ 5
    B.    Record Keeping .................................................................................. 5
  2.8    FINANCIAL AND MANAGEMENT REPORTING: ................................. 6
    A.    Financial ............................................................................................. 6
    B.    Management ........................................................................................ 6
  2.9    CONSTRUCTION COORDINATION ....................................................... 6
  2.10   EMPLOYEES ............................................................................................. 6
ARTICLE 3 – PAYMENT OF EXPENSES ............................................................. 7
  3.1    FACILITIES MANAGER'S EXPENSES TO BE REIMBURSED ............... 7
  3.2    EXPENSES TO BE PAID FROM OPERATING ACCOUNT ..................... 7
ARTICLE 4 – COMPENSATION ............................................................................ 8
  4.1    FACILITIES MANAGEMENT FEE: ......................................................... 8
ARTICLE 5 - INSURANCE ..................................................................................... 8
ARTICLE 6 - TERMINATION ................................................................................ 8
  6.1    EVENTS OF TERMINATION: .................................................................. 9
ARTICLE 7 - MISCELLANEOUS ........................................................................... 9
  7.1    NOTICES .................................................................................................. 9
  7.2    NO LICENSE ACTIVITY ......................................................................... 10
  7.3    INDEMNITY ............................................................................................ 10
  7.4    REPRESENTATIONS ............................................................................... 10
  7.5    COOPERATION ....................................................................................... 10
  7.6    AMENDMENTS ....................................................................................... 10
  7.7    ENTIRE AGREEMENT ............................................................................ 10
  7.8    INTERPRETATION .................................................................................. 11
  7.9    WAIVER ................................................................................................... 11
  7.10   GENDER AND NUMBER ........................................................................ 11
  7.11   AUTHORITY ............................................................................................ 11
  7.12   EXHIBITS ................................................................................................. 11
  7.13   EXECUTION OF DOCUMENTS ............................................................. 11
  7.14   HEADINGS ............................................................................................... 11
  7.15   COUNTERPARTS .................................................................................... 11
  7.16   ELECTRONIC; FACSIMILE SIGNATURES ............................................ 11

7.17    SUCCESSORS AND ASSIGNS.......................................................................... 12
7.18    PARTIAL INVALIDITY ................................................................................... 12
7.19    ATTORNEYS' FEES ........................................................................................ 12

EXECUTION VERSION2

<u>FACILITIES MANAGEMENT AGREEMENT</u>

This FACILITIES MANAGEMENT AGREEMENT dated this _19_ day of September, 2014, is by and between FREEDOM COMMUNICATIONS, INC., a Delaware corporation (hereinafter referred to as "Freedom"), and CARIBOU INDUSTRIES, INC., a Nevada corporation (hereinafter referred to as "Facilities Manager").

RECITALS

A.    OC Media Tower, L.P., a California limited partnership (the "Owner") owns that certain property commonly known as 625 N. Grand Avenue, Santa Ana, California which is improved with an office building, parking structure and central building plant (the "Property").

B.    Freedom has, pursuant to that Lease dated September _19_, 2014 (the "Lease"), leased the Property from the Owner.

C.    Pursuant to the terms of the Lease, Freedom is solely responsible for the maintenance and repair of the Property during the term of the Lease.

D.    Freedom desires to contract with Facilities Manager for the management of all required maintenance and repair of the Property during the term of the Lease. Facilities Manager is willing to perform said duties, all on the terms and conditions set forth below.

FOR VALUABLE CONSIDERATION, RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE AS FOLLOWS:

<u>ARTICLE 1 – COMMENCEMENT DATE</u>

This Agreement shall be for a term of fifteen (15) years, commencing on September _19_, 2014, and ending at midnight on September _18_, 2029, unless terminated pursuant to Article 6. Upon the mutual written agreement of Freedom and Facilities Manager and upon such terms and conditions as shall be mutually agreed, the term of this Agreement, may be renewed and extended for one or more additional five (5) year terms not to exceed the term of the Lease and any extensions thereof. If Owner sells the Property, Freedom or the Facilities Manager shall have the right to terminate this Agreement without cause on thirty (30) days written notice. For purposes of this Agreement, the sale by Michael F. Harrah of a controlling interest in the Owner shall be deemed a sale of the Property by the Owner.

<u>ARTICLE 2 – FACILITIES MANAGER'S RESPONSIBILITIES</u>

2.1    <u>MANAGEMENT</u>: Facilities Manager shall manage, operate, and maintain said property in an efficient, professional and satisfactory manner. In this capacity, Facilities Manager shall deal at arm's length with all third parties and shall serve Freedom's interests at all times. Facilities Manager shall at all times comply with Freedom's written requests and policy guidelines in all matters relating to the management, operation and maintenance of the Property and in full compliance with all applicable governmental laws and regulations.

1

2.2   APPROVED OPERATING BUDGET:   Facilities Manager shall annually prepare and submit to Freedom a proposed operating budget for the operation, repair, and maintenance of the Property for the forthcoming calendar year (the "Proposed Budget"). The Proposed Budget shall also include projected capital expenditures for the year and the following four (4) years. Said Proposed Budget shall be delivered to Freedom no later than November 1 of each calendar year.

Freedom will consider the Proposed Budget, consult with Facilities Manager as desired and, provided the Proposed Budget provides for the first class operation and maintenance of the Property, approve or modify the Proposed Budget in its reasonable discretion. The Proposed Budget as approved or modified by Freedom shall be the "Operating Budget " for the following calendar year. In the event Facilities Manager does not receive notice from Freedom by January 1 of the approved or modified Operating Budget, the prior Operating Budget shall be continue in effect until Freedom shall give Facilities Manager notice of the approved or modified Operating Budget for the current year.

The Operating Budget (including capital expenditures) shall constitute an authorization for Facilities Manager to expand money within the limits established by said Operating Budget.

Facilities Manager shall implement the Operating Budget and Facilities Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed the amounts provided in the Operating Budget, either in total or in any one accounting category.

Facilities Manager shall secure Freedom's prior written approval (which approval Freedom may give, withhold or condition in its reasonable discretion) for any expenditure or obligation for any transaction, or group of similar transactions, that will result in an excess of the lesser of $25,000.00 or 10% of the annual budgeted amount in any one accounting category of the Operating Budget, except for expenditures for emergency repairs (See Section 2.3).

Subsequent to the determination of the Operating Budget by Freedom, should Facilities Manager anticipate that the budgeted amount for any one or more accounting categories will be exceeded, then Facilities Manager shall prepare and submit to Freedom for its approval a proposed revised Operating Budget no later than the end of the current quarter, covering the period commencing with the start of the next quarter through the balance of the fiscal year. (For example: If a budgeted accounting category is anticipated to be exceeded in February, a proposed revised Operating Budget is to be submitted by the end of March covering the period from April 1 through December 31.)

2.3   MAINTENANCE AND REPAIRS: Facilities Manager shall, within the constraints of the Operating Budget, do everything reasonably necessary for the proper operation, maintenance and repair of the Property, including periodic inspections.

Facilities Manager shall have the authority to hire as provided in Section 2.4 below, supervise and terminate, on behalf of Freedom, all contractors, subcontractors, or independent contractors reasonably required in the operation, maintenance and repair of the Property.

No improvements, alterations, or repair work exceeding the limits set forth in the Operating Budget or as provided in Section 2.2 above shall be made by Facilities Manager

EXECUTION VERSION2

without Freedom's prior written authorization except for expenditures for emergency repairs if, in the reasonable judgment of Facilities Manager, such emergency repairs are necessary to avoid danger to life, protect the Property from damage, or the maintain services to the occupants of the Property. Facilities Manager must inform Freedom of any such emergency expenditures as soon as reasonably possible by telephone, followed by a written report detailing the events of such occurrence.

2.4    SERVICE CONTRACTS: Facilities Manager shall submit to Freedom for its prior written approval any service contracts for the Property which Facilities Manager, in its reasonable discretion, deems necessary and appropriate. All service contracts once approved by Freedom shall be in the name of Freedom, with Caribou executing as Facilities Manager for Freedom and shall include a provision for cancellation upon thirty (30) days' written notice. Facilities Manager or its designated representative shall be Freedom's agent and representative with regard to management and administration of all service contracts for the Property.

All contracts for repairs, capital improvements, goods and services exceeding $10,000.00 shall be awarded on the basis of competitive bidding, solicited in the following manner:

(a)    A minimum of two (2) written bids shall be obtained for each purchase between $10,000 and $20,000. Purchases over $20,000 will require a minimum of three (3) bids.

(b)    Each bid will be solicited in an approved format so that uniformity will exist in the bid quotes.

(c)    Facilities Manager may accept low bid without further prior approval from Freedom, if the form of contract has previously been approved by Freedom, the expenditure is for a budget approved item and will not result in an excess of the annual budgeted accounting category of the Operating Budget.

(d)    If Facilities Manager advises acceptance of other than the lowest bidder, Facilities Manager shall adequately support, in writing, its recommendations to Freedom.

(e)    Freedom shall be free to accept or reject any and all bids.

(f)    Upon the written approval of Freedom, Facilities Manager may waive competitive bidding rules for specified contracts or work.

All service contracts shall require that all contractors provide evidence of sufficient insurance (see Article 5). Facilities Manager shall require a statutory form Lien Release from said contractor when payment is made.

2.5    FUNDING OF MAINTENANCE REPAIR AND MANAGEMENT FEE OBLIGATIONS: Freedom shall fund the maintenance, repair and management fee obligations by payment to the Facilities Manager as follows:

(i)    At least two (2) business days prior to the end of each month, Freedom shall fund one-twelfth (1/12) of the year's Operating Budget for operation, maintenance, repairs and

EXECUTION VERSION2

property management fees for the Property (exclusive of monies needed to pay taxes, insurance and other non-monthly expenditures);

(ii)     Freedom shall fund amounts needed to pay taxes, insurance and other non-monthly expenditures at least two (2) business days prior to when said amounts are due;

(iii)     On the tenth (10th) business day of each year, Freedom shall fund an amount equal to the lesser of $25,000.00 or five percent (5%) of the amounts provided in the Operating Budget for maintenance and repairs, as a reserve for unanticipated emergency repairs but only to the extent that the balance in the Operating Account (as defined below) as of the first day of the such year shall be less than Required Reserve;

(iv)     Freedom shall fund any unbudgeted repair obligations reasonably approved by Freedom at least two (2) business days prior to when said payments are due provided Facilities Manager shall provide Freedom with appropriate back up information for each required payment.

All funding shall be by wire transfer to the Operating Account.

2.6     BANK ACCOUNTS AND DISBURSEMENTS:   Facilities Manager, on behalf of Freedom, shall establish and maintain a separate bank account for the deposit of all monies deposited by Freedom to fund Facilities Manager's duties hereunder.  This account shall be set up in such a manner to indicate the custodial nature thereof, and shall be referred to in this agreement as the "Operating Account".  Facilities Manager and its designated representative shall be authorized to draw on the Operating Account to make payments when due for compensation for all contractors, subcontractors, independent contractors, utilities, services, supplies, maintenance, repairs, capital improvements or other costs and expenses provided to or in connection with the operation, repair and maintenance of the Property as provided above, and for the payment of Facilities Manager's fee as provided below, all subject to the limitations of the Operating Budget and this Agreement.

Facilities Manager shall pay on behalf of Freedom all authorized expenditures as provided in Section 2.5 above from deposits by Freedom into the Operating Account including:

(a)     all real property and other taxes levied and assessed against the Property;

(b)     all insurance premiums relating to the Property; and

(c)     all bonds and all special assessments assessed against the Property.

Facilities Manager shall obtain and verify bills for real estate and personal property taxes, improvements assessments, and other like charges, which are or may become liens against said Property and recommend payment or appeal as in its best judgment it may recommend. Facilities Manager shall pay such bills on behalf of Freedom in such time as permit Freedom to avoid penalty for late payment.

Facilities Manager shall not make any payments on account of any ground lease, mortgage, deed of trust or other security instrument, if any, affecting said Property, unless

4

previously instructed and authorized to do so by Freedom.

If the Operating Account contains insufficient funds to pay any of the expenditures to paid by Facilities Manager on behalf of Freedom as provided above, Facilities Manager shall promptly notify Freedom in writing, and Freedom shall promptly deposit such funds as may be necessary to satisfy all such expenditure obligations. Facilities Manager shall not be obligated to expend its own funds for any of Freedom's obligations which Facilities Manager is authorized to pay by this Agreement and shall have no liability in connection therewith; provided, however, Facilities Manager in its sole discretion, shall have the right to advance its own funds to the Operating Account to cover such deficiency, and Freedom shall be obligated to promptly reimburse Facilities Manager for such funds upon demand. In the event that Freedom fails to provide any such additional funds upon five (5) business days written request by Facilities Manager, Facilities Manager shall have the right to terminate this Agreement immediately.

## 2.7   REPORTS; RECORD KEEPING

A.   Reports:  Facilities Manager shall provide to Freedom and Owner, on a monthly basis, not later than the fifteenth (15th) of each month, Facilities Manager's report of repairs and maintenance activities, a detailed operating statement for the Property for the preceding month setting forth all items of operating expense, insurance cost, utility charges, and taxes in a form and with such details as is customarily prepared by facility managers of first class office buildings in Orange County, California.

Within ninety (90) days after the end of each calendar year, Facilities Manager will provide Freedom and Owner with a summary operating statement showing a similar level of detail for the prior year.

Upon the request of Freedom, Facilities Manager shall provide copies of all service contracts, maintenance logs, and utility usage charges and any materials reasonably requested by Freedom.

B.   Record Keeping:  Facilities Manager, in the conduct of its responsibility to Freedom, shall maintain adequate and separate books and records of all monies received and disbursed for said Property. Facilities Manager shall ensure such control over accounting and financial transactions as is reasonably required to protect Freedom's assets from theft, error, or fraudulent activity. All account entries shall be supported by sufficient documentation to ascertain that said entries are properly and accurately recorded.

All financial statements and reports shall be prepared in accordance with generally accepted accounting principles, consistently applied, on a modified cash basis, unless otherwise directed by Freedom.

Facilities Manager's accounting records and reports will be provided in Facilities Manager's current standard format and any changes to such format shall be subject to Freedom's review and approval which approval shall not be unreasonably denied. Facilities Manager shall maintain such other records as Freedom shall reasonably require in connection with said Property.

EXECUTION VERSION2

Said books and records shall be maintained by Facilities Managers at Facilities Manager's address, as specified and shall be subject to Freedom's inspection, copying and audit at any reasonable time, provided such audit tests are related to those activities performed by Facilities Manager for Freedom. Any and all audits conducted by Freedom or Freedom's appointees will be at sole expense of Freedom.

Should Freedom's employees or appointees discover either weaknesses in internal control or errors in record keeping, Facilities Manager shall correct such discrepancies either upon discovery or within a reasonable period of time. Facilities Manager shall inform Freedom, in writing, of the action taken to correct such audit discrepancies, errors in record keeping or weaknesses in internal control.

2.8    FINANCIAL AND MANAGEMENT REPORTING:

A.    Financial: Facilities Manager shall deliver to Freedom, on or before the 20th day of each month, a statement showing all receipts and disbursements for the preceding month. As additional support to the monthly statement, Facilities Manager shall provide copies of all bank statements, and bank reconciliations.

B.    Management: Facilities Manager shall deliver to Freedom, on or before the 20th day of each month, a monthly "Narrative" relating to the management, operation, and maintenance of said Property. The Narrative will include information on the physical condition of said Property and its maintenance and operations.

2.9    CONSTRUCTION COORDINATION:

A.    Construction Coordination. Facilities Manager shall be responsible to supervise, coordinate and oversee all capital improvements and construction work at the Property including, but not limited to tenant improvements, re-roofing, refurbishing, and substantial exterior repainting

B.    Coordination Fee. Facilities Manager shall be entitled to a construction coordination fee according to Exhibit "A". Said fee shall be charged on capital improvements and construction work, including, but not limited to tenant improvements, re-roofing, refurbishing, and substantial exterior repainting to the extent performed or supervised by Facilities Manager,. Normal day-to-day repair and painting pertaining to usual occupant turnover, and any work performed and supervised directly by Freedom, are not subject to this construction coordination fee. Facilities Manager shall require a statutory form Lien Release from said contractor when payment is made. Lien Releases shall be for full amounts of payment.

2.10    EMPLOYEES: Facilities Manager shall have in its employment at all times a sufficient number of capable employees to enable it to professionally, properly, adequately, safely and economically manage the Property. All other personnel reasonably necessary for the operation, maintenance and repair of the Property shall be hired as contractors, subcontractors, or independent contractors and not as employees of Facilities Manager and their compensation shall not reduce the Management Fee (as defined in Section 4.1 below).

All matters pertaining to the employment, supervision, compensation, promotion,

6

EXECUTION VERSION2

discipline and discharge of employees are the responsibility of the Facilities Manager, which is in all respects the employer of such employees. Freedom shall have no responsibility, liability or obligation with respect to Facilities Manager's employees and Facilities Manager shall indemnify, defend, protect and hold Freedom harmless from and against any and all employment related claims, actions, damages, liabilities and losses (including, without limitation, wage and hour claims, wrongful discharge, sexual harassment and discrimination.

<u>ARTICLE 3 – PAYMENT OF EXPENSES.</u>

Subject to the Operating Budget and this Agreement, the costs and expenses which are to be incurred in connection with the operation, maintenance, repair and management of the Property are:

3.1    <u>FACILITIES MANAGER'S EXPENSES TO BE REIMBURSED</u>: Facilities Manager shall be reimbursed out of the Operating Account for costs of the gross salary and wages, payroll taxes, medical insurance, unemployment insurance, and worker's compensation insurance for Facilities Manager's employees as approved in the annual budget, to the extent the Facilities Manager's employees services are provided for the management, operation and maintenance of the Property. Such reimbursement will be based upon a prorata share of time said Facilities Manager's employees actually spend on the management, operation or maintenance of the Property.

3.2    <u>EXPENSES TO BE PAID FROM OPERATING ACCOUNT</u>: Facilities Manager may pay the following expenses directly from the Operating Account subject to the Operating Budget and other terms and conditions outlined in Article 2:

(a)    Costs to correct any violation of federal, state and municipal laws, ordinances, regulations and orders relative to the lease, use, repair and maintenance of the Property.

(b)    Actual and reasonable costs of all maintenance, repairs, decorations and alterations to the Property.

(c)    Costs incurred in connection with all service agreements and utility services for or relating to the Property.

(d)    Costs of capital expenditures and operation of the Property.

(e)    Costs of printed checks for each bank account required by Freedom.

(f)    Cost of electronic data processing, or any prorata charge thereof, for data processing provided by computer service companies.

(g)    Cost of construction coordination, per Section 2.10.

(h)    Facilities Manager's management fee, per Section 4.1.

Freedom shall provide Facilities Manager, without cost to Facilities Manager, office space at

EXECUTION VERSION2

the Property not to exceed 500 square feet in such location as Freedom shall from time to time reasonably determine as <u>may be</u> reasonably required by Facilities Manager for the performance of its duties hereunder, and Freedom will provide and pay the costs of utilities, including electricity, water, sewer, heating and air conditioning for such office.
3.3

## ARTICLE 4 – COMPENSATION

4.1    <u>FACILITIES MANAGEMENT FEE:</u>    In consideration for Facilities Manager's performance of the duties, responsibilities, and services required by this Agreement, Freedom shall pay Facilities Manager a base management fee of eleven thousand dollars ($11,000.00) per month (the "Management Fee"). Said Management Fee shall be paid on a monthly basis out if the Operating Account on the 10th day of the following month. The Management Fee shall be increased three percent (3%) per year on September 1, 2015 and on the first day of September of each succeeding year during the term of this Agreement or any extension thereof.

## ARTICLE 5 - INSURANCE

Facilities Manager, at Freedom's expense, will obtain and keep in force all insurance reasonably necessary to cover all of Facilities Manager's activities and operations in, on or about the Property pursuant to this Agreement including, without limitation, comprehensive commercial general liability insurance, workers compensation and employer's liability insurance and such other insurance in such amounts and against such risks as is customarily maintained by facilities managers of similar properties in Orange County, California. All such policies (other than workers compensation insurance) shall name Freedom as an additional insured.

Facilities Manager shall use its best efforts to determine that all subcontractors brought on to the Property have insurance coverage in the following minimum amounts:

(a)    Workmen's Compensation – Statutory amount.

(b)    Employee's Liability – (in those states where it is required) - $100,000.

(c)    Comprehensive General Liability

(i)    $1,000,000 – Bodily injury and/or property damage per occurrence;

(ii)    $1,000,000 – Combined single limit.

## ARTICLE 6 - TERMINATION

6.1    <u>EVENTS OF TERMINATION:</u>

A.    Notwithstanding Article 1, Freedom may terminate this Agreement at any time for cause upon giving Facilities Manager thirty (30) days' written notice. Cause shall be intentional misconduct, gross negligence, or uncured failure of performance by Facilities Manager after ten (10) days written notice, in the performance of the duties and obligations of Facilities Manager under this Agreement.

In the event Facilities Manager is terminated during the calendar month, Facilities

EXECUTION VERSION2

Manager's compensation pursuant to Article 4.1 shall be prorated accordingly for said month based on the total number of days Facilities Manager acted as Facilities Manager under this Agreement.

B.    Upon the effective date of termination of this Agreement, Facilities Manager shall deliver to Freedom to following:

(i)    Within forty-five (45) days, a statement of income and expenses of the Property for the calendar year or portion thereof ending on the effective date of termination.

(j)    Within three (3) business days, all funds including tenant security deposits them in possession or control of Facilities Manager, except such sums as are then due and owing Facilities Manager pursuant to this Agreement.

(ii)   Within ten (10) days, all records, leases, contracts, permits, plans, unpaid bills and other documents pertaining to the Property and its operation. Facilities Manager further agrees to do all other things reasonably necessary to cause an orderly transition of the management of the Property.

(iii)  Facilities Manager shall transfer and assign to the Freedom or its designee all service contracts and personal property relating to or used in connection with the management, operation and maintenance of the Property, except personal property owned by the Facilities Manager.

(iv)   Facilities Manager shall remove all signs it may have placed on the Property indicating that it is the manager and repair any damage resulting therefrom.

(v)    Facilities Manager shall make itself available to consult with and advise the Freedom or its designee of all aspects of the management, operation and maintenance of the Property for a period of sixty (60) days immediately following the date of such termination at a reasonable consultation fee mutually agreed to between the parties.

## ARTICLE 7 - MISCELLANEOUS

7.1    NOTICES. All notices or other communications required or permitted hereunder shall be in writing, and shall be personally delivered, sent by overnight mail (Federal Express or the like) or telegraphed, delivered or sent by telex, telecopy, facsimile, fax or cable and shall be deemed received upon the earlier of (i) if personally delivered, the date of delivery to the address of the person to receive such notice; (ii) if sent by overnight mail, the business day following its deposit in such overnight mail facility (provided receipt therefor is signed by recipient, its employee or agent); or (iii) if given by telex, telecopy, facsimile or fax, when sent. Any notice, request, demand, direction or other communication sent by cable, telex, telecopy, facsimile or fax must be confirmed within forty-eight (48) hours by letter delivered in accordance with the foregoing.

9

Freedom:

    Freedom Communications, Inc.
    625 N. Grand Avenue
    Santa Ana, CA 92701
    Attention: Eric Spitz
        and Aaron Kushner
    Telephone: (714) 796-7000
    Fax: (714) 835-5349
    Email: spitz@freedom.com

With a copy to:

    William F. Meehan, Esq.
    Rutan & Tucker, LLP
    611 Anton Boulevard, 14th Floor
    Costa Mesa, CA 92626
    Telephone: 641-3417
    Fax: (714) 546-9035
    Email: wmeehan@rutan.com

Facilities Manager:

    Caribou Industries, Inc.
    1103 North Broadway
    Santa Ana, CA  92701
    Attention: Michael F. Harrah
    Telephone: (714) 543-9484
    Fax: (714) 543-9972
    Email: MFH@caribouind.com

With a copy to:

    Stephen L. Fingal, Esq.
    Fingal, Fahrney & Clark, LLP
    5120 Campus Drive, Suite 200
    Newport Beach, CA 92660
    Telephone: (949) 723-8100
    Fax: (949) 723-8108
    Email: sfingal@ffc-law.com

Notice of change of address shall be given by written notice in the manner detailed in this Paragraph. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of the notice, demand, request or communication was sent.

7.2   <u>NO LICENSE ACTIVITY</u>. Freedom and Facilities Manager agree that Facilities Manager shall not be required under the terms of this Agreement to market, or sublease any portion of the Property, collect rents, or perform any other activities that would require a real estate brokerage license under the laws of the State of California.

7.3   <u>INDEMNITY</u>. Facilities Manager shall be indemnified and held harmless by Freedom from all claims, demands, liability and causes of action incurred or assessed against it in connection with the performance of this Agreement including the payment of reasonable attorneys' fees, except such as may arise from its own negligence or willful misconduct.

7.4   <u>REPRESENTATIONS</u>. Facilities Manager represents and warrants that it is fully qualified and licensed to the extent required by law to manage real estate and perform all obligations assumed by Facilities Manager hereunder.

7.5   <u>COOPERATION</u>. Should any claims, demands, suits or other legal proceedings be made or instituted by any person against Freedom or title holder of the Property which arise out of any of the matter relating to this Agreement, the Facilities Manager shall give Freedom all pertinent information and reasonable assistance in the defense or other disposition thereof.

7.6   <u>AMENDMENTS</u>. Any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by the parties in writing.

7.7   <u>ENTIRE AGREEMENT</u>. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior or

EXECUTION VERSION2

contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties in connection with the subject matter hereof, except as specifically set forth herein.  No supplements or modifications or waivers or terminations of this Agreement shall be binding unless executed in writing by the parties to be bound thereby.

7.8    INTERPRETATION.  The parties hereto acknowledge and agree that each has been given the opportunity to independently review this Agreement with legal counsel, and/or has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions hereof.  In the event of an ambiguity in or dispute regarding the interpretation of same, the interpretation of this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the party who causes the uncertainty to exist or against the draftsman.

7.9    WAIVER.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

7.10    GENDER AND NUMBER.  Throughout this Agreement wherever the context so requires, the singular shall include the plural, and the masculine gender shall include the feminine and neuter gender and vice versa.

7.11    AUTHORITY.  The undersigned individuals and/or entities executing this Agreement on behalf of their respective parties represent and warrant that said individuals are authorized to enter into this Agreement on behalf of such parties, the appropriate corporate or other resolutions have been passed and obtained, and that this Agreement shall be binding on same.

7.12    EXHIBITS.  The documents referred to hereinabove and Exhibits attached hereto are incorporated herein by reference as if set forth in full.

7.13    EXECUTION OF DOCUMENTS.  Each party agrees to execute and deliver such other documents and instruments and to take such further actions as may be reasonably necessary to fully carry out the intent and purposes of this Agreement.

7.14    HEADINGS.  The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

7.15    COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same Agreement.

7.16    ELECTRONIC; FACSIMILE SIGNATURES.  Each party (a) has agreed to permit the use, from time to time and where appropriate, of either electronic or facsimile signatures in order to expedite the transaction contemplated by this Agreement, (b) intends to be bound by its respective electronic or facsimile signatures, (c) is aware that the other party will rely on the facsimile signatures, and (d) acknowledges such reliance and waives any defenses to the enforcement of the documents effecting the transaction contemplated by this Agreement based on the fact that a signature was sent electronically or by facsimile.

EXECUTION VERSION2

7.17   <u>SUCCESSORS AND ASSIGNS</u>. This Agreement shall be binding upon and inure to the benefit of the heirs, legatees, estate, executors, legal representatives, successors and assigns of the parties hereto. Specifically, if Freedom shall assign the Lease to New Age Media (as defined in the Lease), Freedom shall assign this Agreement to New Age Media and cause New Age Media to assume Freedom's obligations under this Agreement. This Agreement shall be binding on New Age Media and any other assignee of the Lease. Notwithstanding the foregoing, Facilities Manager may not assign this Agreement without the prior written consent of Freedom which Freedom may grant, withhold or condition in its sole and absolute discretion.

7.18   <u>PARTIAL INVALIDITY</u>. If any term of this Agreement is held by a court of competent jurisdiction to be void or unenforceable, the remainder of the contract terms shall remain in full force and effect and shall not be affected.

7.19   <u>ATTORNEYS' FEES</u>. In the event either party hereto shall commence legal proceedings against the other to enforce the terms hereof, or to declare rights hereunder, as the result of a breach of any covenant or condition of this Agreement, the prevailing party in any such proceeding shall be entitled to recover from the losing party its costs of suit, including reasonable attorneys' fees, as may be fixed by the Court.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

FREEDOM:                                           FACILITIES MANAGER:

FREEDOM COMMUNICATIONS, INC.          CARIBOU INDUSTRIES, INC.
a Delaware corporation                             a Nevada corporation

By: _____                              By: _____
     Aaron Kushner                                       Michael F. Harrah
Its:   Chief Executive Officer                     Its:   President

By: _____
     Eric Spitz
Its:   President

EXECUTION VERSION2

EXHIBIT "A"

CONSTRUCTION COORDINATION FEE

| <u>FEE</u> | <u>CONTRACT AMOUNT</u> |
|---|---|
| 10% | of the first $50,000 |
| 8% | of the second $50,000 |
| 3% | of the amount over $100,000 |

i.e. – Contract for $700,000 would receive a construction management fee of:

| | | Fee |
|---|---|---|
| 1st | $ 50,000 | $ 5,000 |
| 2nd | $ 50,000 | $ 4,000 |
| balance | $600,000 @ 3% | $18,000 |
| | | $27,000 |

1

# EXHIBIT E

## PERFORMANCE HOLDBACK NOTE

[see attached]

## PROMISSORY NOTE SECURED BY DEED OF TRUST

$2,145,239.20             Santa Ana, California             September *19*, 2014

FOR VALUE RECEIVED, Freedom Communications, Inc., a Delaware corporation ("Maker") promises to pay to OC Media Tower, L.P., a California limited partnership ("OCMT"), or to the such subsequent owner of the fee title to the entirety of the Property (as defined in that certain Lease ("Lease") of even date herewith by and between Maker and OCMT ("Holder"), at 1103 N. Broadway, Santa Ana, California 92701, or at such other place as Holder may from time to time designate in writing, the principal sum of two million one hundred forty-five thousand two hundred thirty nine dollars and twenty cents ($2,145,239.20) without interest. This Promissory Note Secured by Deed of Trust ("Note") is executed and delivered pursuant to Section 30(a) of the Lease. All words and phrases having their initial letters capitalized herein and not otherwise defined shall have the meanings set forth in the Lease.

1.    <u>Payments</u>. Principal and interest, if any, shall be all due and payable on the first of the following to occur:

(a)    March *19*, 2016 or such later date as provided in Section 30(b) of the Lease upon payment of Alternative Performance Rent by or on behalf of Tenant; or

(b)    The sale of the Property; or

(c)    The failure of Maker to repay this Note following ten (10) days written notice from Holder as provided in Section 30(b)(Y)(i) of the Lease or such later date as provided in Section 30(b) of the Lease upon payment of Alternative Performance Rent by or on behalf of Tenant; or

(d)    Maker is in default under the terms of Section 3 of this Note.

2.    <u>Note Secured by Deed of Trust; Due on Sale</u>. This Note is secured by that certain Deed of Trust with Assignment of Rents of even date herewith (the "Deed of Trust"), executed by FREEDOM SPV II LLC, a Delaware limited liability company, as Trustor, naming OCMT as Beneficiary, and First American Title Insurance Company as Trustee, affecting the real property described therein (the "Secured Real Property"). Reference is made to the Deed of Trust for the right of the Beneficiary thereunder to accelerate the indebtedness evidenced by this Note, which Deed of Trust provides in substance as follows:

If Trustor sells or conveys the Property or any interest therein, or suffers his title, or any interest in the Property to be divested, whether voluntarily or involuntarily; without the written consent of Beneficiary being first had and obtained, Beneficiary, at Beneficiary's option, may without prior notice, declare all sums secured by this Deed of Trust, irrespective of their stated due dates, immediately due and payable and may exercise all rights and remedies provided in this Deed of Trust.

3.    <u>Acceleration on Default</u>. At the option of Holder, without prior notice, and regardless of any prior forbearance, all sums remaining unpaid under this Note shall become

1

immediately due and payable upon the occurrence of a Default of Maker under this Note. The occurrence of any of the following events shall constitute a default ("Default") by Maker under this Note:

(a)  Maker fails to make any payment required by this Note or the Deed of Trust when due after notice and expiration of any applicable cure period; or

(b)  Maker fails to perform any obligation contained in this Note, the Deed of Trust, or any other instrument securing this Note (collectively the "Security Documents") when the obligation is required to be performed after notice and expiration of any applicable cure period; or

(c)  Commencement of foreclosure or other lien enforcement action by any senior lienholder or judgment creditor under any superior liens or judgments encumbering the Secured Real Property.

4.  Waiver of Presentment, Notice of Dishonor, and Protest.  Presentment, notice of dishonor, and protest are waived by all makers, sureties, guarantors, and endorsers of this Note.

5.  Forbearance Not a Waiver.  No delay or omission on the part of Holder in exercising any rights under this Note or under the Deed of Trust or any other security agreement given to secure this Note, on default by Maker, shall operate as a waiver of such right or of any other right under this Note or other agreements, for the same default or any other default.  Maker and any sureties, guarantors, and endorsers of this Note consent to all extensions without notice for any period or periods of time and to the acceptance of partial payments before or after maturity, and to the acceptance, release, and substitution of security, all without prejudice to Holder.  Holder shall similarly have the right to deal in any way, at any time, with one or more of the foregoing parties without notice to any other party, and to grant any such party any extensions of time for payment of any of the indebtedness, or to grant any other indulgences or forbearances whatsoever, without notice to any other party and without in any way affecting the personal liability of any such party.

6.  Successors and Assigns.  This Note and all of the covenants, promises, and agreements contained in it shall be binding on and inure to the benefit of the respective legal and personal representatives, devisees, heirs, successors, and assigns of Maker and Holder; provided, however, the Holder's interest under this Note may not be transferred or assigned separate from (i) ownership of the entire fee simple interest in and to the Property, and (ii) ownership of the entire landlord's interest in and to the Lease.

7.  Modification.  This Note may be modified or amended only by an agreement in writing signed by the party against whom the agreement is sought to be enforced.

8.  Applicable Law.  This Note will be governed by and construed in accordance with California law.

9.  Joint and Several Liability.  This Note shall be the joint and several obligation of all makers, sureties, guarantors, and endorsers, and shall be binding on them and their successors and assigns.

2

EXECUTION VERSION2

10.    <u>Usury</u>.  All agreements between Maker and Holder of this Note are expressly limited, so that in no event or contingency whatsoever, whether by reason of the advancement of the proceeds of this Note, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Holder of this Note for the use, forbearance, or detention of the money to be advanced under this Note exceed the highest lawful rate permissible under applicable usury laws.  If, under any circumstances whatsoever, fulfillment of any provision of this Note or of the Deed of Trust securing this Note, or any other agreement pertaining to, after timely performance of such provision is due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction deems applicable, then, ipso facto, the obligations to be fulfilled shall be reduced to the limit of such validity, and if, under any circumstances whatsoever, Holder shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to the reduction of the unpaid principal balance under this Note and not to the payment of interest, or, if such excessive interest exceeds the unpaid balance of principal under this Note, such excess shall be refunded to Maker.  This provision shall control every other provision of all agreements between Maker and Holder.

11.    <u>Attorneys' Fees</u>.  Maker agrees to pay the following costs, expenses, and attorneys' fees paid or incurred by Holder, or adjudged by a court:  (a) Reasonable costs of collection, costs, and expenses, and attorneys' fees paid or incurred in connection with the collection or enforcement of this Note, whether or not suit is filed; and (b) costs of suit and such sum as the court may adjudge as attorneys' fees in any action to enforce payment of this Note or any part of it.

MAKER:

FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation

By:
Name:        Aaron Kushner
Title:        Chief Executive Officer


By:
Name:        Eric Spitz
Title:        President


3

EXECUTION VERSION2

## EXHIBIT F

## PERFORMANCE HOLDBACK DEED OF TRUST

[see attached]

EXECUTION VERSION2

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

LONG FORM DEED OF TRUST AND ASSIGNMENT OF RENTS (INDIVIDUAL)

TITLE ORDER NO.          ESCROW NO.          APN NO.

This Deed of Trust, made this _19_ day of September, 2014, between FREEDOM SPV II, a Delaware limited liability company, herein called Trustor, whose address is C/O Freedom Communications, Inc., 625 N. Grand Avenue, Santa Ana, California 92701, First American Title Insurance Company, herein called Trustee, and OC MEDIA TOWER, L.P., A CALIFORNIA LIMITED PARTNERSHIP, herein called Beneficiary,

Witnesseth:   That Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE IN TRUST, WITH POWER OF SALE, that property in the County of Orange, State of California, described as:

SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY
REFERENCE

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph (10) of the provisions herein to collect and apply such rents, issues and profits.

For the Purpose of Securing:   1. Performance of each agreement of Trustor incorporated by reference or contained herein, 2.  Payment of the indebtedness evidenced by one promissory note of even date herewith, and any extension or renewal thereof, in the principal sum of $2,145,239.20 executed by Freedom Communications, Inc., a Delaware corporation, in favor of Beneficiary, and 3.  Payment of such further sums as the then record owner of said property may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

To Protect the Security of This Deed of Trust, Trustor Agrees:

    (1)    To keep said property in good condition and repair, not to remove or demolish

1

EXECUTION VERSION2

any building thereon, to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon, not to commit or permit waste thereof, not to commit, suffer or permit any act upon said property in violations of law to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2)    To provide and maintain fire insurance covering any improvements on the Property naming Beneficiary as an additional insured.    Subject to the paramount rights of any senior secured creditors, the amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3)    To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, and to pay all costs and expenses including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

(4)    To pay before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock, when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto, all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any  action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto, and in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5)    To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum

2

allowed by law at the time when said statement is demanded.

(6)    Subject to the paramount rights of any senior secured creditors, that any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(7)    That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his rights either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(8)    That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may reconvey any part of said property, consent to the making of any map or plot thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(9)    That upon written request of Beneficiary state that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder.    The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "The person or persons legally entitled thereto".

(10)    Subject to the paramount rights of any senior secured creditor, that as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice; either in person , by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees.  Upon any indebtedness secured hereby, and in such order as Beneficiary may determine.  The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such

EXECUTION VERSION2

notice.

(11)   That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof, all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

(12)   Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(13)   That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby whether or not named as Beneficiary herein in this Deed, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the

4

EXECUTION VERSION2

plural.

(14)   <u>DUE ON SALE</u>.  If Trustor sells or conveys the Property or any interest therein, or suffers his title, or any interest in the Property to be divested, whether voluntarily or involuntarily; without the written consent of Beneficiary being first had and obtained, Beneficiary, at Beneficiary's option, may without prior notice, declare all sums secured by this Deed of Trust, irrespective of their stated due dates, immediately due and payable and may exercise all rights and remedies provided in this Deed of Trust.

(15)   That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

The undersigned Trustor requests that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at his address hereinbefore set forth.

TRUSTOR:

FREEDOM SPV II, LLC,
a Delaware limited liability company

By:    FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation, its Managing Member

By: _____
Name:  Aaron Kushner
Title:   Chief Executive Officer

By: _____
Name:  Eric Spitz
Title: _____

5

STATE OF CALIFORNIA                )
                                   ) ss.
COUNTY OF _Orange_                 )

On September _8_, 2014 before me, _Nathan A. Thompson_ (Notary Public), personally appeared _Aaron Kushner_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

NATHAN A. THOMPSON
Commission # 1907429
Notary Public - California
Orange County
My Comm. Expires Oct 9, 2014

Notary Signature

My commission expires: _10/9/2014_

STATE OF CALIFORNIA                )
                                   ) ss.
COUNTY OF _Orange_                 )

On September _8_, 2014 before me, _Nathan A. Thompson_ (Notary Public), personally appeared _Eric Spitz_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

NATHAN A. THOMPSON
Commission # 1907429
Notary Public - California
Orange County
My Comm. Expires Oct 9, 2014

Notary Signature

My commission expires: _10/9/2014_

6

EXECUTION VERSION2

# EXHIBIT A
## DESCRIPTION OF PROPERTY

EXECUTION VERSION2

# EXHIBIT 5
## ENVIRONMENTAL REPORTS

1.    GaiaTech Phase 1 Environmental Assessment, April, 2012.

2.    Iris Environmental Phase 2 Environmental Assessment, March, 2014.

## EXHIBIT 6
## INSURANCE POLICIES

[see attached]

EXECUTION VERSION2

EXECUTION VERSION2

| Type | Company | Policy Period | Policy Limits | Policy Limit/ Loss Basis | Deductible | 2014 Estimated Policy Premium | Notes |
|------|---------|---------------|---------------|--------------------------|------------|------------------------------|-------|
| General Liability | Liberty Mutual Fire Insurance Company Policy #TB2-631-509650-014 | 4/1/14-15 | $2,000,000 aggregate / $1,000,000 per occurrence | Aggregate/ Per Occurrence | $0 | $60,698 | |
| Excess Liability | St. Paul Fire & Marine Insurance Company (Travelers) - Policy #ZUP-14T2980A-14-NF | 4/1/14-15 | $25,000,000 | Aggregate/Per Occurrence | $0 | $73,577 | |
| Excess Liability | Federal Insurance Company (Chubb) Policy #79836397 | 4/1/14-15 | $25,000,000 excess of $25,000,000 | Aggregate/Per Occurrence | $0 | $41,915 | |
| Storage Tank Liability | ACE American Insurance Company Policy #G24785567 001 | 4/1/14-15 | $1,000,000 | Aggregate/Per Occurrence | $5,000 | $459 | Premium includes 20% commission which is credited to 2100 Freedom |
| Property | Lexington Insurance Company Policy #01294484 | 6/1/14-15 | $345,000,000 Per Occurrence "All Risk" of Direct Physical Loss / Various Sublimits | Per Occurrence | $25,000 All Risk / Various deductibles for EQ, Flood and Windstorm. EQ is excluded in California | $267,470 plus $8,559 S/L taxes & fees | Premium includes 15% commission which is credited to 2100 Freedom |
| Premises Pollution Liability | ACE / Illinois Union Policy #PPI G2704139 001 (Aim Media Texas, LLC) | 6/21/12-22 | $10,000,000 Per Pollution Condition $10,000,000 Aggregate | Aggregate | $100,000/Per Condition $300,000/Aggregate $50,000/Maintenance | $126,485 | $6,210.41 S/L taxes & fees |
| Pollution & Remediation Legal Liability | XL / Indian Harbor Policy #PEC0038332 (Freedom Communications Holding, Inc.) | 7/25/12-22 | $20,000,000 Each Pollution Condition $20,000,000 Aggregate | Aggregate | $100,000/Per Condition $300,000/Aggregate $25,000/Each /Every Additional Condition | $183,391 | $5,960.21 S/L taxes & fees |
| Pollution & Remediation Legal Liability | XL / Indian Harbor Policy #PEC0038023 (Halifax Media Holdings LLC) | 6/27/12-22 | $25,000,000 Each Pollution Condition $50,000,000 Aggregate | Aggregate | $100,000/Per Condition $300,000/Aggregate $25,000/Each /Every Additional Condition | $297,709 | $17,394.71 S/L taxes & fees |

EXECUTION VERSION2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pollution & Remediation Legal Liability | XL / Indian Harbor Policy #PEC0037791 (Testor FCI Acquisition, LLC) | 6/1/12-22 | $20,000,000 Each Pollution Condition $20,000,000 Aggregate | Aggregate | $100,000/Per Condition $300,000/Aggregate $25,000/Each /Every Additional Condition | $153,015 | $5,508.54 S/L taxes & fees |
| Pollution & Remediation Legal Liability | XL / Indian Harbor Policy #PEC0042742 (2100 Trust, LLC) (Press-Enterprise) | 11/21/13-23 | $10,000,000 Each Pollution Condition $10,000,000 Aggregate | Aggregate | $100,000/Per Condition $300,000/Aggregate $25,000/Each /Every Additional Condition | $123,951 | $3,966.43 S/L taxes & fees |

# EXHIBIT 7
## DUE DILIGENCE MATERIALS
### *[to be revised/conformed with actual documents delivered]*

(a)    Copy of the Property survey.

(b)    Copy of any third party leases on the Property.

(c)    Copy of the Title Commitment.

(d)    Monthly utility bills, including gas and electric, or evidence of payment for utilities for the Property for the past two (2) years.

(e)    Copies of any third party contracts affecting the Property.

(f)    Copies of any as-built plans and specifications for the Property, including soil reports, and any property condition reports.

(g)    List of all threatened, pending, or ongoing claims or lawsuits and all outstanding judgments relating to the Property or the Seller.

(h)    Copies of all policies of insurance evidencing all casualty, liability, and other insurance policies presently in effect with respect to the Property.

(i)    Copies of any other reports, studies, tests, surveys, assessments or other materials pertaining to the ownership, operation or condition of the Property in Seller's possession or reasonable control.

(j)    Property tax bills for the period of time during which the Seller has owned the Real Property.

(k)    Copy of any third party operating agreements.

(l)    Copies of all Property building reports, environmental reports, structural reports, site plans, floor plans and engineering data that Seller has in its possession.

(m)    Copies of any roof reports or maintenance/patching repairs for the period of time during which the Seller has owned the Real Property.

(n)    Copies of any HVAC reports or maintenance/repairs for the period of time during which the Seller has owned the Real Property.

(o)    Copy of five (5) year certification document regarding the elevator(s), in addition to the most recent permit requested and any elevator reports or maintenance/repair/replacement reports.

(p)    Copy of the most recent certification document regarding the fire sprinkler system, in addition to any fire sprinkler reports or maintenance/repair/replacement reports.

(q)    Copies of the invoices for the past two (2) years from the current alarm monitoring company.

(r)    All advertising, marketing, collateral material and/or promotional programs being utilized with respect to the Property (including computer artwork, ad layouts, etc.) in paper format;

EXECUTION VERSION2

(s)  Copies of all construction, equipment and/or roof guaranties or warranties, in Seller's possession, custody or control;

(t)  Aging receivables report for the last three (3) months or, if less, for such period of time as applicable;

(u)  Copies of all certificates of occupancy (or their equivalent) issued by the applicable governmental authority for the Property including confirmation of zoning for the Seller's current use of the Property;

(v)  Insurance loss runs for the last year (property and liability) or, if less, for such period of time as applicable; and

(w)  Copy of all licenses and permits in the possession or control of Seller or their agent relating to Seller's ownership, use or operation of the Property.

**EXHIBIT 8**
**DEED**

[see attached]

EXECUTION VERSION2

RECORDING REQUESTED BY:

     AND

WHEN RECORDED MAIL TO:


MAIL TAX STATEMENT TO:

Same as above

_____

[Space above for Recorder's use only]

In accordance with Section 11932 of the California Rev. and Tax. Code, Grantor has declared the amount of the transfer tax which is due by a separate statement which is not being recorded with this Grant Deed.

## GRANT DEED

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, FREEDOM SPV II, LLC, a Delaware limited liability company, HEREBY GRANTS to OC MEDIA TOWER L.P., a California limited partnership, all that real property in the County of Orange, State of California, described as follows:

     SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS
     REFERENCE INCORPORATED HEREIN.

This conveyance is made subject to all liens and encumbrances of record.

     EXECUTED this _19_ day of September, 2014.

GRANTOR:

FREEDOM SPV II, LLC,
a Delaware limited liability company

By:   FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation, its Managing Member

     By: _____
     Name: Aaron Kushner, Chief Executive Officer

     By: _____
     Name: Eric Spitz,    President

[ALL SIGNATURES TO BE ACKNOWLEDGED]

EXECUTION VERSION2

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

File No: _____

APN No: _____

STATE OF **California** )SS

COUNTY OF **Orange** )

On **September 8, 2014** before me, **Nathan A. Thompson** , Notary Public, personally appeared

**Aaron Kushner & Eric Spitz** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

NATHAN A. THOMPSON
Commission # 1907429
Notary Public - California
Orange County
My Comm. Expires Oct 9, 2014

This area for official notarial seal.

---

## OPTIONAL SECTION
## CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the documents.

☐ INDIVIDUAL

☐ CORPORATE OFFICER(S)    TITLE(S)

☐ PARTNER(S)    ☐ LIMITED    ☐ GENERAL

☐ ATTORNEY-IN-FACT

☐ TRUSTEE(S)

☐ GUARDIAN/CONSERVATOR

☐ OTHER

SIGNER IS REPRESENTING:

_____    _____
**Name of Person or Entity**         Name of Person or Entity

---

## OPTIONAL SECTION

Though the data requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

TITLE OR TYPE OF DOCUMENT: _____

NUMBER OF PAGES _____    DATE OF DOCUMENT _____

SIGNER(S) OTHER THAN NAMED ABOVE _____

Reproduced by First American Title Insurance Company National Commercial Services 11/2007

**EXHIBIT A**
**LEGAL DESCRIPTION**

**EXHIBIT 9**
**FORM ASSIGNMENT OF CONTRACTS**

[see attached]

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

This Assignment and Assumption of Contracts (this "**Assignment**") is made as of September _19_, 2014, by and between **Freedom SPV II, LLC, a Delaware limited liability company** ("**Assignor**"), and **OC Media Tower, L.P., a California limited partnership** ("**Assignee**").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, sells, transfers and assigns unto Assignee all of the rights, title and interest of Assignor in, to and under the contracts listed on **Exhibit A** attached hereto (the "**Contracts**").

Assignee hereby accepts the foregoing assignment and agrees to assume any executory obligations of Assignor under the Contracts accruing from and after the date hereof.

Assignee hereby accepts the foregoing assignment and agrees to assume, pay, perform and discharge, as and when due, all of the agreements and obligations of Assignor under the Contracts accruing from and after the date hereof and agrees to be bound by all of the terms and conditions of the Contracts.

Assignor hereby covenants that it will, at any time and from time to time upon written request therefor, at Assignee's sole expense and without the assumption of any additional liability therefor, execute and deliver to Assignee, and its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to fully evidence the assignment contained herein and to enable Assignee, and its successors and assigns, to fully realize and enjoy the rights and interests assigned hereby.

Assignor shall indemnify defend and hold Assignee harmless from and against any and all claims, costs, demands, losses, damages, liabilities, lawsuits, actions and other proceedings in law or in equity or otherwise, judgments, awards and expenses of very kind and nature whatsoever, including without limitation, attorneys' fees, in connection with matters accruing under the Contracts prior to the date hereof.

Assignee shall indemnify defend and hold Assignor harmless from and against any and all claims, costs, demands, losses, damages, liabilities, lawsuits, actions and other proceedings in law or in equity or otherwise, judgments, awards and expenses of very kind and nature whatsoever, including without limitation, attorneys' fees, in connection with matters accruing under the Contracts on and after the date hereof.

The provisions of this Assignment shall be binding upon, and shall inure to the benefit of, the successors and assigns of Assignor and Assignee, respectively. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the date first above written.

ASSIGNOR:

FREEDOM SPV II, LLC,
a Delaware limited liability company

By:   FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation, its Managing Member

    By:
    Name:    Aaron Kushner
    Title:    Chief Executive Officer

By:   FREEDOM COMMUNICATIONS, INC.,
a Delaware corporation, its Managing Member

    By:
    Name:    Eric Spitz
    Title:    President

PURCHASER:

OC MEDIA TOWER L.P.,
a California limited partnership

By:  Southwest Property Investments, Inc.,
a California corporation, its General Partner

    By:
    Name:    Michael F. Harrah
    Title:    President

EXHIBIT "A"
TO
ASSIGNMENT OF CONTRACTS

CONTRACTS

| VENDOR NAME |
| --- |
| Simplex Grinnell |
| Mr. Clean Up |
| Schindler Elevator Corp |
| Linc Mechanical Services |
| UPS Security |
| California Dining Services |
| KDOC |
| Tom's Trucking (dirt lot lease) |
| KKPC / Southern CA. Public Radio |
| Unison (for roof cell site) |

**EXHIBIT 10**
**SNDA**

[see attached]

RECORDING REQUESTED BY

AND WHEN RECORDED RETURN TO:

PLAZA DEL SOL REAL ESTATE TRUST
3545 Aero Court
San Diego, CA 92123
Attn: _____

Assessor's Parcel No.: _____

SUBORDINATION, NONDISTURBANCE

AND ATTORNMENT AGREEMENT

NOTICE:     THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT
AGREEMENT RESULTS IN THE LEASEHOLD ESTATE IN THE
PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY
THAN THE LIEN OF SOME OTHER OR LATER SECURITY
INSTRUMENT.

THIS   SUBORDINATION,   NONDISTURBANCE   AND   ATTORNMENT
AGREEMENT ("Agreement") made to be effective as of the _19_ day of September 2014, by
and among PLAZA DEL SOL REAL ESTATE TRUST UNDER DECLARATION OF TRUST DATED
FEBRUARY 9, 1996, AS AMENDED ("Lender"), OC MEDIA TOWER LP, a California limited
partnership ("Landlord"), and FREEDOM COMMUNICATIONS INC., a Delaware corporation
("Tenant");

W I T N E S S E T H

WHEREAS, Lender is or will be the owner and holder of a Deed of Trust, Assignment of
Rents, Security Agreement and Fixture Filing dated as of September 19, 2014 (the "Deed of
Trust"), covering the real property described in **EXHIBIT "A"**, attached hereto and made a part
hereof for all purposes, and the buildings and improvements thereon, provided in the Lease (as
hereinafter defined) (hereinafter collectively called the "Property"), which Deed of Trust shall be
recorded in the Official Records of Orange County, California, securing the payment of a loan
(the "Loan") made by Lender to Borrower pursuant to that certain Promissory Note by Borrower
in favor of Lender dated as of September 19, 2014 ("Note") (with the Note, Deed of Trust, and
the other documents executed by Borrower in connection with the Loan being hereinafter
sometimes referred to individually and collectively as "Loan Documents"); and

WHEREAS, Tenant is, or will be, the holder of a leasehold estate pursuant to a lease
(hereinafter called the "Lease") covering the Property ("Premises"); and

WHEREAS, Borrower (with such party and its successors and assigns occupying the position of landlord under the Lease being referred to collectively hereinafter as "Landlord") has assigned its rights as landlord under the Lease to Lender to facilitate repayment of the Loan and performance of its obligations under the Deed of Trust; and

WHEREAS, Tenant and Lender desire to confirm their understanding with respect to the Lease and the Deed of Trust;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Lender and Tenant hereby agree and covenant as follows:

1.    SUBORDINATION.  The Lease is hereby made, and shall at all times continue to be, subject and subordinate in each and every respect, to the lien of the Deed of Trust and to any and all liens, interests and rights created thereby and to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust or the indebtedness or other obligations secured thereby.

2.    NONDISTURBANCE.  So long as Tenant is not in default (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, (a) Tenant's possession of the Premises and Tenant's rights and privileges under the Lease, or any extensions or renewals thereof, shall not be diminished or interfered with by Lender in the exercise of any of its rights under the Loan Documents or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights, (b) Tenant's occupancy of the Premises shall not be disturbed by Lender in the exercise of any of its rights under the Loan Documents during the term of the Lease or any extensions or renewals thereof or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights, and (c) Lender will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest and estate under the Lease because of any default under the Deed of Trust or any other instrument evidencing or securing the Loan.

3.    ATTORNMENT.  If any proceedings are brought for the foreclosure of the Deed of Trust, or if the Property is sold pursuant to a trustee's sale under the Deed of Trust, or if Lender becomes owner of the Property by acceptance of a deed or assignment in lieu of foreclosure or otherwise, Tenant shall attorn to the Lender or purchaser, as the case may be, upon any such foreclosure sale or trustee's sale, or acceptance by Lender of a deed or assignment in lieu of foreclosure, and Tenant shall recognize Lender or such purchaser, as the case may be, as the landlord under the Lease.  Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto.  Tenant agrees, however, to execute and deliver at any time, and from time to time, within ten (10) business days after the request of Landlord, any holder(s) of any of the indebtedness or other obligations secured by the Deed of Trust, or any such purchaser, all instruments or certificates which may be reasonably necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment.  In the event of any such attornment, Tenant further waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligation of Tenant thereunder as a result of any such foreclosure proceeding or trustee's sale.

EXECUTION VERSION2

4.    LENDER'S RIGHTS, REMEDIES AND LIABILITY AS A LANDLORD OR LENDER IN POSSESSION.  If Lender shall succeed to the interest of Landlord under the Lease in any manner, or if any purchaser acquires the Property upon any foreclosure of the Deed of Trust or any trustee's sale under the Deed of Trust, Lender or such purchaser, as the case may be, shall have the same remedies by entry, action or otherwise in the event of any default by Tenant (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants and conditions of the Lease on Tenant's part to be performed that Landlord had or would have had if Lender or such purchaser had not succeeded to the interest of Landlord.  Thereafter, Lender or such purchaser shall be bound to Tenant under all the terms, covenants, and conditions of the Lease, and Tenant shall, from and after the succession to the interest of Landlord under the Lease by Lender or such purchaser, have the same remedies against Lender or such purchaser for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against Landlord if Lender or such purchaser had not succeeded to the interest of Landlord, and Tenant shall be bound to Lender or such purchaser under all of the terms, covenants and conditions of the Lease. However, Lender or such purchaser shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), except for defaults of a continuing nature, in which case Lender shall have notice and cure rights set forth in Paragraph 6 below, calculated from the date Lender receives said notice of default. In no event shall Lender or such purchaser have any liability for damages, whether direct, indirect, foreseeable, consequential, exemplary or otherwise, as a result of any act or omission of any prior landlord (including Landlord), except to the extent such damages occurred as a result of any act or omission on the part of Lender or such other purchaser during such time as Lender or such purchaser succeeds to the interest of the prior landlord under the Lease; or

(b)    subject to offsets or defenses which Tenant might have against any prior landlord (including Landlord), except for those based on defaults of a continuing nature, so long as Tenant shall have provided Lender with notice of the Landlord's default that gave rise to such offset or defense and the opportunity to cure same, all on accordance with Paragraph 6 below, after Lender or such purchaser has acquired ownership of the Premises under the Lease; or

(c)    bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord), unless the same was paid to and received by Lender; or

(d)    bound by any representation or warranty contained in the Lease or made by any party to Tenant, including, but not limited to, Landlord, except as to a breach of a representation or warranty which is of a continuing nature of which written notice from Tenant has been delivered pursuant to Paragraph 6, below and subject to Paragraph 4(a) above; or

(e)    bound by any amendment or modification of the Lease made without Lender's consent.

Neither Lender (or such purchaser) nor any other party who from time to time shall be included in the definition of Lender hereunder, shall have any prospective liability or responsibility under or pursuant to the terms of this Agreement or the Lease from the date it ceases to own an interest in or to the Property.  Tenant further acknowledges and agrees that neither Lender nor any